1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
7                   SOUTHERN DISTRICT OF CALIFORNIA
8
9    JOHN CESARIO,                          Case No.:  23-cv-1803-WQH-BLM
10                              Plaintiff,   **ORDER**
11   v.
12   BIOCEPT, INC.; CBIZ INC.;
     MICHAEL W. NALL; MAYER
13   HOFFMAN MCCANN, INC.;
     BRUCE E. GERHARDT;
14   COOLEY LLP; BRUCE A.
     HUEBNER; JASON
15   MCCARTHY; MARSHA A.
16   CHANDLER;
     LIPPERT/HEILSHORN &
17   ASSOCIATES, INC.; JODY
18   CAIN; CHARLES BAIR;
     TIMOTHY C. KENNEDY;
19   LYLE ARNOLD; MAXIM
20   GROUP LLC; MICHAEL W.
     BROWN; AEGEA
21   BIOTECHNOLOGIES INC.;
22   CBIZ MHM LLC; STEPHAN
     FANUCCI; IVOR ROYSTON;
23   DAVID HALE; MICHAEL
24   RABINOWITZ; PAUL
     LAROSA; TIPTON EVANS; and
25   ANDREW ROSEN,
26
27                              Defendants.
28

1

HAYES, Judge:

The matters before the Court are the (1) Motion to Dismiss Second Amended Complaint filed by Defendant Mayer Hoffman McCann, P.C. ("Mayer Hoffman") (ECF No. 91); (2) Motion to Dismiss Second Amended Complaint filed by Defendants CBIZ, Inc. and CBIZ MHM, LLC (collectively, the "CBIZ Defendants") (ECF No. 92); (3) Motion to Dismiss Plaintiff's Second Amended Complaint filed by Defendant Lippert/Heilshorn & Associates, Inc. ("LHAI") (ECF No. 93); (4) Motion to Dismiss Second Amended Complaint filed by Defendants Maxim Group LLC ("Maxim"), Jason McCarthy ("McCarthy"), Michael Rabinowitz ("Rabinowitz"), Paul LaRosa ("LaRosa"), Andrew Rosen ("Rosen"), and Tipton Evans ("Evans") (collectively, the "Maxim Defendants") (ECF No. 94); (5) Motion to Dismiss the Second Amended Complaint filed by Defendants Bruce E. Gerhardt ("Gerhardt") and Bruce A. Huebner ("Huebner") (ECF No. 95); (6) Motion to Dismiss Second Amended Complaint filed by Defendants Cooley LLP ("Cooley") and Charles Bair ("Bair") (collectively, the "Cooley Defendants") (ECF No. 98); (7) Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) filed by Defendants Michael W. Nall ("Nall") and Timothy C. Kennedy ("Kennedy") (ECF No. 100); (8) Motion to Dismiss Second Amended Complaint filed by Defendant Aegea Biotechnologies, Inc. ("Aegea") (ECF No. 120); (9) Objection to Aegea's Motion to Dismiss filed by Plaintiff John Cesario ("Plaintiff") (ECF No. 133); (10) Motion to Strike Plaintiff's Supplemental Opposition filed by Defendants Gerhardt and Huebner (ECF No. 150); (11) Motion for a Show Cause Hearing for Rule 11 Violations ("Rule 11 Motion") filed by Plaintiff (ECF No. 83); (12) Motion to Supplement the Second Amended Complaint filed by Plaintiff (ECF No. 123); and (13) Motion to Amend Complaint ("Motion to Amend") filed by Plaintiff (ECF No. 152).

## I.    PROCEDURAL BACKGROUND

On September 29, 2023, Plaintiff, proceeding pro se, initiated this action by filing a Complaint. (ECF No. 1.) On October 20, 2023, Plaintiff filed a First Amended Complaint ("FAC"). (ECF No. 4.) Several defendants subsequently filed motions to dismiss the FAC.

(ECF Nos. 8, 9 & 20.) On January 24, 2024, two days after the motions to dismiss the FAC were fully briefed, Plaintiff filed a Motion to File a Second Amended Complaint. (ECF No. 52.) On April 2, 2024, the Court granted Plaintiff's Motion to File a Second Amended Complaint and denied the then-pending motions to dismiss the FAC as moot. (ECF No. 82.)

On April 10, 2024, Plaintiff filed the Second Amended Complaint ("SAC"), the operative pleading, against Defendants Biocept Inc. ("Biocept");[1] CBIZ, Inc.; Nall; Mayer Hoffman;[2] Gerhardt; Cooley; Huebner; McCarthy; Marsha A. Chandler ("Chandler"); LHAI; Jody Cain ("Cain"); Bair; Kennedy; Lyle Arnold ("Arnold"); Maxim; Mike Brown ("Brown"); Aegea; CBIZ MHM LLC;[3] Stephan Fanucchi ("Fanucchi"); Ivor Royston

---

[1] Biocept is currently undergoing Chapter 7 bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). *See Tiedemann v. von Blanckensee*, 72 F.4th 1001, 1007 (9th Cir. 2023) (recognizing that courts may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue" (quoting *Kipp v. Davis*, 971 F.3d 939, 945 n.2 (9th Cir. 2020))). The Bankruptcy Court's docket reflects that an automatic stay is in effect as to litigation against Biocept. *See In re Biocept, Inc.*, No. 1:23-bk-11731, ECF No. 3 at 1 (Bankr. D. Del. Oct. 16, 2023); *see also* 11 U.S.C. § 362(a)(1) (providing that an automatic stay operates as to "the commencement or continuation, including the issuance or employment of process, of a judicial … proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy] proceeding …"). The present action was commenced on September 29, 2023, before the commencement of Biocept's bankruptcy proceedings on October 13, 2023. *See In re Biocept, Inc.*, No. 1:23-bk-11731, ECF No. 1 (Bankr. D. Del. Oct. 13, 2023). Accordingly, pursuant to 11 U.S.C. § 362(a)(1), the present action is currently stayed as to Biocept only. *See In re Silver State Broad., LLC*, BAP No. NV-23-1111-NFB, 2024 WL 583088, at *4 (B.A.P. 9th Cir. Feb. 13, 2024) ("Nothing in the express language of § 362(a) extends the automatic stay to non-debtors. The automatic stay protects only the debtor, the debtor's property, and the property of the debtor's bankruptcy estate. It does not protect the debtor's owners, affiliates, or co-obligees." (internal citation omitted)).

[2] On August 26, 2024, Mayer Hoffman filed a Notice of Name Change, informing the Court and parties that it "has changed its name to CBIZ CPAs P.C." (ECF No. 160 at 2.) Given that the parties' briefing on the pending motions references this entity by its former name, the Court will also refer to this entity as "Mayer Hoffman" for purposes of this Order.

[3] On August 26, 2024, CBIZ MHM, LLC filed a Notice of Name Change, informing the Court and parties that it "has changed its name to CBIZ ADVISORS, LLC." (ECF No. 161 at 2.) Given that the parties' briefing on the pending motions references this entity as "CBIZ MHM, LLC," the Court will also refer to this entity as "CBIZ MHM, LLC" for purposes of this Order.

("Royston"); David Hale ("Hale"); Rabinowitz; LaRosa; Evans; Rosen; Andy Burczyk ("Burczyk"); and Bill Mann ("Mann").[4] (ECF No. 84, SAC.)

### A. Motions to Dismiss the SAC

On May 1, 2024, Mayer Hoffman; the CBIZ Defendants; LHAI; the Maxim Defendants; Gerhardt and Huebner; the Cooley Defendants; and Nall and Kennedy filed their respective Motions to Dismiss the SAC. (ECF Nos. 91, 92, 93, 94, 95, 98 & 100.) On May 28, 2024, Aegea filed its Motion to Dismiss the SAC. (ECF No. 120.)[5]

On May 13, 2024, Plaintiff filed his Responses in Opposition to the Motions to Dismiss filed by Mayer Hoffman; the CBIZ Defendants; LHAI; the Maxim Defendants; Gerhardt and Huebner; the Cooley Defendants; and Nall and Kennedy. (ECF Nos. 105, 106, 107, 108, 109[6] & 116[7].) On June 5, 2024, Plaintiff filed his Response in Opposition to Aegea's Motion to Dismiss (ECF No. 132), as well as a separate Objection to the timeliness of Aegea's Motion to Dismiss (ECF No. 133).

On May 24, 2024, the Maxim Defendants filed their Reply in support of their Motion to Dismiss. (ECF No. 119.) On May 30, 2024, LHAI filed its Reply in support of its Motion

---

[4] Although neither Burczyk nor Mann are named in caption of the SAC (SAC at 1), both are listed in the "Parties" section of the SAC, *id.* at 17. "[T]he case 'caption of an action is only the handle to identify it and ordinarily the determination of whether or not a defendant is properly in the case hinges upon the allegations in the body of the complaint and not upon his inclusion in the caption.'" *Munoz v. U.S.*, No. 10cv1003-MMA (NLS), 2011 WL 5036003, at *2 (S.D. Cal. Oct. 24, 2011) (quoting *Hoffman v. Halden*, 268 F.2d 230, 303–04 (9th Cir. 1959), *overruled on other grounds by Cohen v. Norris*, 300 F.2d 24 (9th Cir. 1962)). The Court accordingly assumes that Plaintiff intended to include Burczyk and Mann as defendants in this action. However, the docket reflects that several defendants, including Burczyk and Mann, as well as Chandler, Cain, Arnold, Brown, Fanucchi, Royston, and Hale, have not been served and have not made an appearance in this action.

[5] Mayer Hoffman; the CBIZ Defendants; LHAI; the Maxim Defendants; Gerhardt and Huebner; the Cooley Defendants; Nall and Kennedy; and Aegea are collectively referred to as the "Moving Defendants."

[6] Plaintiff filed a single Response in Opposition addressing Gerhardt and Huebner's Motion to Dismiss (ECF No. 95) and Nall and Kennedy's Motion to Dismiss (ECF No. 100) together.

[7] Plaintiff's Response in Opposition to LHAI's Motion to Dismiss was also docketed as ECF No. 110-1.

to Dismiss. (ECF No. 124.) On June 3, 2024, Mayer Hoffman; the CBIZ Defendants; and the Cooley Defendants filed their respective Replies in support of their Motions to Dismiss. (ECF Nos. 125, 126 & 127.) On June 10, 2024, Gerhardt and Huebner and Nall and Kennedy filed their respective Replies in support of their Motions to Dismiss. (ECF Nos. 134 & 135.) On June 27, 2024, Aegea filed its Reply in support of its Motion to Dismiss. (ECF No. 149.)

On June 5, 2024, Plaintiff filed supplemental opposition briefs, which he termed "Plaintiff's Final Response[s]" to the respective Motions to Dismiss filed by Mayer Hoffman; the CBIZ Defendants; and the Maxim Defendants. (ECF Nos. 130 & 131.) On June 10, 2024, Plaintiff filed his "Final Response" to the Motion to Dismiss filed by LHAI. (ECF No. 136.) On June 17, 2024, Plaintiff filed his "Final Response[s]" to the Motions to Dismiss filed by Nall and Kennedy; Gerhardt and Huebner; and the Cooley Defendants. (ECF Nos. 139 & 142.)

On June 28, 2024, Gerhardt and Huebner filed a Motion to Strike Plaintiff's Supplemental Opposition (ECF No. 150), which Nall and Kennedy joined (*see* ECF No. 151).

**B.      Plaintiff's Motion to Supplement the SAC**

On May 28, 2024, Plaintiff filed a Motion to Supplement the Second Amended Complaint ("Motion to Supplement") pursuant to Federal Rule of Civil Procedure 15(d). (ECF No. 123.)

On June 18, 2024, Aegea; Mayer Hoffman; Gerhardt and Huebner; and LHAI each filed Responses in Opposition to the Motion to Supplement. (ECF Nos. 137, 138, 143 & 144.) On the same day, Nall and Kennedy filed a Notice of Joinder in Gerhardt and Huebner's Response (ECF No. 145), and the Cooley Defendants and Maxim Defendants filed Notices of Joinder in all of the Responses in Opposition to the Motion to Supplement (ECF Nos. 146 & 147).

/ / /

/ / /

### C.    Plaintiff's Motion to Amend the SAC

On July 9, 2024, Plaintiff filed a Motion to Amend (ECF No. 152), accompanied by a proposed Third Amended Complaint ("proposed TAC") (ECF No. 152-2).

On August 8, 2024, Gerhardt and Huebner filed a Response in Opposition to the Motion to Amend Complaint (ECF No. 154), which Nall and Kennedy; the CBIZ Defendants; and Mayer Hoffman joined (ECF Nos. 155 & 157). On the same day, Aegea filed a Response in Opposition to the Motion to Amend Complaint. (ECF No. 156.) The Cooley Defendants filed a Notice of Joinder in both Gerhardt and Huebner's Response and Aegea's Response. (*See* ECF No. 158.)

On August 14, 2024, Plaintiff filed a "global" Reply brief in support of his motion to Amend Complaint. (ECF No. 162.)[8]

### D.    Plaintiff's Rule 11 Motion

On April 10, 2024, the same day he filed the SAC, Plaintiff also filed the Rule 11 Motion (ECF No. 83), in which he requests that the Court impose sanctions against CBIZ Inc.; Mayer Hoffman; CBIZ President and CEO Jerome Grisco ("Grisco"); Mann; MHM CEO Andrew Gragnani ("Gragnani"); Attorney Nicole Cemo ("Cemo"); and Attorney Phillip Eskenazi ("Eskenazi") pursuant to Federal Rule of Civil Procedure 11(b) for purportedly "attempt[ing] [to] mislead the court with statements that they know are false."[9] (ECF No. 83 at 4.)

On May 13, 2024, Mayer Hoffman and CBIZ, Inc. filed a Response in Opposition to the Rule 11 Motion. (ECF No. 102.) On May 24, 2024, Plaintiff filed a Reply. (ECF No. 122.)

## II.    ALLEGATIONS IN THE SECOND AMENDED COMPLAINT

The present action arises from a "Covid-19 penny stock scam." (SAC ¶ 1.)

---

[8] Plaintiff's attachments to his Reply brief were docketed as ECF Nos. 159-1–159-5.

[9] Neither Grisco nor Gragnani are parties to this action or attorneys that signed pleadings in this action.

### A.    The Parties

#### 1.    Biocept and Its Officers

Biocept is "a publicly traded corporation that traded on the NASDAQ Exchange." *Id.* at 10. As "a molecular oncology diagnostics corporation," *id.* "Biocept develops and sells lab assays that can find rare tumor cells and tumor DNA in blood and cerebrospinal fluid." *Id.* ¶ 27.

Nall was Biocept's CEO and on Biocept Board of Directors "from 2013 until his forced resignation on February 15, 2022." *Id.* at 12. Kennedy was Biocept's CFO, SVP, and COO "until his forced resignation on February 15th, 2022." *Id.* Gerhardt and Huebner were both trained CPAs, members of Biocept's Board of Directors, and members of Biocept's audit committee. *Id.* at 14–15. Unserved defendant Arnold was Biocept's Chief Science Officer and Senior Vice President, as well as the founder of Aegea, another "biotechnology corporation" with which Biocept co-owned at least one patent and later entered a separate co-development agreement. *Id.* at 13.

#### 2.    Mayer Hoffman, CBIZ, Inc., and CBIZ MHM LLC

Mayer Hoffman "served as Biocept's accountant and auditor from its initial public stock offering in 2005 through April 2022." *Id.* at 12.

Mayer Hoffman and CBIZ, Inc. are "connected … through an alternative practice structure." *Id.* at 11. CBIZ, Inc. is the "'parent' of other Defendants" and "states in [its] annual reports that [it] employ[s] the Partners of [Mayer Hoffman] who conduct and sign off on audits." *Id.* CBIZ, Inc. also "establish[es] the guidelines for [its] auditors and guarantee[s] compliance with [Securities and Exchange Commission ('SEC')] Independence regulations by means of thorough training and supervision." *Id.*

CBIZ MHM LLC is "the entity where CBIZ and the CBIZ employees who are [Mayer Hoffman] Partners conduct accounting business in the United States. CBIZ uses CBIZ MHM LLC as a pass-through entity that forwards most of its billable revenue to CBIZ." *Id.* at 17.

/ / /

### 3.    The Maxim Defendants

Maxim "acted as Biocept's banker and sole bookrunner from 2018 until April 20, 2020." *Id.* at 16. McCarthy is a senior equity analyst at Maxim, whose responsibilities include "producing investment reports with price targets for Biocept." *Id.* at 17. Rabinowitz is the Chairman and CEO of Maxim. *Id.* LaRosa and Rosen are the Co-Heads of Capital Markets at Maxim. *Id.* Evans is the Head of Compliance at Maxim. *Id.*

### 4.    The Cooley Defendants

Bair is an attorney who "handled all the SEC matters on behalf of Biocept" and "assisted Biocept in all matters of Biocept's business." *Id.* at 15. Bair is a partner at Cooley. *Id.* at 16.

### 5.    LHAI and Cain

LHAI was "Biocept's outside licensed [Investor Relations] firm." *Id.* "Even though [LHAI] was an outside investor relations firm hired by Biocept, they are privileged to inside information company directives, and plans as if they were an employee." *Id.*

Unserved defendant Cain was a senior vice president at LHAI and "Biocept's outside licensed [Investor Relations] representative." *Id.* at 15.

### 6.    Aegea

Aegea is "a biotechnology corporation" that made certain agreements with Biocept. *Id.* at 12.

### 7.    Plaintiff

"[Plaintiff] was an investor who purchased Biocept shares between April 2020 and August 2020." *Id.* at 10.

## B.    The Alleged Fraud

### 1.    Biocept and Aegea's Agreement to Co-Develop a COVID-19 Test

On April 9, 2020, "Biocept posted that [it was] beginning to do COVID-19 testing, along with prices on [its] website." *Id.* at 33.

On June 3, 2020, Biocept and Aegea signed an agreement to co-develop a "novel revolutionary COVID-19 test" (the "Agreement"). *Id.* ¶ 48. The Agreement "was material

8

and should have been disclosed to the investing public" because "developing a COVID-19 test was outside of Biocept's normal oncology testing business, (ii) Covid-19 dominated the news cycle, (iii) Biocept and the other defendants knew that announcing of [sic] a COVID-19 test would spike Biocept's stock price and trading volume." *Id.* ¶¶ 48–49. However, "Biocept's management team and Board of Directors intentionally concealed" the announcement of the Agreement "in order to prevent Biocept's stock price from exceeding $1.00 for ten straight days thereby curing the NASDAQ deficiency." *Id.* ¶ 48.

"CBIZ, MHM, and CBIZ MHM LLC, Cooley, Bair, Aegea and Cain knew that Biocept entered into this agreement and knew that the agreement was material to the investing public." *Id.* ¶ 49. "Furthermore, … they all had a duty to disclose that Biocept was committing fraud and violating security laws by suppressing the news." *Id.*

On August 6, 2020, "Biocept released an unlawful and delinquent press release," titled: "Biocept Announces Agreement with Aegea Biotechnologies to Develop New, Highly Sensitive PCR-based COVID-19 Assay Utilizing Patented Switch-Blocker PCR Technology." *Id.* ¶ 56. The purpose of this press release "was to manipulate Biocept's stock price and trading volume." *Id.* "Furthermore, the press release misled readers by not including important information like the date and details of the First Right of Refusal." *Id.* "Biocept violated security laws when it failed to file a Form 8-K." *Id.* "Biocept also failed to attach the Development Agreement as an exhibit in SEC disclosures as required by laws," because "Biocept intentionally wanted to conceal the terms of the June 3rd Agreement." *Id.* "Biocept's senior management and board of directors have sole responsibility for the content of SEC disclosures and press releases." *Id.* ¶ 58. "However, at all times defendants Bair, MHM-CBIZ, Cooley, Aegea, and Cain assisted Biocept in committing security violations and fraud." *Id.*

In quarterly reports filed on August 13, 2020, and November 12, 2020, Biocept "fraudulently included misrepresentations in the sections concerning COVID-19 and Related Parties." *Id.* ¶¶ 65, 72. Specifically, the reports stated: "On June 3, 2020, the Company announced entering into a development agreement with Aegea focused on the

co-development by Biocept and Aegea of a highly sensitive PCR-based assay designed by Aegea for detecting the COVID-19 virus." *Id.* ¶ 65. "Biocept was attempting to cover up its fraud and CBIZ, MHM, and CBIZ MHM LLC, Cooley and Cooley attorney Bair were aiding and abetting it." *Id.* "Nall and Kennedy knew they were signing a report to cover up fraud and securities violations." *Id.* ¶ 72.

On January 12, 2021, Biocept stated in a shareholder letter: "We are now in the process of completing the final validation and testing phase of the COVID-19 assay development project with Aegea Biotechnologies and we expect the assay to be ready for deployment in clinical testing laboratories in the first quarter of 2021." *Id.* ¶ 79. "Nall knew this was not true." *Id.*

On November 15, 2021, "the [U.S. Food and Drug Administration ('FDA')] issued new guidance on issuing [emergency use authorizations] for COVID-19 tests … stating that [it would] no longer issue [emergency use authorizations] for regular PCR tests." *Id.* ¶ 91. In an earnings call that same day, Nall stated: "[W]e expect to begin commercialization of the assay co-developed with [Aegea] by the end of the year." *Id.* ¶ 92. "Nall, the Biocept executives and Biocept's Board of Directors knew this statement was false." *Id.*

On April 4, 2022, Biocept filed its 2021 annual report, which "removed any mention of the COVID-19 test from the Overview and Management's Discussion and Analysis of Financial Condition and Results of Operation." *Id.* ¶ 96. The report only referenced the COVID-19 test in the "Related Party transactions" section. *Id.*

"Biocept never had any intention of bringing the Aegea – Biocept COVID-19 test to market, the only purposes that the test served was press release fodder to pump Biocept's stock price higher." *Id.* at 62.

"CBIZ MHM & CBIZ MHM LLC, Cooley, Bair, LHA, Cain and Fanucchi knew or should have known that the purported assay to develop a novel COVID-19 test was a fraud." *Id.* at 82. "CBIZ, MHM, and CBIZ MHM LLC [were] supposed to make sure that Biocept's filings were accurate, but instead they participated in breaking security laws and

deceiving Biocept shareholders." *Id.* ¶ 105. "Cooley and Bair assisted in drafting the June 3rd agreement and knew it was memorialized on June 3rd." *Id.* ¶ 22. "Cooley and Bair reviewed and approved every press release, and suggested edits," and "reviewed every proxy, prospectus, and quarterly and annual report." *Id.* "Cain reviewed and suggested edits to every press release issued by Biocept." *Id.* ¶ 23.

### 2.    Biocept's Reverse Stock Split

"As of December 31, 2019, Biocept had an operating deficit of $245,000,000." *Id.* ¶ 29. "Biocept funded these massive losses by constantly selling shares to the public." *Id.*

On April 20, 2020, "Biocept filed a preliminary Proxy with the SEC," which included a proposal "to gain approval for Biocept's third reverse [stock] split within a span of just four years." *Id.* ¶ 40. "The vote was to be counted" at Biocept's annual meeting on June 5, 2020. *Id.* "The stated reason Biocept cited for the reverse split was to bring it into compliance with a deficiency notice that Biocept received from NASDAQ, which cited Biocept as being out of compliance with the $1.00 minimum bid requirement." *Id.* ¶ 2. "However Biocept took all possible measures to prevent its stock price from naturally trading at or above $1.00 for ten consecutive days, which would have resolved the issue." *Id.* "Biocept did not have shares to sell to support its massive operating losses." *Id.* ¶ 43. "Obtaining more shares to sell to the public to fund operations was Biocept's primary, and intentionally suppressed reason for [the reverse split proposal]." *Id.* "Biocept concealed this material disclosure on the proxy." *Id.* The reverse split proposal "became the linchpin for Biocept's fraudulent acts and SEC disclosure violations." *Id.* ¶ 2.

On June 5, 2020, "Biocept's proposal to reverse split the common stock was voted down at the annual meeting." *Id.* ¶ 51. "However, shareholders were not aware that ALL 46,201,989 million Broker Non-Votes were counted as being against the reverse split proposal." *Id.*

On July 1, 2020, "Biocept's shareholders again voted down the reverse split proposal." *Id.* ¶ 52. "Once again, shareholders were not aware that ALL 46,201,989 million Broker Non-Votes were counted as being against the reverse split proposal." *Id.*

On July 16, 2020, "Biocept issued a false and misleading press release titled: 'Leading Independent Proxy Advisory Firms ISS and Glass Lewis Both Support Biocept Proposal to Authorize the Reverse Split of Common Shares.'" *Id.* This press release contained a statement that was "a half-truth at best" that:

> The reverse stock split proposal is intended to increase the per-share trading price of Biocept's common stock to satisfy the $1.00 minimum closing bid price requirement for continued listing on Nasdaq. Biocept's board believes that maintaining Biocept's Nasdaq listing may provide a broader market for Biocept's common stock than if Biocept's common stock were delisted from Nasdaq, and could help in generating interest in Biocept among investors.

*Id.* "Biocept knew that ISS and Glass Lewis were unaware that [Biocept] had hidden important news illegally"—specifically, "the June 3rd Agreement" with Aegea to develop a COVID-19 test. *Id.* ¶ 53. The news of the Agreement, "if disclosed, would have rectified the NASDAQ deficiency." *Id.* The news of the Agreement was hidden "because it could have disrupted Biocept's main objective of getting the reverse split proposal approved." *Id.* "Biocept was forced to carry out a reverse split of its common shares to address operational deficits, as there were not enough shares available for public sale in the treasury." *Id.*

On July 31, 2020, Biocept shareholders again voted against the reverse split proposal. *Id.* ¶ 54.

On August 6, 2020, Biocept issued the press release announcing the Agreement with Aegea. *Id.* ¶ 56. "Biocept strategically chose August 6th as the opportune day to release [its] unlawful and delinquent press release" because "the strategic date of August 6th prevented Biocept's shares from closing above $1.00 for 10 straight days." *Id.* ¶ 59. Biocept made sure that only 9 trading days existed between August 6th and August 18th." *Id.*

On August 18, 2020, Biocept obtained shareholder approval of the reverse split "through fraud" and "as a result of 100% of the Broker Non-Votes changing their votes as a result of the pump and dump." *Id.* ¶¶ 2, 61. "Maxim had control of [Biocept's] 46,201,989

broker non-votes." *Id.* ¶ 62. "Between August 6, 2020 and August 18, 2020, after taking advantage and profiting from the Biocept's stock price surging on August 6 press release, 100% of the Broker Non-Votes reversed and voted for the reverse split proposal." *Id.* ¶ 61.

"[T]he 2020 reverse split was carried out unlawfully to manipulate the stock price, resulting in harm to [Plaintiff]." *Id.* ¶ 45. "In fact, it was the nexus of a pump and dump scheme." *Id.*

### 3.    Biocept's Quid-Pro-Quo Pump-and-Dump Scheme

"The August 6 press release" announcing Biocept's Agreement with Aegea "was the kick-off of the illegal pump and dump scheme." *Id.* ¶ 56.

"Maxim or Maxim's clients bought shares of Biocept's stock prior to August 6th in an attempt to profit from the August 6th unlawful press release." *Id.* ¶ 19. "After the market closed on August 5th, Maxim released an absurd $2.00 buy recommendation to draw attention to the stock." *Id.* Specifically, "on the night of August 5th, after Biocept's trading volume surged 35 fold, and just hours before the unlawful August 6, 2020 press release was issued, McCarthy issued a buy signal on Biocept with a 200% increase in Biocept's stock price." *Id.* ¶ 62. "McCarthy apparently knew a material press release was forthcoming and knew that Maxim controlled the 46 million broker non-votes." *Id.* ¶ 20.

"Maxim and/or Maxim's clients sold the Biocept stock they owned after its price nearly doubled on August 6th," following "the unlawful and delinquent" press release." *Id.* ¶ 19. "Maxim and/or Maxim's clients … then engaged in short selling Biocept's stock to manipulate the stock price." *Id.* "Maxim was aware that Biocept was planning to implement a reverse stock split, which would significantly impact the stock price due to their voting control." *Id.* "Maxim's client Sabby, inexplicably raised its stake in Biocept from 500,000 shares to 9 million shares during the outset of the COVID-19 pandemic." *Id.* ¶ 63. "Shortly after the August 6, 2020, announcement, Sabby dumped all but 193,000 shares according to 13F filings." *Id.*

On August 17, 2020, McCarthy "issued a pump buy recommendation on Biocept," *id.* ¶ 20, "immediately before the unlawful fourth vote to approve the reverse split vote was

held on August 18, 2020," *id.* ¶ 4. "McCarthy knew or should have known that Maxim control [sic] the vote and that Maxim had already submitted its vote for the reverse split." *Id.* ¶ 20.

"[Plaintiff] alleges that Maxim had control of [Biocept's] 46,201,989 broker non-votes." *Id.* ¶ 62. "The firm that controlled the Broker Non-Votes knew that if they voted for the reverse split, it would be approved." *Id.* ¶ 63. They also knew the reverse split would be implemented. *Id.* "[A]ll or a portion of the broker non-votes that Maxim voted for were sold and therefore disinterested, which compounds Maxim's unlawful acts." *Id.* ¶ 18.

On August 18, 2020, "as a result of 100% of the Broker Non-Votes changing their vote as a result of the pump and dump the reverse split proposal was approved." *Id.* ¶ 61. "Between August 6, 2020 and August 18, 2020, after taking advantage and profiting from the Biocept's stock price surging on August 6 press release, 100% of the Broker Non-Votes reversed and voted for the reverse split proposal." *Id.*

"LaRosa, Rosen, Evans and Rabinowitz, by virtue of their positions at Maxim, knew or should have known what Maxim was doing regarding Biocept." *Id.* ¶ 21.

### 4. Plaintiff's Biocept Stock Purchases

"[Plaintiff] bought Biocept shares well before and directly after the August 6th 2020 press release believing and relying on Biocept disclosures being truthful." *Id.* ¶ 103. "The majority of the $197,000 in losses suffered came from purchases on August 7th and 18th when Maxim's price target calling for a 300% increase occurred." *Id.* "These purchases were before [Plaintiff] knew the reverse split was approved." *Id.* "[Plaintiff] bought approximately $40,000 worth of stock on August 3rd, based on Biocept's releasing COVID-19 testing figures." *Id.* "[Plaintiff] was induced into not selling his shares because he thought Biocept was actually going to co-develop and clinically validate the COVID-19 test when they did not have any intention to do that." *Id.*

"Had [Plaintiff] known that Biocept concealed the reason for the reverse split, and then embarked on acts to willfully and knowingly prevent Biocept from curing the

23-cv-1803-WQH-BLM

NASDAQ deficiency, he would have never bought Biocept stock." *Id.* "[Plaintiff] was induced to hold his original shares, and induced to buy more shares based on Biocept's claim they were developing a novel new COVID-19 test and Maxim's August 17th price target." *Id.*

### 5.    Causes of Action

The SAC asserts the following causes of action: (1) common law fraud; (2) constructive fraud; (3) conspiracy to commit fraud; (4) aiding and abetting fraud; (5) aiding and abetting violations of the California Corporations Code; (6) aiding and abetting violations of fiduciary duties; (7) violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b–5, and Section 17(a)(1)–(3) of the Securities Act; and (8) violations of the California Corporations Code.

Plaintiff seeks damages, including punitive damages, as well as costs, attorney's fees, and other relief as the Court finds just. *Id.* ¶ 115.

## III.    DISCUSSION

### A.    Procedural Objections in the Briefing on the Motions to Dismiss

As a preliminary matter, the Court addresses two procedural motions: (1) the Motion to Strike Plaintiff's Supplemental Opposition filed by Gerhardt and Huebner (ECF No. 150)[10] and (2) the Objection to Aegea's Motion to Dismiss filed by Plaintiff (ECF No. 133).

### 1.    Gerhardt and Huebner's Motion to Strike

Gerhardt and Huebner contend that the Court should strike Plaintiff's Supplemental Opposition pursuant to Federal Rule of Civil Procedure 12(f) and Local Civil Rule 7.1, because it was procedurally improper and Plaintiff filed it without obtaining leave from the Court. (ECF No. 150.)

---

[10] Defendants Nall and Kennedy filed a Notice of Joinder in the Motion to Strike Plaintiff's Supplemental Opposition. (ECF No. 151.)

On June 17, 2024, despite having previously filed a response in opposition to Gerhardt, Huebner, Nall, and Kennedy's respective Motions to Dismiss (ECF No. 109), Plaintiff submitted an additional filing, entitled "Plaintiff's Final Response to Nall, Kennedy, Huebnar [sic] and Gerhardt Motion to Dismiss Plaintiff's Second Amended Complaint" (the "Supplemental Opposition"). Plaintiff's Supplemental Opposition was effectively a surreply. Local Rule 7.1 provides for the filing of a motion, an opposition, and a reply. *See* S.D. Cal. Civ. L.R. 7.1(e). The Local Rules do not provide for the filing of a surreply. Other district courts within the Ninth Circuit have found that a party must seek leave of the court to file a surreply. *See Spina v. Maricopa Cnty. Dep't of Transp.*, No. CV05-0712-PHX-SMM, 2009 WL 890997, at *1 (D. Ariz. Apr. 1, 2009) ("Neither Federal Rule of Civil Procedure 7 nor the local rules of practice for this District provide for the filing of a surreply, and surreplies are not authorized by any other rules of procedure absent express prior leave of the Court…. Plaintiff's Surreply was, therefore, improper."); *see also Brown v. Harris*, No. 1:12-CV-01472-GSA-PC, 2014 WL 711027, at *1 (E.D. Cal. Feb. 21, 2014).

In this case, Plaintiff did not seek leave of the Court to file the surreply or attempt to show that a valid reason for additional briefing exists. (*See* ECF No. 139.) Plaintiff's "Supplemental Opposition" was therefore improper. While the Court recognizes that Plaintiff is proceeding pro se, Plaintiff is nevertheless required to follow the same procedural rules as any other litigant. *See McNeil v. Toor*, No. 1:19-cv-01257-ADA-HBK, 2023 WL 5613805, at *1–2 (E.D. Cal. Aug. 30, 2023) (granting the defendants' motion to strike the plaintiff's filing as an "improper surreply" because, "[d]espite Plaintiff's pro se status, he is required to comply with the Court's rules."); *see also Hoffman v. Lassen County*, No. 2:16-cv-00946-JAM-AC, 2017 WL 3189937, at *2 (E.D. Cal. July 27, 2017).

23-cv-1803-WQH-BLM

The Court accordingly grants the Motion to Strike Plaintiff's Supplemental Opposition. (ECF No. 150.) The Court does not consider Plaintiff's Supplemental Opposition (ECF No. 139) in ruling on the pending Motions to Dismiss.[11]

### 2.    Plaintiff's Objection that Aegea's Motion to Dismiss Is Untimely

In addition to filing a response in opposition to Aegea's Motion to Dismiss, Plaintiff separately filed an Objection to Aegea's Motion to Dismiss, which the Court liberally construes as a motion to strike Aegea's Motion to Dismiss. (ECF No. 133.)

Aegea filed its Motion to Dismiss on May 28, 2024. Plaintiff contends that Aegea's Motion to Dismiss was due on May 1, 2024. (*See* ECF No. 133 at 2.)

Aegea contends that its Motion to Dismiss is timely because it was never served with the Second Amended Complaint. Specifically, Aegea contends that because it "had not yet made an appearance in the action when Plaintiff filed the Second Amended Complaint," Plaintiff was required to "personally serve Aegea." (ECF No. 149 at 4.)

On April 2, 2024, the Court issued an Order (the "April 2nd Order") granting Plaintiff leave to file the SAC and instructing Defendants to "file a response to the [SAC] within twenty-one (21) days of the entry of the [SAC] on the docket." (ECF No. 82 at 5.) The Court noted, however, that "[t]he twenty-one-day response deadline only applie[d] to Defendants named in the [FAC] that [had] been served and made an appearance in this case." *Id.* at 5 n.1. The Court stated that "[a]ll new Defendants named for the first time in the [SAC] or those who have been newly served shall file a response within the time period permitted in the Federal Rules of Civil Procedure." *Id.*

On April 10, 2024, Plaintiff filed the SAC. (ECF No. 84.) Accordingly, pursuant to the Court's Order, May 1, 2024, was the deadline for defendants who had previously made

---

[11] The Court observes that Plaintiff filed sur-replies to other pending motions. (*See, e.g.*, ECF Nos. 130, 131 & 136.) Many of these sur-replies reiterate the contentions Plaintiff initially raised in his Responses in Opposition. In any event, because there are no pending objections to these sur-replies, the Court declines to strike them from the docket *sua sponte*. The Court cautions Plaintiff, however, that it will not consider future filings that fail to comply with the Local Rules, including impermissible sur-replies.

23-cv-1803-WQH-BLM

an appearance in this action to file their responses to the SAC. As Aegea asserts, however, it had not made an appearance in this action prior to April 2, 2024.[12]

Generally, Federal Rule of Civil Procedure 5 governs the service of "a pleading filed after the original complaint." Fed. R. Civ. P. 5(a)(1)(B). Where, however, a defendant has not yet appeared in the action prior to the filing of the amended complaint, which adds one or more claims for relief, the plaintiff must serve that defendant in accordance with Federal Rule of Civil Procedure 4. *See Menna v. Radmanesh*, No. CV 14-355-R (MAN), 2014 WL 6892724, at *1 n.1 (C.D. Cal. Oct. 7, 2014) (noting that, although the plaintiff had served the defendants with the original complaint and summons, because the defendants had not yet appeared in the action when the plaintiff filed the amended complaint, which added a new claim for relief, the plaintiff was required to serve the defendants in accordance with Federal Rule of Civil Procedure 4).

A comparison of the FAC and the SAC reveals that the SAC added new claims for relief against Aegea, including conspiracy to commit fraud and aiding and abetting fraud claims. Because Aegea had not yet entered an appearance in this action at the time Plaintiff filed the SAC, Plaintiff was required to serve Aegea with the SAC pursuant to Federal Rule of Civil Procedure 4. The docket contains no executed summons reflecting that service of the SAC was properly effectuated upon Aegea. As a result, Aegea's time to respond to the SAC never began to run. *See* Fed. R. Civ. P. 12(a)(1)(A)(i) ("A defendant must serve an answer … within 21 days after being served with the summons and complaint.").

Aegea's Motion to Dismiss (ECF No. 120) was accordingly timely filed. The Court overrules Plaintiff's Objection to Aegea's Motion to Dismiss. (ECF No. 133.)

---

[12] Although the docket reflects that a summons for Aegea was returned executed on March 22, 2024, the summons states that Aegea was served on March 21, 2024. (ECF No. 81 at 2.) At that time, the Court had not yet granted Plaintiff leave to file the SAC. Thus, Aegea could not have been served with the SAC on March 21, 2024. The executed summons form also states that the summons for Aegea was issued on October 23, 2023, which was the date that the Clerk of the Court issued the summons for the FAC (ECF No. 5). (*See* ECF No. 81 at 2.) This detail further confirms that Aegea was served with the FAC and not the SAC on March 21, 2024.

23-cv-1803-WQH-BLM

**B.     Motions to Dismiss**

  **1.     Legal Standard**

  Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a claim for relief, a pleading "must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Rule 12(b)(6) "is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).

  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (quoting Fed. R. Civ. P. 8(a)). A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

  Where a plaintiff alleges fraud or misrepresentation in a private securities-fraud lawsuit, the complaint "must [also] satisfy the dual pleading requisites of Federal Rule of Civil Procedure 9(b) and the [Private Securities Litigation Reform Act ('PSLRA')]." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Under Rule 9(b), a

complaint "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The pleader must "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Davidson v. Kimberly-Clark Corp.*, 873 F.3d 1103, 1110 (9th Cir. 2017) (quoting *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)), *as corrected* (Mar. 12, 2018). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (citation omitted).

Under the PSLRA, a plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). To adequately allege scienter, a complaint's allegations must give "rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). To adequately allege loss causation, a plaintiff must show "that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Erica P. John Fund v. Halliburton*, 563 U.S. 804, 812 (2011).

"When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003) (citing Fed. R. Civ. P. 12(b)). However, a court may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* (citing *Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994)).

Where the documents are not physically attached to the complaint, they may be

considered if the documents' "authenticity ... is not contested" and "the plaintiff's complaint necessarily relies" on them. *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir. 1998) (quotation omitted); *see also Ritchie*, 342 F.3d at 908 ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim. The defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)."); *see also Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("We have extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint.").

### 2.    Rule 10(b)–5(b) Claims

"To state a federal securities fraud claim in violation of § 10(b), a plaintiff must show: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1032 (9th Cir. 2016) (quoting *Thompson v. Paul*, 547 F.3d 1055, 1061 (9th Cir. 2008)).

In general, the Moving Defendants contend that Plaintiff's Section 10(b) claims should be dismissed because: (1) Plaintiff fails to allege any material misrepresentations or omissions that can be specifically attributed to the Moving Defendants; (2) Plaintiff does not properly plead scienter; (3) Plaintiff fails to allege reliance; and (4) Plaintiff fails to plead loss causation. Several Moving Defendants also contend that there is no private right of action for aiding and abetting a securities fraud claim.

/ / /

/ / /

21

### a.    Material Misrepresentation or Omission by the Defendant

"To prevail on a § 10(b) claim, a plaintiff must show the defendant made a statement that was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). "Even if a statement is not false, it may be misleading if it omits material information." *Id.* at 1008–09. "[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

"Pure omissions are not actionable under Rule 10b–5(b)." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 258 (2024). However, "'representations that state the truth only so far as it goes, while omitting critical qualifying information,'" or half-truths, are actionable. *Id.* (quoting *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 188 (1989)).

The Supreme Court has held that only a "maker" of an "untrue statement of a material fact" can be held liable under Section 10(b) and Rule 10b–5. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011). "For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142. "[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.* at 142–43. "One who prepares or publishes a statement on behalf of another is not its maker." *Id.* at 142.

/ / /

/ / /

/ / /

###### i. Moving Defendants Who Were Not Members of Biocept's Board of Directors

The Court first addresses Plaintiff's allegations regarding material misrepresentations or omissions with respect to his securities fraud claims against the CBIZ Defendants, Mayer Hoffman, the Cooley Defendants, and LHAI—the Moving Defendants who are named in the securities fraud cause of action but were not members of Biocept's Board of Directors, excluding Maxim.[13] These Moving Defendants contend that Plaintiff fails to allege that they made any misrepresentations or omissions. They contend that, instead, all of the alleged misstatements or omissions Plaintiff identifies were made by Biocept. They also contend that Plaintiff does not allege that any of Biocept's alleged misrepresentations or omissions can be attributed to them. In fact, several Moving Defendants point out that the SAC explicitly states: "Biocept's senior management and board of directors have *sole responsibility* for the content of SEC disclosures and press releases." (SAC ¶ 58 (emphasis added); *see also, e.g.*, ECF No. 91-1 at 8; ECF No. 93-1 at 7; ECF No. 98-1 at 23.) In particular, the Cooley Defendants contend that "Plaintiff alleges that the Cooley Defendants reviewed the statements and assisted in drafting them, but beyond this, there are no factual allegations about their specific involvement in the supposed fraud, much less that they possessed ultimate authority over the contents of any challenged statements (they did not)." (ECF No. 98-1 at 23 (citing SAC ¶ 22).)

With regard to the alleged misrepresentations, the SAC exclusively references Biocept's reports and SEC filings, as well as statements made by Biocept directors. (*See, e.g.*, SAC ¶ 65 (alleging that "Biocept fraudulently included misrepresentations in the sections concerning COVID-19 and Related Parties" in its Q-2 Report); *id.* ¶ 2 ("Biocept signed a co-development agreement with Aegea … and concealed the announcement of the agreement); *id.* ¶ 9 ("Biocept's 2020 proxy knowingly fraudulently concealed … the primary reason the reverse split proposal was on the proxy"); *id.* ¶ 56 ("Biocept

---

[13] Maxim does not challenge Plaintiff's Section 10(b) claims on this basis, contending instead that Plaintiff fails to allege the elements of scienter and loss causation. (*See generally* ECF No. 94-1; ECF No. 119.)

intentionally changed the wording regarding the June 3rd Agreement …. to conceal their earlier fraudulent statements.").) The SAC contains no allegations that the CBIZ Defendants, Mayer Hoffman, the Cooley Defendants, or LHAI made any misrepresentations or omissions themselves. For example, as Mayer Hoffman points out, Plaintiff does not allege that it made a misstatement in any of its audit reports. (*See* ECF No. 91-1 at 27.) Instead, the SAC generally alleges that the non-Biocept defendants "knew of" Biocept's alleged misrepresentations and omissions and allowed them to "stand" or "stood silent." (*See, e.g.*, SAC ¶ 66 ("Defendants … Bair, Cooley, Cain and CBIZ, MHM, and CBIZ MHM LLC knew that the Q-2 filing contained fraudulent statements and misrepresentations.").)

The Ninth Circuit has previously determined that a plaintiff's claims failed to meet the *Janus* standard where the defendant did not bear "a statutory obligation to file with the SEC" and "there [was] no allegation that [the defendant] made the filings and falsely attributed them to the [filing defendant]" or that the defendant "had ultimate authority over the [filing defendant's] SEC filings." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 693 n.8 (9th Cir. 2011). Here, even considering Plaintiff's allegations that the Cooley Defendants "reviewed and approved every press release, and suggested edits" and "reviewed every proxy, prospectus and quarterly and annual report" (SAC ¶ 22), the SAC does not allege that the CBIZ Defendants, Mayer Hoffman, the Cooley Defendants, or LHAI were obligated to make any of Biocept's SEC filings, made any of the filings in question and falsely attributed them to Biocept, or had "ultimate authority" over Biocept's pertinent filings. *See Janus*, 564 U.S. at 143 (explaining that "[e]ven when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.").

Accordingly, the SAC fails to sufficiently allege that these defendants were the "makers" of any alleged misrepresentations or omissions. Thus, the SAC fails to state Section 10(b) claims against the CBIZ Defendants, Mayer Hoffman, the Cooley Defendants, or LHAI.

23-cv-1803-WQH-BLM

### ii.    Moving Defendants Who Were Members of Biocept's Board of Directors

The Court next addresses Plaintiff's allegations regarding material misrepresentations or omissions with respect to his securities fraud claims against Nall, Kennedy, Gerhardt, and Huebner—the Moving Defendants who were members of the Biocept Board of Directors (collectively, the "Biocept Moving Defendants").

### (a)    Statements Over Which the Defendants Are Not Alleged to Have Had "Ultimate Authority"

The Biocept Moving Defendants generally contend that, under *Janus*, 564 U.S. at 141, they cannot be held liable under Section 10(b) for statements that they did not make or statements over which they are not alleged to have had "ultimate authority." In particular, Gerhardt and Huebner contend that they "did not sign the April 20 Proxy, the potentially challenged Form 8-Ks or press releases (including the August 6 press release), or [Biocept's] Form 10-Qs or prospectuses during the relevant period." (ECF No. 95-1 at 20.) Nall and Kennedy contend that, "[e]xcept for a single allegation that [Nall] signed some of the Biocept SEC filings, the [SAC] has no allegations specific to just him." (ECF No. 100-1 at 17 (citing SAC at 11–12, ¶ G).) Nall and Kennedy contend that "Plaintiff does not allege that Mr. Nall or Mr. Kennedy had ultimate authority over the contents of, had any involvement in the preparation of, or much less signed: (a) the April 2020 proxy statement, (b) various Biocept press releases, and (c) the May 2021 prospectus." (ECF No. 100-1 at 25 (citing SAC ¶¶ 38, 52, 56, 79, 93).) Nall and Kennedy further contend that "Kennedy is not alleged to have any role in: (1) a March 2, 2021 press release issued by Aegea and published on Biocept's website, (2) Biocept's 'March 31st 2021 earnings call', (3) Biocept's 'Q-3 2021 earnings call,' or any of Mr. Nall's statements to investors about commercializing the COVID-19 test." (ECF No. 100-1 at 25 (citing SAC ¶¶ 79–82, 91–92).) Nall and Kennedy contend that the SAC does not "allege that Mr. Kennedy signed the April 29, 2020 proxy statement issued in advance of shareholder voting on the reverse split, because he did not." *Id.* (citing ECF No. 98-4). These defendants contend that Plaintiff's "conclusory assertion" that "Biocept's management team and board of directors

have sole responsibility for the content of SEC disclosures and press releases" is insufficient to establish their "ultimate authority" over the statements in question. (ECF No. 95-1 at 20 (quoting SAC at 43).)

"Several district courts applying *Janus* have found that a corporate officer's position alone, without additional allegations as to the officer's ability to control the contents of the statement at issue, does not suffice to render the officer a 'maker' of the statement." *Mandalevy v. Bofi Holding, Inc.*, No. 17cv667-GPC-KSC, 2021 WL 794275, at *6 (S.D. Cal. Mar. 2, 2021) (collecting cases). Although "a plaintiff need not plead that the defendant directly issued the allegedly misleading statement," the plaintiff "must plead sufficient facts to show that the defendant had the power and authority to control the content and issuance of the statement." *Id.* (citing *Janus*, 564 U.S. at 142).

In *Mandalevy*, the court first reasoned that the allegation that "'Individual Defendants possess the power and authority to, and did, control the contents of [the company's] … press releases' likely would not meet the particularity requirement standing alone" and accordingly would not satisfy *Janus*. *Id.* at *7. The Court went on to find that, as to one of the defendants, where the allegations "mainly relate[d] to [his] signing of SEC filings," "[n]one of the confidential witnesses discuss[ed] [his] involvement," and the plaintiffs did not allege that he "was involved in the everyday operation of the business such that he would be responsible for [the company's] press releases," the plaintiffs failed to allege sufficient facts to show that he was the "maker" of the press release in question. *Id.* The Court ultimately concluded, however, that the plaintiffs provided sufficient "additional factual allegations that plausibly suggest[ed] [other] Individual Defendants were the 'makers' of the press release statement under *Janus*," such as alleging that the President/CEO/Director was "so involved in the day-to-day operations that essentially everyone at [the company] reported to him," and that the CFO "was very involved in the oversight of the Company's finances" and "according to confidential witnesses, actively discussed the response to the SEC probe." *Id.*

The SAC contains no particularized allegations akin to those described in *Mandalevy* that plausibly suggest that Nall, Kennedy, Gerhardt, or Huebner were the "makers" of any Biocept statements or filings that they did not sign. *See id.* The SAC's conclusory allegations that Nall and Kennedy "signed SEC filings, knowing that the filings contained fraudulent statements" are insufficient to allege with particularity which SEC filings each defendant signed or that they had ultimate authority over the statements. (SAC at 12.) Accordingly, to the extent the SAC alleges that Gerhardt, Huebner, Nall, and Kennedy are liable for any of Biocept's alleged misleading statements or omissions merely by virtue of their positions as Biocept officers, such allegations are insufficient under *Janus*, 564 U.S. at 142.[14]

**(b)    Failing to Disclose the Agreement and Failing to File a Form 8-K**

Many of the SAC's securities fraud allegations appear to stem from Biocept's purported failure to disclose certain information, including its Agreement with Aegea, as well as Biocept's failure to file Form 8-Ks. (*See, e.g.*, SAC ¶ 49 ("Co-developing a novel COVID-19 test was outside of Biocept's normal scope of business. Biocept was required to file a Form 8-K with the SEC."); *id.* ¶ 56 ("Biocept also failed to attach the Development Agreement as an exhibit in SEC disclosures as required by laws.").)

Gerhardt and Huebner contend that Section 10(b) and Rule 10b–5(b) "do not create an affirmative duty to disclose any and all material information." (ECF No. 95-1 at 22 (quoting *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022)). They contend that, instead, "[d]isclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not

---

[14] In Plaintiff's Response in opposition to Nall, Kennedy, Gerhardt, and Huebner's Motions to Dismiss, Plaintiff adds new allegations, attributing certain actions and statements to these defendants that the SAC attributes only to Biocept. The Court cannot consider new allegations raised in the Plaintiff's Response when ruling upon a motion to dismiss. *See Schneider v. Cal. Dep't of Corrs.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998). The Court accordingly does not consider the aforementioned allegations (or any other additional allegations Plaintiff included in his Responses to any of the pending Motions to Dismiss).

misleading.'" *Id.* (quoting *Weston Fam. P'Ship LLLP*, 29 F.4th at 620). Gerhardt and
Huebner contend that "Plaintiff does not identify any statement made by any defendant
that was rendered misleading by [Biocept's] alleged delayed announcement of the
Development Agreement." *Id.* Gerhardt and Huebner further contend that Biocept's failure
to file a Form 8-K disclosing the Agreement does not give rise to a Section 10(b) claim.
*Id.* at 23.

Plaintiff contends that "Nall, Kennedy, Hueber [sic] and Gerhardt also intentionally
violated security laws by failing to attach the June 3rd agreement as an exhibit to the second
quarter report," citing 17 C.F.R. § 230.411 and 17 C.F.R. § 240.12b–23(c) for the
proposition that "the exhibits required in the exhibit table must be filed as indicated, as part
of the registration statement or report." (ECF No. 109 at 5.) In response, Gerhardt and
Huebner contend that the provisions cited by Plaintiff "do not establish that Biocept was
obligated to attach the Development Agreement to any SEC filing," but instead "simply
describe the process for incorporating a document by reference into an SEC filing." (ECF
No. 134 at 9.)

As the Court explained above, "[p]ure omissions are not actionable under Rule 10b–
5(b)." *Macquarie Infrastructure Corp.*, 601 U.S. at 258. In other words, Plaintiff's
allegations that Biocept failed to disclose or omitted any mention of the Agreement do not,
without more, give rise to a Section 10(b) violation. The SAC does not allege that Biocept
made any half-truths that gave rise to a duty to disclose the Agreement in order to render
the half-truths "not misleading." *Id.* Instead, the SAC repeatedly alleges that Biocept
"concealed" the Agreement altogether. (*See, e.g.*, SAC ¶ 2 ("Biocept unlawfully concealed
the June 3rd agreement to develop a COVID-19 test."); *see also id.* ¶¶ 48, 56–57.) These
allegations do not, without more, constitute an actionable omission under Section 10(b).
*See Khoja v. Orexigen Therapeutics, Inc.*, 498 F. Supp. 3d 1296, 1311–12 (S.D. Cal. 2020)
(finding that the lead plaintiff failed to state a claim to the extent he relied on certain

28

defendants' failure to disclose certain information because "[a]bsent a duty to disclose, there is no actionable misleading omission").[15]

The Court also finds that Biocept's failure to file a Form 8-K disclosing the Agreement does not give rise to a Section 10(b) violation. As these defendants contend, 17 C.F.R. § 240.13a-11(c) explicitly provides that "[n]o failure to file a report on Form 8–K that is required solely pursuant to Item 1.01 … of Form 8-K shall be deemed to be a violation of 15 U.S.C. [§] 78j(b) and § 240.10b–5 [Section 10(b)]." 17 C.F.R. § 240.13a-11(c). Item 1.01 of Form 8-K pertains to an entity's disclosure of "entry into a material definitive agreement." *See* U.S. Sec. & Exch. Comm'n, Form 8-K at 7, https://www.sec.gov/about/forms/form8-k.pdf (last visited Jan. 14, 2025). Thus, Biocept's failure to disclose its Agreement with Aegea in a Form 8-K is not a violation of Section 10(b). *See Takata v. Riot Blockchain, Inc.*, No. 18-2293 (GC) (RLS), 2023 WL 7133219, at *9 (D.N.J. Aug. 25, 2023) (reasoning that the plaintiff "cannot allege that the failure to comply with Item 1.01(a) is, standing alone, sufficient to state a claim under Section 10(b) and Rule 10b–5" (quoting *In re Bank of Am. Corp. Sec., Derivative & Emp. Ret. Income Sec. Act (ERISA) Litig.*, No. 09 MD 2058(PKC), 2011 WL 3211472, at *10 (S.D.N.Y. July 29, 2011))).[16]

---

[15] The SAC also appears to allege that Biocept committed another actionable omission in the August 6, 2020, press release announcing the agreement with Aegea to develop the COVID-19 test. Specifically, the SAC alleges that the press release "misled readers by not including important information like the date and details of the First Right of Refusal. (SAC ¶ 56.) However, the SAC again fails to explain why the omission of such details was material, how the press release otherwise asserted a "half-truth," or how the disclosure of those details was necessary in order to render other statements not misleading. *See Macquarie Infrastructure Corp.*, 601 U.S. at 258. Moreover, as the Court found above, the SAC fails to sufficiently allege that any of the Biocept Moving Defendants had "ultimate authority" over Biocept's press releases.

[16] The Court also agrees with Gerhardt and Huebner that the regulations cited by Plaintiff in his Response in Opposition do not evince an obligation to file the Development Agreement. *See* 17 C.F.R. § 230.411(c) ("Any document or part thereof filed with the Commission pursuant to any Act administered by the Commission *may be incorporated by reference as an exhibit* to any registration statement filed with the Commission …." (emphasis added)); 17 C.F.R. § 240.12b–23(c) (same). Thus, Plaintiff does not

23-cv-1803-WQH-BLM

Accordingly, to the extent the SAC premises Plaintiff's security fraud claims upon the Biocept Moving Defendants' alleged role in (1) Biocept's general failure to disclose the Agreement or (2) Biocept's failure to file a Form 8-K, such allegations are insufficient to allege an "omission" or other violation of Section 10(b).

### (c)    Forward-Looking Statements

Some of the Moving Defendants contend that Plaintiff bases his securities fraud claims on forward-looking statements that are protected by the PSLRA's "safe harbor."

The PSLRA creates a safe harbor for forward-looking statements. 15 U.S.C. § 78u–5. Thus, "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues" is not actionable under Section 10(b). *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 925 (9th Cir. 2003) (citing 15 U.S.C. § 78u–5(i)). Under the safe harbor, "a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 767 (9th Cir. 2023) (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017)); *see* 15 U.S.C. § 78–u5(c)(1).

As relevant here, the SAC alleges that "[o]n the morning of November 15th, 2021, the FDA issued new guidance on issuing [emergency use authorizations] for COVID-19 tests … stating that [it would] no longer issue [emergency use authorizations] for regular PCR tests." (SAC ¶ 91.) The SAC alleges that on that same day, during Biocept's "Q-3 2021 earnings call at 4pm after the stock market closed," Nall made an "intentional fraudulent statement on the call" that "[a]s a final update on COVID-19 testing, following validation, we expect to begin commercialization of the assay co-developed with Aegea

---

adequately allege that Biocept "failed to comply" with these provisions, much less that a failure to comply with these provisions would give rise to a violation of Section 10(b).

Biotechnologies by the end of the year." *Id.* ¶ 92. The SAC alleges that "Nall, the Biocept executives and Biocept's Board of Directors knew this statement was false" because "[t]he test was already validated in October 2021, before the FDA rules changed." *Id.* The SAC also alleges that "Biocept had no intention of developing or commercializing the test." *Id.* ¶ 114.

Additionally, the SAC alleges that in Biocept's shareholder letter dated January 12, 2021, Biocept stated that the COVID-19 test would be "completed and ready for, and ready for [sic] deployment by the first quarter of 2021," but "Nall knew this was not true." *Id.* ¶ 79. The SAC alleges that the letter stated, in relevant part: "We are now in the process of completing the final validation and testing phase of the COVID-19 assay development project with Aegea Biotechnologies and we expect the assay to be ready for deployment in clinical testing laboratories in the first quarter of 2021." *Id.*

The SAC also contains allegations as to why the PSLRA's safe harbor is inapplicable. *See id.* ¶¶ 108–10. The SAC alleges that "to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements." *Id.* ¶ 109. It further alleges that, "[a]lternatively," "at the time those statements were made, Biocept and CBIZ, MHM, and CBIZ MHM LLC knew the statement was false or misleading, or the statement was authorized and/or approved by a [sic] CBIZ, MHM, and CBIZ MHM LLC recklessly disregarded that the statement was materially false or misleading when made." *Id.* ¶ 110.

Gerhardt and Huebner contend that "any statement concerning the expectations for commercialization of the COVID Test are statements of opinion and/or are protected under the Reform Act's safe harbor for forward-looking statements." (ECF No. 95-1 at 24 (citing SAC at 55, 61).) Gerhardt and Huebner contend that "Plaintiff pleads no facts about any defendant's lack of genuine belief regarding the expected validation/commercialization of the COVID Test, nor does he plead any fact that renders those opinion statements

23-cv-1803-WQH-BLM

misleading." (ECF No. 95-1 at 25.) As for the November 15, 2021, earnings call, Gerhardt and Huebner contend that Nall's statement that Biocept "expect[ed] to begin commercialization" of the COVID-19 test was not false or misleading, despite occurring on the same day the FDA issued new regulations, because "FDA regulations, particularly at the height of the pandemic, take time to understand thoroughly," and Biocept "reviewed those regulations and within one week disclosed that commercialization would be delayed." (ECF No. 95-1 at 25.)

The Court finds that the statements identified above regarding Biocept's ongoing co-development and prospective commercialization of the COVID-19 test are forward-looking because they are "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products … of the issuer." 15 U.S.C. § 78u–5(i)(1)(B). The forward-looking nature of these statements is evidenced by the phrase "we expect." (*See, e.g.*, SAC ¶ 92 ("*[W]e expect* to begin commercialization … by the end of the year." (emphasis added)); *id.* ¶ 79 ("*[W]e expect* the assay to be ready for deployment … in the first quarter of 2021." (emphasis added)); *see also Garcia v. Hetong Guo*, No. CV-15-1862-MWF-MRWx, 2016 WL 102213, at *9 (C.D. Cal. Jan. 7, 2016); *Szymborski v. Ormat Techs., Inc.*, 776 F. Supp. 2d 1191, 1198 (D. Nev. 2011) (reasoning that "language such as 'we expect'" identified certain corporate statements as "fall[ing] squarely under the definition of forward-looking statements protected under the PSLRA's safe harbor").)

The SAC appears to allege that these forward-looking statements were false or misleading based on the conclusory allegation that "Biocept had no intention of developing or commercializing the test." (SAC ¶ 114.) However, the SAC does not allege any particularized facts to support this allegation. At best, Plaintiff alleges that Biocept "delay[ed] validating" the COVID-19 test, *id.* at 83, which does not plausibly equate to an intention to never validate, develop, or commercialize the test. The SAC similarly does not allege any particularized facts supporting that Nall, Kennedy, Gerhardt, or Huebner were aware of such an intention to never develop or commercialize the test.

At most, the SAC alleges that Aegea CEO Stella Sung ("Sung") informed Plaintiff that "Nall did not want to validate the test," *id.* ¶ 43, and that "Sung believed that Nall purposely delayed validating the test to renegotiate the agreement and avoid problems with Thermal Fisher," *id.* ¶ 71. The SAC elaborates that Sung stated in text messages to Plaintiff that "Mike [Nall] really wants to get the covid flu/combo test adding the flu will take four to five weeks longer. … Don't know if Mike [Nall] is deliberately being difficult for negotiating purposes or not." *Id.* ¶ 43. As Nall and Kennedy contend, however, Sung's text messages do not plausibly demonstrate "fraudulent intent" to never develop the COVID-19 test, but merely indicate that Nall implemented negotiation tactics and wished to develop a modified version of the test that could also test for the flu. (*See* ECF No. 100-1 at 25–26.) These allegations accordingly do not support an inference that Nall's statements on earning calls regarding the expected development and commercialization of the COVID-19 test were made with knowledge that they were false or misleading.

The SAC also appears to allege that the statements concerning the expected development and commercialization of the COVID-19 test were false or misleading because Nall stated during the November 15, 2021, earnings call that, "following validation," Biocept "expect[ed] to begin commercialization … by the end of the year," despite the FDA having released new regulations earlier that morning that would apparently delay the development of the test. (*See* SAC ¶¶ 91–92.) However, besides alleging the general timing of the regulations release (during "the morning") and the earnings call ("at 4pm"), the SAC contains no particularized allegations demonstrating that Nall was aware of the new regulations at the time of the earnings call or otherwise knew that the new regulations rendered his statement about the expected commercialization date of the test false. *See id.* Without allegations containing such particularized facts, the SAC

fails to demonstrate that Nall's statement regarding the COVID-19 test's expected commercialization date was made with knowledge that it was false or misleading.[17]

In sum, the SAC's allegations do not adequately allege that Biocept never intended to develop or commercialize the test, much less that Nall, Kennedy, Gerhardt, or Huebner were aware of such an intention. The SAC's conclusory allegation that "to the extent the statutory safe harbor would otherwise apply … [defendants] knew the statement was false or misleading," *id.* ¶ 110, is not sufficient to thwart the application of the PSLRA's safe harbor provision. Plaintiff's failure to allege particularized facts demonstrating that Nall, Kennedy, Gerhardt, and Huebner knew these statements were false or misleading renders the safe harbor applicable.[18] *See Garcia*, 2016 WL 102213, at *9 (concluding that the safe harbor provision applied to protect the defendant's forward-looking statement in part because the plaintiff failed to allege "particularized facts demonstrating that [the defendant] knew that this statement was false when made").

Thus, based upon the allegations of the SAC, Biocept's and Nall's statements regarding the development and commercialization of the COVID-19 test are protected by the PSLRA's safe harbor and cannot constitute actionable statements to support Plaintiff's Section 10(b) claims.

### (d)    Filings the Defendants Signed and Statements They Made

The Court next considers various statements that the SAC alleges the Biocept Moving Defendants made, either verbally or in filings or documents that they signed.

### (i)    Biocept's Quarterly and Annual Reports

The SAC alleges, and the corresponding defendants acknowledge, that Nall and Kennedy each signed Biocept's Form 10-Q reports (quarterly reports) for the second and

---

[17] To the extent Plaintiff instead alleges that this statement was "false" because the test "was already validated," *id.* ¶ 92, the Court addresses this contention separately. *See infra* at 37–38.

[18] The Court expresses no opinion as to whether the alternative prong of the safe harbor provision, which applies if the forward-looking statements included cautionary language, *Glazer Cap. Mgmt.*, 63 F.4th at 767, is met in this case.

third quarters of 2020 and Gerhardt signed Biocept's 2020 and 2021 Form 10-Ks (annual reports). (*See* ECF No. 100-1 at 24 (citing SAC at 12–13, ¶¶ F–G, ¶¶ 68, 72); ECF No. 95-1 at 20.)

In relevant part, the SAC alleges the following regarding Biocept's second-quarter report, issued on August 13, 2020: "Biocept falsely claimed the following: 'On June 3, 2020, the Company *announced* entering into a development agreement with Aegea focused on the co-development by Biocept and Aegea of a highly sensitive PCR-based assay designed by Aegea for detecting the COVID-19 virus.'" (SAC ¶ 65 (emphasis added).) The SAC further alleges: "This was not a simple oversight, the June 3rd announcement was the biggest announcement in Biocept's history. Biocept tried to hide the fact that they broke securities laws by not revealing the important agreement they made on June 3rd." *Id.* ¶ 68.

The SAC alleges the following with respect to Biocept's third-quarter report, issued on November 12, 2020: "Biocept's board of directors and executive management team [chose] to leave the deceitful statements about the June 3rd Agreement unchanged, even after being notified by [Plaintiff] that the statements [were] fraudulent. Nall and Kennedy knew they were signing a report to cover up fraud and securities law violations." *Id.* ¶ 72.

Gerhardt and Huebner contend that "Plaintiff fails to explain" how the "inadvertent[ ]" statement that Biocept "'announced' the Development Agreement on June 3 instead of 'entered' it" "would have been material to a reasonable investor." (ECF No. 95-1 at 23.) Gerhardt and Huebner contend that investors "would have already been aware of the Development Agreement by virtue of the August 6 Press Release." *Id.*

The SAC does not contain sufficient allegations explaining why "there is a substantial likelihood that a reasonable investor would have acted differently" if the quarterly reports had stated that Biocept "entered" into the Agreement on June 3, rather than stating that Biocept "announced" the Agreement on that date. *Livid Holdings Ltd.*, 416 F.3d at 946. As Gerhardt and Huebner point out, by the time Biocept filed its second-quarter report on August 13, 2020, Biocept had already formally "announced" the Agreement in a press release issued one week earlier, on August 6, 2020. (*See* SAC ¶ 56.)

Given that the Agreement itself (and consequently, its "announcement" date) had already been made public at the time Biocept filed the quarterly reports, it is unclear how the discrepancies in the reports regarding the announcement date would have induced a reasonable investor to buy or sell shares in Biocept or were otherwise material. Indeed, Plaintiff implicitly acknowledges this, as the SAC alleges that "[Plaintiff] further purchased shares based on the fact that Biocept was going to develop a novel assay to detect COVID-19," *id.* ¶ 114—notably not based upon when Biocept represented that it announced the Agreement.[19]

The SAC thus fails to allege the materiality of the misstatements of the announcement date in Biocept's quarterly reports.[20] These alleged misrepresentations accordingly cannot support Plaintiff's Section 10(b) claims.

       (ii)  **Nall's Statement on the March 31, 2021, Earnings Call**

The SAC alleges that during an earnings call on March 31, 2021, Nall "intentionally lied" by stating:

> In regards to our collaboration with the Aegea Biotechnologies, earlier this month, after successfully developing a next-generation COVID-19 assay, we announced a supply agreement under which Aegea is providing us with the

---

[19] The allegation that Biocept corrected this misrepresentation in its 2020 Annual Report sheds no light on the issue of materiality. The SAC alleges that in Biocept's Annual Report issued on April 4, 2021, "Biocept intentionally changed the wording regarding the June 3rd Agreement" from 'On June 3, 2020, the Company announced entering into a development agreement with Aegea' to instead say 'In June 2020, we entered into a development agreement with [Aegea].'" *Id.* at 56. The SAC further alleges that "Biocept and [Mayer Hoffman] made a deliberate yet subtle change in wording to conceal their earlier fraudulent statements, with the goal of escaping the notice of investors in the eight months that followed." *Id.* Again, it is unclear from the SAC's allegations how the announcement date of the Agreement would influence a reasonable investor's actions or otherwise be material.

[20] The SAC also attributes other omissions or misrepresentations to Biocept's 2020 annual report, including that Biocept "[f]ailed to file a Form 8-K disclosing the Aegea and Biocept amendments to the cross-licensing agreement regarding Switch Blocker," "[f]ailed to add the amended cross licensing agreement as an exhibit," and "[f]ailed to disclose in the patent section that the main patent that Biocept's blood based business was based on was co-owned with Aegea." (SAC ¶ 88.) The SAC, however, does not allege any facts explaining the significance of these omissions, their relationship to the other fraudulent misrepresentations or omissions alleged in the SAC, or how these omissions were otherwise material.

23-cv-1803-WQH-BLM

kits for validation and commercialization in our lab. This next-generation COVID-19 assay was developed using the patented Switch-Blocker technology that is jointly owned by Biocept and Aegea, which is the same technology that is the basis for many of our ultrasensitive oncology assays.

(SAC ¶ 82.) However, as Nall and Kennedy point out, the SAC does not allege "what is false or misleading" about this statement. (ECF No. 100-1 at 19.)

In order to allege falsity under the PSLRA, a plaintiff's complaint must "specify each statement alleged to have been misleading," as well as "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1); *see In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012). The SAC fails to allege sufficient facts specifying "the reason or reasons why the statement [was] misleading." 15 U.S.C. § 78u–4(b)(1). Because the SAC does not sufficiently allege the falsity of Nall's statement on the March 31, 2021, earnings call, this statement cannot support Plaintiff's Section 10(b) claims.[21]

### (iii) Nall's Statement on the November 15, 2021, Earnings Call

The SAC alleges that during an earnings call on November 15, 2021, Nall made an "intentional fraudulent statement on the call" that "[a]s a final update on COVID-19 testing, following validation, we expect to begin commercialization of the assay

---

[21] To the extent Plaintiff intends to allege that this statement was false due to Nall's use of the word "we" in the phrase "we announced," both the falsity and materiality of this phrase are unclear. The SAC alleges that Aegea, not Biocept, issued the March 2, 2021, press release announcing the supply agreement. (SAC ¶ 80; *see also id.* ¶ 82 ("Biocept did not even issue its own press release.").) However, the SAC also alleges that "[t]he press release tagged Biocept and was put on Biocept['s] website" and that Nall "approved" the Aegea press release and was quoted in it. *Id.* ¶ 80. The SAC's allegations support that Biocept took multiple steps that aligned with "announcing" the supply agreement itself or, at the very least, joining in making the "announcement"—namely, allowing itself to be tagged in the press release, placing the press release on its own website, and even including a quote from Nall, its CEO, in the press release—such that a reasonable Biocept shareholder would have been aware of the announcement and Biocept's role in the supply agreement. Nall's statement that "we announced" the supply agreement thus does not appear to be either false or material based upon the allegations in the SAC.

The Court's analysis applies with equal force to the SAC's challenge to the identical statement in Biocept's 2020 annual report. *See id.* ¶ 86 (quoting Biocept's annual report as stating "[i]n early March 2021, we announced a supply agreement with Aegea for the PCR-based COVID-19 assay kit" and alleging that "Biocept never announced the Supply agreement with Aegea, but the 2020 Audited annual report makes this fraudulent statement").

co-developed with Aegea Biotechnologies by the end of the year." *Id.* ¶ 92. The SAC alleges that "Nall, the Biocept executives and Biocept's Board of Directors knew this statement was false" because "[t]he test was already validated in October 2021, before the FDA rules changed." *Id.* The SAC alleges that Biocept's annual report for 2021 contains a statement "that the validation of the Aegea-Biocept COVID-19 test was completed in October." *Id.* ¶ 71. The SAC also alleges that a journal article published in November 2021 indicates that the test "was purportedly validated long before October 28th, 2021." *Id.*

Although it is unclear which aspect of the statement in Nall's earning call Plaintiff alleges was a "misrepresentation," to the extent the SAC alleges that the statement "following validation" was false because the COVID-19 test was "already validated," Plaintiff fails to demonstrate the materiality of this statement. The SAC does not allege sufficient facts to allow for an inference that knowledge of the test's true validation status would have induced a reasonable investor to buy or sell shares in Biocept or would have otherwise been material to a reasonable investor.

In sum, the SAC fails to allege the falsity and/or materiality of the alleged misrepresentations that are attributed to specific Biocept Moving Defendants. In any event, even if the SAC had sufficiently alleged the materiality or falsity of these statements, Plaintiff's Section 10(b) claims nevertheless fail because, as the Court explains below, the SAC does not adequately allege other elements of his claims, particularly scienter or loss causation.

**b.    Scienter**

To overcome the PSLRA pleading requirements when pleading scienter against a corporate defendant, a plaintiff must allege that the corporation, acting through its officers or agents, engaged in fraudulent conduct with scienter. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015). In a Section 10(b) action, scienter refers to "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). "[D]eliberate recklessness is 'an extreme departure from the standards of ordinary

care … which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id.* (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)).

Under the PSLRA, the allegations of a complaint must give "rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). This requires a weighing of competing inferences from the underlying allegations— "[a] complaint will survive, … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" but it "must be more than merely 'reasonable.'" *Id.* (citations omitted).

With respect to omissions, "the plaintiff must plead 'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Zucco Partners*, 552 F.3d at 991 (citations omitted). To determine if the scienter requirement is satisfied, a "court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326.

### i.    The SAC Must Allege Scienter

In his briefing in response to the Motions to Dismiss, Plaintiff cites *In re Finjan Holdings, Inc.*, contending that this Ninth Circuit decision "appears to lower the pleading bar for allegations about state of mind and expressions of opinion in cases that do not require proof of scienter." (ECF No. 109 at 15 (citing *In re Finjan Holdings, Inc.*, 58 F.4th 1048 (9th Cir. 2023)).) Plaintiff's briefing goes on to recognize, however, that *In re Finjan Holdings* "does not apply where proof of scienter is required, and it does not dilute the separate pleading-particularity requirements under the securities laws and Federal Rule of Civil Procedure 9(b)." *Id.*

To the extent Plaintiff contends that he need not plead scienter in support of his Section 10(b) claims, Plaintiff is incorrect. As several Moving Defendants point out, *In re Finjan Holdings* concerned only Section 14(e) claims, and is accordingly inapplicable to the Section 10(b) claims asserted in this action.[22] *See In re Finjan Holdings*, 58 F.4th at 1052 (acknowledging that "the subjective falsity required by Section 14(e) is not equivalent to the scienter requirement … required by, for example, Section 10(b)"). Plaintiff must, therefore, sufficiently allege scienter in order to state a viable Section 10(b) claim.

### ii.    Group Allegations of Scienter Are Insufficient

In a section of the SAC entitled "Scienter," Plaintiff alleges that "[a]ll the Defendants knew, or should have known about the violations of securities laws, fiduciary violations, and fraud. … The Defendants knew they were violating securities laws and fraud while giving material assistance to Biocept." (SAC ¶ 116.) The SAC also alleges that "[t]he Defendants in this case either knew or should have known that they were breaking security laws by helping Biocept commit securities law violations." *Id.* ¶ 3.

Several of the Moving Defendants generally contend that Plaintiff's "group allegations" of scienter are insufficient. (*See, e.g.*, ECF No. 93-1 at 22; ECF No. 135 at 8.)

The SAC's group allegations fail to provide "a strong inference" of the Moving Defendants' scienter sufficient to satisfy the PSLRA. *See* 15 U.S.C. § 78u–4(b)(2)(A). The SAC's conclusory allegations that "[a]ll the Defendants knew, or should have known about the violations of securities laws, fiduciary violations, and fraud" do not meet this exacting standard. (SAC ¶ 116.) "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted). Moreover, the SAC's allegations that various defendants "should have

---

[22] Whereas Section 14(e) "prohibits the use of false or misleading statements in connection with a tender offer," Section 10(b) "deals generally with falsities in the purchase and sale of securities." *In re Finjan Holdings*, 58 F.4th at 1051; *compare* 15 U.S.C. § 78n(e) (Section 14(e)), *with* 15 U.S.C. § 78j(b) (Section 10(b)).

known" about Biocept's alleged fraud by virtue of their positions as Biocept's auditor, attorney, investor relations firm, and investment banker are insufficient. *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 952–53 (9th Cir. 2023) ("The only strong inference to be drawn was that the [defendant] *should* have known of the possible violations, not that he actually knew about them, which was insufficient to plead scienter." (citing *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008))).

The SAC's "group allegations" fail to allege scienter against the Moving Defendants.

### iii.    Scienter Allegations: Biocept Moving Defendants

Gerhardt and Huebner contend that the SAC's "only allegations as to knowledge or intent are insufficient on their face as they are either conclusory or constitute mere recitation of the elements of the claims." (ECF No. 95-1 at 27 (citing SAC ¶ 13 ("Gerhardt was aware of Biocept's violations of security laws and fraud."); *id.* ¶ 14 ("Huebner was aware of Biocept's violations of security laws and fraud."); *id.* ¶ 38 ("Biocept's management team and Board of Directors intentionally concealed this information [related to the June 3 Agreement]."); *id.* ¶ 74 ("Defendants knew, or should have known about the violations of securities laws, fiduciary violations, and fraud.").) Nall and Kennedy similarly contend that the SAC "pleads no particularized facts bearing on either Mr. Nall or Mr. Kennedy's knowledge or intent relating to the allegations that Biocept (1) concealed the primary purpose of the reverse stock-split, (2) delayed announcing the Aegea co-development agreement, or (3) never intended to commercialize the COVID-19 test." (ECF No. 100-1 at 21 (citing SAC ¶ 66 ("Defendants Nall [and] Kennedy … knew that the Q-2 filing contained fraudulent statements and misrepresentations."); *id.* ¶ 72 ("Nall and Kennedy knew they were signing a report to cover up fraud and securities law violations.").) As for the allegations that Biocept engaged in a "quid-pro-quo pump-and-dump" scheme, Gerhardt and Huebner contend that the SAC does not allege that any Biocept defendants "dumped" their shares or "sold any shares during the relevant

period or otherwise benefited in any way from the alleged fraud," which "cut[s] strongly against any inference of fraud/scienter." (ECF No. 95-1 at 30.)

"Pump and dump schemes involve the touting of a company's stock … through false and misleading statements to the marketplace. After pumping the stock, fraudsters make huge profits by selling their cheap stock into the market." *United States v. Zolp*, 479 F.3d 715, 717 n.1 (9th Cir. 2007) (citations and quotations omitted); *see United States v. Hackett*, 123 F.4th 1005, 1007 n.6 (9th Cir. 2024) ("The critical steps in the 'pump-and-dump scheme' are control, pump, and dump."). While a lack of stock sales is not dispositive as to scienter, the Ninth Circuit has "recognized that a lack of stock sales can detract from a scienter finding." *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018).

The SAC's conclusory allegations regarding the Biocept Moving Defendants' scienter, coupled with a failure to allege that these defendants sold any stock or received any financial benefit from the alleged pump-and-dump scheme, fall short of alleging an "inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The allegations that several of these defendants signed certain Biocept filings containing alleged misstatements, without more, is insufficient to create a strong inference of scienter. *See Khoja v. Orexigen Therapeutics, Inc.*, No. 15-CV-540 JLS (JLB), 2019 WL 4599882, at *15 (S.D. Cal. Sept. 23, 2019) (reasoning that, absent allegations that the defendants knew the public filings they signed contained misstatements, their "signatures on those public filings alone [did] not give rise to a strong inference of scienter"); *see also In re Am. Apparel, Inc. S'holder Litig.*, No. CV 10-06352 MMM (RCx), 2013 WL 10914316, at *31 n.246 (C.D. Cal. Aug. 8, 2013). Plaintiff accordingly fails to allege scienter as to Gerhardt, Huebner, Nall, or Kennedy, further requiring dismissal of his Section 10(b) claims against these defendants.

### iv.    Scienter Allegations: Maxim

Maxim contends, *inter alia*, that, as a corporation, it can have scienter only through its employees. (ECF No. 94-1 at 13.) Maxim contends that the SAC contains no allegations

leading to the inference that McCarthy—the Maxim employee who issued the "buy recommendations" on Biocept's stock to allegedly "pump the stock price higher" (SAC ¶ 9)—issued research reports that "reflected anything other than his honestly held beliefs" or otherwise had "knowledge of the purported [pump-and-dump] scheme." (ECF No. 94-1 at 13.) Thus, Maxim contends, the SAC's failure to sufficiently allege McCarthy's scienter consequently results in a failure to allege that Maxim acted with scienter.

The SAC alleges that McCarthy "issued an absurd price target on Biocept after the markets closed on August 5, 2020," when he "should have known that Biocept's shares were traded at a volume 35 times higher than normal on August 5th. McCarthy apparently knew a material press release was forthcoming and knew that Maxim controlled the 46 million broker non-votes." (SAC ¶ 20.) The SAC further alleges that "McCarthy knew or should have known that Maxim control[led] the vote and that Maxim had already submitted its vote for the reverse split. … McCarthy continued to issue absurd price target[s] and buy recommendations on Biocept until its bankruptcy filing." *Id.*

The Court agrees with Maxim that the SAC's allegations fail to allege particularized facts that lead to a strong inference that McCarthy was aware of the alleged pump-and-dump scheme, much less that he acted with the requisite scienter. Plaintiff's allegations that McCarthy "knew or should have known" are conclusory and insufficient. Accordingly, Plaintiff's failure to allege that McCarthy, as Maxim's employee, acted with the requisite scienter necessarily results in a failure to allege scienter as to Maxim. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d at 475 ("[A] corporation 'can only act through its employees and agents' and can likewise only have scienter through them."). Plaintiff thus fails to allege scienter as to Maxim.

Accordingly, the SAC's Section 10(b) claim against Maxim must be dismissed for failure to allege the necessary element of scienter.

### v.    Scienter Allegations: Mayer Hoffman

Mayer Hoffman contends that the SAC fails to allege scienter against it because Plaintiff does not allege any misstatements regarding financial information, which was the

subject of Mayer Hoffman's audits. (ECF No. 91-1 at 30.) Mayer Hoffman contends that, instead, "Plaintiff merely identifies misleading statements in unaudited documents or actions allegedly taken by other defendants" and "alleges in a conclusory fashion that Mayer Hoffman misled Biocept's investors and engaged in 'reckless auditing practices.'" *Id.*

Although auditors like Mayer Hoffman can be held liable under Section 10(b) and Rule 10b–5 for "preparing and certifying publicly filed financial statements that they know, or are reckless in not knowing, are false," *Ponce v. Sec. & Exch. Comm'n*, 345 F.3d 722, 729 (9th Cir. 2003), Plaintiff does not allege that Biocept made any fraudulent statements with regard to its finances or that Mayer Hoffman recklessly audited any financial statements that contained misrepresentations. Instead, Plaintiff alleges that Mayer Hoffman knew or should have known about Biocept's alleged misrepresentations or omissions regarding non-financial information in audited documents and in certain unaudited documents (*see, e.g.*, SAC at 56; *id.* ¶ 92), which exceeds the scope of responsibility of an auditor such as Mayer Hoffman.[23] Accordingly, the SAC fails to adequately allege scienter against Mayer Hoffman under a theory of conducting a "reckless" audit or otherwise, further requiring dismissal of Plaintiff's Section 10(b) claim against Mayer Hoffman.

/ / /

_____

[23] Indeed, the SAC's citations to Public Company Accounting Oversight Board ("PCAOB") standards and SEC regulations undermine Plaintiff's assertions regarding Mayer Hoffman's purported responsibilities to review or audit Biocept's non-financial information, as these standards and regulations specifically discuss an auditor's role in reviewing "financial information" and "financial statements." (*See* SAC ¶ 66 (quoting PCAOB AS § 4105, which "establish[es] standards and provide[s] guidance on the nature, timing, and extent of the procedures when conducting a review of *interim financial information*" and defines "interim financial information" as "financial information or statements"); *id.* ¶ 67 (quoting 17 C.F.R. § 210.8–03, which states that "*interim financial statements* included in quarterly reports on Form 10–Q … must be reviewed by an independent public accountant …." (emphasis added)).) Furthermore, PCAOB standards explicitly state that "the auditor has no responsibility to audit information outside the basic financial statements in accordance with PCAOB auditing standards." PCAOB AS § 2705.04; *see also* PCAOB AS § 2710.04 ("The auditor's responsibility with respect to information in a document does not extend beyond the financial information identified in his report, and the auditor has no obligation to perform any procedures to corroborate other information contained in a document.").

### c.    Loss Causation

Loss causation is a plaintiff's "burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss, by tracing the loss back to 'the very facts about which the defendant lied.'" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (quoting *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013)).

"At the pleading stage … the plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (citing *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008)). "In other words, the plaintiff must plausibly allege that the defendant's fraud was '*revealed* to the market and *caused* the resulting losses.'" *Id.* (quoting *Metzler*, 540 F.3d at 1063). A plaintiff asserting securities fraud must allege "that the market 'learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally.'" *Id.* at 887–88 (quoting *Metzler*, 540 F.3d at 1063). "Simply pleading 'that the market reacted to the purported "impact" of the alleged fraud … rather than to the fraudulent acts themselves' is not sufficient." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th at 952–53 (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010)).

Identifying corrective disclosures is "the most common way for plaintiffs to prove that '[t]he truth became known.'" *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020). When "information correcting the misstatement or omission that is the basis for the action is disseminated to the market," a corrective disclosure occurs. 15 U.S.C. § 78u-4(e)(1) (using that event to establish a statutory cap on damages); *see also In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1184 (9th Cir. 2024). "[A] corrective disclosure need not reveal the full scope of the defendant's fraud in one fell swoop; the true

facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures." *In re BofI Holding*, 977 F.3d at 790. However, "[a] corrective disclosure must reveal 'new facts' that, taken as true, 'render some aspect of the defendant's prior statements false or misleading.'" *Pampena v. Musk*, 705 F. Supp. 3d 1018, 1052 (N.D. Cal. 2023) (quoting *In re BofI Holding*, 977 F.3d at 790).

Several Moving Defendants contend that Plaintiff fails to allege loss causation. Some Moving Defendants point out that the SAC does not allege that Plaintiff sold his stock, let alone when he sold it. Several Moving Defendants also contend that Plaintiff does not identify any "corrective disclosures."

Plaintiff contends that the SAC "detailed the results of declining price action at the time a reverse split vote is approved and after the implementation of a reverse split." (ECF No. 109 at 10.)

In the "Loss Causation" section of the SAC, Plaintiff alleges that his "losses can be attributed to the (1) the fraudulent acts committed by Biocept, (2) the fraudulent reverse split, (3) the purported COVID-19 test was a fraud." (SAC ¶ 103.) Plaintiff alleges that he was "induced to hold his original shares, and induced to buy more shares based on Biocept's claim they were developing a novel new COVID-19 test and Maxim's August 17th price target." *Id.* Plaintiff also alleges that he "was induced into not selling his shares because he thought Biocept was actually going to co-develop and clinically validate the COVID-19 test when they did not have any intention to do that." *Id.* The SAC further alleges that "[h]ad [Plaintiff] known that Biocept concealed the reason for the reverse split, and then embarked on acts to willfully and knowingly prevent Biocept from curing the NASDAQ deficiency, he would have never bought Biocept stock." *Id.* The SAC alleges that Plaintiff suffered "$197,000 in losses," "the majority" of which "came from purchases on August 7th and 18th when Maxim's price target calling for a 300% increase occurred." *Id.*

The SAC does not allege that Biocept (or any other defendant) made any "corrective disclosures," much less how Biocept's stock price was affected by such disclosures.

Furthermore, the SAC does not allege if or when Plaintiff sold his stock.[24] Although Plaintiff need only plausibly allege that the revelation of the fraud "caused the company's stock price to drop and investors to lose money," *In re Facebook, Inc. Sec. Litig.*, 87 F.4th at 934, the SAC does not allege particularized facts connecting Biocept's decline in value to the alleged fraud itself. The SAC's conclusory statement that "Plaintiff's losses can be attributed to" the alleged fraud is insufficient. (SAC ¶ 103.) While the SAC includes several charts purportedly demonstrating the fall of Biocept's stock "price per share," "closing price," and "pre-split closing price" in relation to the implementation of the reverse split, *id.* at 70–72,[25] the SAC does not contain particularized allegations explaining how the decline in value was related to any alleged revelations of *fraud*, rather than a reaction to the *impact* of the alleged fraud (the reverse split) or perceptions of Biocept's "poor financial health." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th at 952–53; *Loos*, 762 F.3d at 888. Accordingly, the Court agrees with Gerhardt and Huebner that Plaintiff does not "attribute his losses to any revelation of the alleged fraud," but "simply bases his [Biocept stock] purchases and losses on … the fact of the Reverse Split itself." (ECF No. 95-1 at 31.) Such allegations are insufficient to adequately plead loss causation.

The SAC accordingly does not sufficiently allege loss causation, further requiring dismissal of the Section 10(b) claims against the Moving Defendants.[26]

---

[24] Although Plaintiff attached an affidavit to the SAC that states that he had "completely divested [his] shares by the end of November 2020" (ECF No. 84-1 ¶ 57), the Court cannot consider such attachments when evaluating the sufficiency of the SAC in ruling upon a motion to dismiss. *See Ritchie*, 342 F.3d at 908 ("Affidavits and declarations … are not allowed as pleading exhibits unless they form the basis of the complaint."). Regardless, even if the Court could consider this statement in Plaintiff's affidavit, the SAC nevertheless fails to plead loss causation for the additional reasons described below.

[25] The Court observes that one of the charts does not appear pertinent to the alleged fraud, as it lists dates and events occurring in 2023. (*See* SAC at 70.) The alleged fraud at issue here purportedly occurred in 2020.

[26] Several Moving Defendants also contend that Plaintiff's Section 10(b) claims fail because the SAC does not adequately allege reliance. In a section of the SAC entitled "Presumption of Reliance and Reliance," Plaintiff alleges that he is "entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v.*

1

2

>         **d.    No Private Right of Action for Aiding and Abetting a**
>              **Securities Fraud Claim**

The CBIZ Defendants, Mayer Hoffman, the Cooley Defendants, and LHAI also contend that Plaintiff cannot assert securities fraud claims against them under an aiding and abetting theory of liability. (*See* ECF No. 91-1 at 25; ECF No. 92-1 at 5 n.1 (noting that the CBIZ Defendants "expressly join in … and incorporate and adopt Mayer Hoffman's arguments"); ECF No. 93-1 at 10; ECF No. 98-1 at 21.)

The Supreme Court has made clear that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994); *see also Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 158 (2008) ("The § 10(b) implied private right of action does not extend to aiders and abettors).

---

*U.S.*, 406 U.S. 128 (1972), because the claims asserted … are predicated in part upon material omissions of fact that the Defendants had a duty to disclose." (SAC ¶ 111.)

The Moving Defendants contend, in part, that this case primarily involves affirmative misrepresentations, rather than omissions, rendering the *Affiliated Ute* presumption inapplicable. (*See* ECF No. 91-1 at 31; *see also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2 F.4th 1199, 1204 (9th Cir. 2021) ("[B]inding circuit precedent makes clear that the *Affiliated Ute* presumption is limited to cases that primarily allege omissions and present plaintiffs with the difficult task of proving a speculative negative." (citing *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999))).)

A presumption of reliance does not appear appropriate in this case. As the SAC alleges, Plaintiff's securities fraud claims are premised only "*in part* upon material omissions of fact that the Defendants had a duty to disclose." (SAC ¶ 111 (emphasis added).) Indeed, Plaintiff's claims seem to rest primarily on alleged affirmative misrepresentations, such as that "Biocept fraudulently included misrepresentations in the sections concerning COVID-19 and Related Parties" in its Q-2 Report (*id.* ¶ 65), Biocept's "stated reason … for the reverse split was to bring it into compliance with a deficiency notice that Biocept received from NASDAQ," when "the main reason for the reverse split proposal was to enable Biocept to sell more shares of its common stock … in order to fund its significant operational losses," which is a misrepresentation (*id.* ¶¶ 9–10), and Biocept represented that it "was going to develop a novel assay to detect COVID-19," despite "Biocept ha[ving] no intention of developing or commercializing the test," which is a misrepresentation (*id.* ¶ 114). Furthermore, the Court found above that the SAC fails to allege any actionable omissions that can be attributed to any of the Moving Defendants. *See supra* at 27–30.

The Court need not decide this issue at this juncture because, as discussed above, Plaintiff has not sufficiently alleged that the Moving Defendants made any material misrepresentations or omissions. The SAC consequently fails to allege reliance upon any material misrepresentations or omissions that can be attributed to the Moving Defendants.

Thus, the SAC's Section 10(b) claims further warrant dismissal to the extent Plaintiff asserts them based upon an aiding and abetting theory of liability.

### 3. Other Securities Fraud Claims
#### a. Scheme Liability Claim Under Rule 10b–5(a) or (c)

"Under Rule 10b–5(a) or (c), a defendant who uses a 'device, scheme, or artifice to defraud,' … may be liable for securities fraud." *Khoja*, 899 F.3d at 1017 (quoting *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011)); *see* 17 C.F.R. § 240.10b–5(a), (c). A plaintiff may allege that a defendant violated subsections (a) and (c) under either a dissemination theory—meaning engaging in the "dissemination of false or misleading statements with intent to defraud"—or a traditional conduct-based scheme liability theory. *See Sneed v. AcelRx Pharms., Inc.*, No. 21-cv-04353-BLF, 2022 WL 4544721, at *6 (N.D. Cal. Sept. 28, 2022) (citing *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 78–79 (2019)).

To state a claim under Rules 10b–5(a) or (c), a plaintiff must allege: "(1) a device, scheme or artifice to defraud, or an act, practice or course of business that operates as fraud; (2) in connection with the purchase or sale of securities; (3) scienter; and (4) the use of the means of instrument of interstate commerce." *Sec. & Exch. Comm'n v. Zouvas*, No. 3:16-cv-0998-CAB-(DHB), 2016 WL 6834028, at *5 (S.D. Cal. Nov. 21, 2016) (citing 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5; *SEC v. Phan*, 500 F.3d 895, 907–08 (9th Cir. 2007)). "Although the heightened pleading requirements of the PSLRA do not apply to claims under Rule 10b–5(a) and (c), such claims must be pleaded with specificity under Rule 9(b)." *Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, No. CV 15-8574 PSG (MRWx), 2016 WL 6782768, at *14 (C.D. Cal. Aug. 9, 2016) (citation omitted); *see also In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1193 (D. Or. 2015).

"To be liable for a scheme to defraud, 'each defendant [must have] committed a manipulative or deceptive act in furtherance of the scheme.'" *Sec. & Exch. Comm'n v. Zwebner*, No. 3:16-cv-01013-CAB-(DHB), 2016 WL 9526398, at *3 (S.D. Cal. Nov. 29, 2016) (quoting *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997)). "If a defendant's

conduct or role in an illegitimate transaction has the principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme to defraud, then the defendant is using or employing a deceptive device within the meaning of § 10(b)." *Id.* (quoting *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1050 (9th Cir. 2006), *vacated on other grounds sub nom. Avis Budget Grp. Inc. v. Cal. State Tchrs.' Ret. Sys.*, 552 U.S. 1162 (2008)).

Several Moving Defendants contend that, to the extent Plaintiff intends to assert a Section 10(b) claim for "scheme liability" based on his allegations concerning the purported pump-and-dump scheme, the SAC fails to allege the requisite facts with particularity. Specifically, as to a dissemination theory of scheme liability, LHAI contends that it "is a third-party that had no role in disseminating any of the statements [Plaintiff] concludes [are] false, and [Plaintiff] has no specific allegations that would plausibly show LHAI did so with the requisite scienter." (ECF No. 93-1 at 22.) The Cooley Defendants contend that "[a]ll of the challenged statements were issued by Biocept," and "Plaintiff does not allege (nor can he) that the Cooley Defendants separately disseminated any of them to investors, much less with intent to deceive." (ECF No. 98-1 at 28.)

With respect to a conduct-based theory of scheme liability, the Cooley Defendants contend that, "[a]side from acting as Biocept's outside counsel, Plaintiff does not allege any specific conduct by the Cooley Defendants, much less conduct furthering the supposedly fraudulent scheme." *Id.* at 29. Nall and Kennedy similarly contend that Plaintiff fails to plead that they engaged in "conduct furthering the supposedly fraudulent scheme," including "what specific actions Mr. Nall or Mr. Kennedy took in furtherance of" the alleged pump-and-dump scheme. (ECF No. 100-1 at 25.)

The SAC does not allege with particularity how each defendant "committed a manipulative or deceptive act in furtherance of the scheme." *Cooper*, 137 F.3d at 624. The SAC does not allege with particularity that any of the Moving Defendants "disseminated" any false or misleading statements in relation to the scheme. The SAC does not allege that any of the Moving Defendants, including Biocept directors Gerhardt, Huebner, Nall, and

Kennedy, signed (or played any role in disseminating) the August 6, 2020, press release or the proxy materials containing Biocept's purported false reason for seeking the reverse split. Although the SAC alleges that Maxim, through McCarthy, "issued a buy signal on Biocept with a 200% increase in Biocept's stock price" as part of the alleged pump-and-dump scheme (SAC ¶ 62), as the Court explained above, the SAC does not allege particularized facts that lead to a strong inference that McCarthy—and by extension, Maxim—was aware of the alleged pump-and-dump scheme, much less that he acted with the requisite scienter. *See supra* at 42–43 (citing *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d at 475).

For another matter, Gerhardt and Huebner contend that, to the extent Plaintiff alleges the reverse split was intended to conceal the "primary purpose" of "obtaining more shares to sell to the public" (SAC ¶ 43), that objective "was fully disclosed in the proxy [materials]." (ECF No. 95-1 at 21 (citing ECF No. 97-18 at 42 ("Because our authorized common stock will not be reduced by the reverse stock split, the overall effect will be an increase in authorized but unissued shares of common stock.")).)[27] Despite Plaintiff's attempt to dismiss this language in the proxy statement as "boilerplate language every proxy seeking a reverse split has" (ECF No. 109 at 10), the language's existence in the proxy statement undermines the SAC's theory that the reverse split was a "device, scheme, or artifice to defraud" or an "act, practice, or course of business which operat[ed] … as fraud or deceit." 17 C.F.R. § 240.10b–5(a), (c).

In another effort to allege that the reverse split was the "nexus" of a fraudulent pump-and-dump scheme, the SAC alleges that "shareholders were not aware that ALL 46,201,989 million Broker Non-Votes were counted as being against the reverse split proposal." (SAC ¶ 51.) Nall and Kennedy contend, however, that "the proxy statement

---

[27] The Court may take judicial notice of Biocept's proxy materials (ECF No. 97-18), because they are "incorporated by reference in the complaint." *Ritchie*, 342 F.3d at 907; *see, e.g.*, SAC at 8 ("Biocept's 2020 proxy knowingly fraudulent concealed that [sic] the primary reason the reverse split proposal was on the proxy."); *id.* ¶ 40 ("On April 20, 2020, Biocept filed a preliminary Proxy with the SEC.").

expressly disclosed that, for purposes of the reverse split, 'broker non-votes … will have the same effect as "Against" votes.'" (ECF No. 100-1 at 18 (quoting ECF No. 98-4 at 9).) Again, this express language in the proxy statement further weakens the SAC's allegation that the reverse split was a "device, scheme, or artifice to defraud" or an "act, practice, or course of business which operat[ed] … as fraud or deceit." 17 C.F.R. § 240.10b–5(a), (c).

The SAC's allegations regarding the purported quid-pro-quo pump-and-dump scheme accordingly lack the requisite particularity to state a claim against the Moving Defendants for "scheme liability" under Rule 10b–5(a) or (c).

### b. Section 17(a) Claim

The SAC's Table of Contents cites Section 17(a)(1)–(3) of the Securities Act of 1933 ("Section 17(a)"), stating: "Count VII- Violating Section 10(b) of the Securities Exchange Act of 1934 ('Exchange Act'), Rule 10b–5 promulgated thereunder, and Section 17(a)(1)– (3) of the Securities Act." (SAC at 3.) Multiple Moving Defendants contend that there is no private right of action available under Section 17(a). (*See, e.g.*, ECF No. 98-1 at 21 n.6; ECF No. 100-1 at 23 n.8.)

The Ninth Circuit has held that no private right of action exists under Section 17(a). *See In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 823 F.2d 1349, 1358 (9th Cir. 1987); *see also Sec. & Exch. Comm'n v. Fusion Hotel Mgmt. LLC*, 3:21-cv-02085-L-MSB, 2022 WL 16924110, at *3 (S.D. Cal. Nov. 10, 2022) ("No private right of action, only SEC enforcement, is available under Section 17(a)."). Accordingly, to the extent Plaintiff attempts to assert his securities fraud claims based upon alleged violations of Section 17(a), he is precluded from doing so.

### c. Section 20 Claim

The SAC's "Jurisdiction" section alleges, in relevant part, that "[t]he claims asserted herein arise under §§ 10(b), 20(a), 20(b), and 20A of the Exchange Act." (SAC at 9.) The Cooley Defendants contend that, "[t]o the extent the Court construes Plaintiff's cursory mentions of these code provisions as additional causes of action, these too should be dismissed for violation of Rule 8 and failure to state a claim." (ECF No. 98-1 at 21 n.7.)

The Cooley Defendants also contend that, because claims under Section 20(a) and 20A of the Exchange Act are derivative claims, Plaintiff must successfully plead a Section 10(b) claim in order to succeed on his Section 20(a) and 20A claims. *Id.* at 29 n.12.

"Claims under Section 20A are derivative and therefore require an independent violation of the Exchange Act." *Id.*; *see also In re VeriFone Holdings*, 704 F.3d at 711 ("To prevail on its claims for violations of § 20A, [the plaintiff] must first sufficiently allege a violation of § 10(b) or Rule 10b–5."). Courts accordingly dismiss Section 20(a) claims where the plaintiff fails to allege a predicate Section 10(b) claim. *See, e.g.*, *Ferreira v. Funko Inc.*, No. 2:20-cv-02319-VAP (PJWx), 2021 WL 8820650, at *38 (C.D. Cal. Oct. 22, 2021) (dismissing a Section 20A claim because "[w]ithout a predicate violation by these particular Defendants, Plaintiffs' Section 20A claim against them fails").

Because the SAC fails to state an underlying violation of Section 10(b) against any of the Moving Defendants, it consequently also fails to state a claim for a violation of Section 20 against them, to the extent Plaintiff intended to do so.

### d.    Section 307 Claim

The SAC alleges that "Cooley and Bair are charged with violations of SEC rules, after they willfully and knowingly disregarded SEC Rules for Attorneys Section 307." (SAC at 92.) The Cooley Defendants contend that there is no private right of action for violations of Section 307. *Id.* (ECF No. 98-1 at 22 (citing 17 C.F.R. § 205.7).)

As relevant here, 17 C.F.R. § 205.7 explicitly states that "[n]othing in this part is intended to, or does, create a private right of action against any attorney, law firm, or issuer based upon compliance or noncompliance with its provisions," and clarifies that "[a]uthority to enforce compliance with this part is vested exclusively in the [SEC]." 17 C.F.R. § 205.7.[28] Thus, Plaintiff may not bring a private right of action against attorneys

---

[28] The SEC enacted 17 C.F.R. Part 205—which sets out "Standards of Professional Conduct for Attorneys"—in order to implement Section 307, 15 U.S.C. § 7245. *See Wadler v. Bio-Rad Laby's, Inc.*, 212 F. Supp. 3d 829, 855 (N.D. Cal. 2016); *see also* 17 C.F.R. § 205.1 ("This part sets forth minimum standards of professional conduct for attorneys appearing and practicing before the Commission ….").

or law firms based upon purported violations of Section 307, or its implementing regulations contained in 17 C.F.R. Part 205. *See Cohen v. Telsey*, No. 09-2033 (DRD), 2009 WL 3747059, at *18 (D.N.J. Nov. 2, 2009) (recognizing that, under 17 C.F.R. § 205.7, "no private right of action exists for a violation of the duty of an attorney to report a material violation to certain parties in certain situations"). To the extent Plaintiff attempts to assert his securities fraud claim against the Cooley Defendants based upon alleged violations of Section 307, he is precluded from doing so.

In sum, the SAC fails to adequately allege a securities fraud claim against any of the Moving Defendants.

### 4.    Common Law Fraud Claims

Plaintiff asserts a cause of action for common law fraud against Moving Defendants Nall, Kennedy, Gerhardt, Huebner, and the Maxim Defendants. Specifically, the SAC alleges that Nall, Kennedy, Gerhardt, and Huebner committed fraud by:

1. Concealing a material reason for the reverse split proposal in the 2020 proxy statement.
2. Concealing the June 3rd[,] 2020 agreement with Biocept[.]
3. Issuing the July 18th press release[.]
4. Adjourning the annual meeting to later future dates to obtain shareholder [a]pproval for the reverse split[.]
5. Making fraudulent statements in the second and third quarter 2020 reports filed with the SEC.
6. Issuing a delinquent press release on August 6, 2020.
7. Delaying validating and never intending to commercialize the COVID-19 test.
8. Implementing an unlawful reverse split on or about September 8th[,] 2020.

(SAC at 83.) The SAC alleges that the Maxim Defendants "committed common law fraud with Biocept in committing fraud by":

1. Voting shares, that may or may not have been disinterested, at the August 18th[,] 2020 shareholder meeting with the knowledge that Biocept committed fraud in concealing the June 3rd[,] 2020 agreement.
2. Issuing a buy recommendation on August 5th[,] 2020 knowing that Biocept was about to announce a material agreement.

3. Issuing a buy recommendation on August 17th[,] 2020 knowing that Maxim voted for the reverse split proposal.

4. Participating in a quid pro quo pump and dump scheme with Biocept between August 1st and August 21st[,] 2020[.]

5. Shorting Biocept stock, either for Maxim's account or the accounts of its Clients after August 6th[,] 2020[.]

*Id.* at 83–84.

The Moving Defendants generally contend that the SAC lacks particularized allegations explaining each defendant's role in the alleged fraud. The Maxim Defendants contend the fraud claim lacks particularized allegations regarding "the who, what, when, where, and how." (ECF No. 94-1 at 14 (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).) Gerhardt and Huebner contend the SAC fails to allege a false or misleading statement, any deceptive conduct, or fraudulent intent.[29] (ECF No. 95-1 at 19–20, 27.) Nall and Kennedy contend the SAC fails to meet the *Iqbal*/*Twombly* plausibility standard "because its fraud theory is implausible on its face." (ECF No. 100-1 at 14.)

To state a claim for fraudulent misrepresentation, a plaintiff must allege: (1) a misrepresentation; (2) knowledge that the representation was false; (3) intent to induce reliance on the misrepresentation; (4) justifiable reliance on the misrepresentation; and (5) resulting damage. *Agosta v. Astor*, 120 Cal. App. 4th 596, 603 (Ct. App. 2004). Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) requires that the claimant allege "the time, place,

---

[29] Gerhardt and Huebner contend that because "[a]ll of Plaintiff's state/common law fraud claims are, in sum and substance, securities fraud claims," they "should therefore be governed by the [PSLRA's] heightened pleading standards." (ECF No. 95-1 at 17–18.) Gerhardt and Huebner recognize, however, that "the Ninth Circuit has not opined whether the [PSLRA's] heightened pleading standard applies to state/common law claims for securities fraud." *Id.* Gerhardt and Huebner contend that, "[r]egardless, all of Plaintiff's claims fail under any pleading standard." *Id.* Because the Court concludes that the SAC fails to allege Plaintiff's claims sounding in common law fraud under the Rule 9(b) standard ordinarily applied to fraud claims, the Court does not consider whether the PSLRA's heightened pleading standard applies to these claims.

23-cv-1803-WQH-BLM

and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz*, 476 F.3d at 764 (citing *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)). "In a fraud action against a corporation, a plaintiff must 'allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.'" *Santana v. BSI Fin. Servs., Inc.*, 495 F. Supp. 3d 926, 947 (S.D. Cal. 2020) (quoting *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 157 (Ct. App. 1991)).

"[T]he elements of a cause of action for fraud based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Kaldenbach v. Mut. of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 850 (Ct. App. 2009) (quotations and citations omitted).

Regardless of whether Plaintiff intends to assert a claim of fraudulent misrepresentation or fraudulent concealment, the SAC must allege fraudulent intent. Unlike the PSLRA's heightened pleading standard for alleging scienter, fraudulent intent may be alleged generally under Rule 9(b). *ESG Cap. Partners, LP*, 828 F.3d at 1032. However, a plaintiff must nevertheless allege "more than 'conclusory … allegations' and 'bare assertions … amount[ing] to nothing more than a 'formulaic recitation of the elements.'" *Kumandan v. Google LLC*, No. 19-cv-04286-BLF, 2022 WL 103551, at *11 (N.D. Cal. Jan. 11, 2022) (quoting *Iqbal*, 556 U.S. at 680–81). "'[M]ere conclusory allegations' that representations or omissions 'were intentional and for the purpose of defrauding and deceiving plaintiffs … are insufficient.'" *Pemberton v. Nationstar Mortg. LLC*, 331 F. Supp. 3d 1018, 1047 (S.D. Cal. 2018) (quoting *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 132 (Ct. App. 2007)).

As the Court found above, the SAC's allegations regarding the defendants' fraudulent intent are conclusory. (*See, e.g.*, SAC ¶ 116 ("All the Defendants knew, or should have known about the violations of securities laws, fiduciary violations, and fraud. … The Defendants knew they were violating securities laws and fraud while giving material assistance to Biocept."); *see also id.* ¶¶ 13–14, 20 38, 66, 72, 74.) Such conclusory allegations regarding the defendants' intent cannot support Plaintiff's fraud claims, whether based upon theories of misrepresentation or concealment.

The Court further finds that the SAC lacks particularized allegations regarding the who, what, when, where, and why of the alleged fraud. For example, while the SAC alleges that two of Biocept's quarterly reports misstated the date that Biocept "announced" the Agreement with Aegea, it is unclear what role any of the defendants played in this misstatement (besides Nall and Kennedy signing the reports). The SAC also does not sufficiently allege what role this misstatement played in facilitating the alleged fraudulent scheme, given that Biocept had already announced the Agreement prior to filing either of the reports, rendering the "announcement date" easily verifiable.

Finally, as stated above, it is unclear if Plaintiff has suffered any damage from the alleged fraud, as the SAC does not allege particularized facts allowing for an inference that Plaintiff's shares declined in value as a result of the alleged fraud, rather than for some other reason.

The SAC fails to state a common law fraud claim against the Moving Defendants.

## 5.    Constructive Fraud Claims

Plaintiff asserts a cause of action for constructive fraud against Biocept Moving Defendants Nall, Kennedy, Gerhardt, and Huebner. Specifically, the SAC repeats the same allegations that are listed in support of the common law fraud claim. (SAC at 86.) The SAC also alleges that the defendants "disseminated or approved the false statements … which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the

23-cv-1803-WQH-BLM

statements made, in light of the circumstances under which they were made, not misleading." *Id.*

Gerhardt and Huebner generally contend that "[a]ll of Plaintiff's claims fail because he cannot plead any false or misleading statement, or any deceptive conduct," "[Plaintiff] does not establish knowledge of the alleged fraud or any scienter/fraudulent intent," and "[Plaintiff] cannot establish reliance, loss causation or damages." (*See* ECF No. 95-1 at 19, 26, 30 & n.19.) In addition to joining these arguments, Nall and Kennedy generally contend that the SAC lacks particularized facts showing their roles in the alleged fraud. (*See* ECF No. 100-1 at 12–13, 16.)

"Constructive fraud is a unique species of fraud applicable only to a fiduciary or confidential relationship." *Salahutdin v. Valley of Cal., Inc.*, 24 Cal. App. 4th 555, 562 (Ct. App. 1994) (citation omitted). To succeed on a constructive fraud claim, a plaintiff must show: (1) the existence of a fiduciary or confidential relationship; (2) nondisclosure; (3) reliance; and (4) resulting injury. *Younan v. Equifax Inc.*, 111 Cal. App. 3d 498, 516 (Ct. App. 1980). Unlike fraud claims, "a plaintiff need not establish fraudulent intent to assert a viable constructive fraud claim as long as the parties are in a fiduciary or confidential relationship." *Sacramento E.D.M., Inc. v. Hynes Aviation Indus., Inc.*, 965 F. Supp. 2d 1141, 1152 (E.D. Cal. 2013) (citing *Sandy v. McClure*, 676 F. Supp. 2d 866, 882 (N.D. Cal. 2009)); *see* Cal. Civ. Code § 1573 ("Constructive fraud consists … In any breach of duty which, *without an actually fraudulent intent*, gains an advantage to the person in fault …." (emphasis added)).[30] Like fraud claims, however, "constructive fraud claims [under California law] are subject to the particularity requirements of Rule 9(b)." *William Morris Endeavor Ent., LLC v. Writers Guild of Am.*, 478 F. Supp. 3d 932, 943 (C.D. Cal. 2020) (quoting *Edumoz, LLC v. Republic of*

---

[30] Gerhardt and Huebner's contention that "all of Plaintiff's causes of action … fail" because "claims of fraud, constructive fraud, and securities fraud require showing of fraudulent intent or deliberate recklessness" is accordingly incorrect. (ECF No. 95-1 at 27.) The Court does not dismiss Plaintiff's constructive fraud claim based on a failure to allege fraudulent intent.

*Mozambique*, No. CV 13-02309-MMM, 2014 WL 12802921, at *30 (C.D. Cal. July 21, 2014)).

Plaintiff's constructive fraud claim appears to rest almost entirely upon the same allegations that support his common law fraud claim. (*Compare* SAC at 84, *with id.* at 86–87.) Thus, "[b]ecause the [SAC's] factual allegations offered in support of [Plaintiff's] constructive fraud claim are almost identical to the allegations in support of the fraud claim, the Court's reasoning above requires dismissal of [Plaintiff's] constructive fraud claim for failure to comply with Rule 9(b)'s pleading requirements." *Sacramento, E.D.M., Inc.*, 965 F. Supp. 2d at 1152.

The SAC fails to state a constructive fraud claim against the Moving Defendants.

### 6. Conspiracy to Commit Fraud Claims

Plaintiff asserts a cause of action for conspiracy to commit fraud against the CBIZ Defendants, Mayer Hoffman, the Cooley Defendants, LHAI, Aegea, and the Maxim Defendants. Specifically, the SAC repeats much of the same allegations that are listed in support of the common law fraud claim, in addition to alleging that the CBIZ Defendants, Mayer Hoffman, the Cooley Defendants, LHAI, and Aegea "[t]ook definitive actions to prevent Biocept from organically curing the NASDAQ Deficiency." (SAC at 88–89.)

Several Moving Defendants contend that the SAC's failure to allege the common law fraud claim necessitates dismissal of the conspiracy claim. (*See, e.g.*, ECF No. 91-1 at 23 n.10; ECF No. 98-1 at 30 n.13; ECF No. 120-1 at 27.) The Maxim Defendants contend that, aside from a "conclusory allegation that Maxim conspired with Biocept," the SAC lacks allegations "show[ing] that the Maxim Defendants entered into any agreement to aid in the commission of a fraud, or that they knew of or otherwise participated in an alleged fraud with the particularity required by Rule 9(b)." (ECF No. 94-1 at 14–15.) Aegea contends that "there are no factual allegations in the SAC regarding what actions Aegea took." (ECF No. 120-1 at 10.)

"In order to state a claim for conspiracy to commit fraud, a plaintiff must allege sufficient facts to state a claim for both fraud and civil conspiracy." *Comercializadora*

*Recmaq Limitada v. Hollywood Auto Mall, LLC*, No. 12cv0945 AJB (MDD), 2013 WL
2248140, at *4 (S.D. Cal. May 20, 2013); *see Del E. Webb Corp. v. Structural Materials
Co.*, 123 Cal. App. 3d 593, 603 n.4 (Ct. App. 1981) ("A conspiracy to commit fraud is not
itself a tort and such conduct is not actionable unless a fraud is in fact committed."). The
elements of an action for civil conspiracy under California law are: (1) formation and
operation of the conspiracy; (2) wrongful conduct in furtherance of the conspiracy; and
(3) damage resulting from such wrongful conduct. *Comercializadora Recmaq Limitada*,
2013 WL 2248140, at *4 (citing *Wasco Prods. v. Southwall Techs.*, 435 F.3d 989, 992 (9th
Cir. 2006)). "In the context of civil conspiracy, '[t]o survive a motion to dismiss, plaintiff
must allege with sufficient factual particularity that defendants reached some explicit or
tacit understanding or agreement.'" *Nasso v. Integrated Admin., Inc.*, No. CV 15-8534
DMG (GJSx), 2016 WL 6922346, at *5 (C.D. Cal. July 15, 2016) (quoting *NetApp, Inc. v.
Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 836 (N.D. Cal. 2014)). "[F]ormulaic recitations
and conclusory statements will not suffice to allege conspiracy plausibly." *Id.* (quoting
*United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Constr. Trades Dep't, AFL-CIO*,
770 F.3d 834, 842 (9th Cir. 2014)). Rule 9(b)'s heightened pleading standard applies to
claims alleging conspiracy to commit fraud. *See Swartz*, 476 F.3d at 765.

Plaintiff's conspiracy claims fail because, as explained above, the SAC does not
sufficiently allege the underlying tort of fraud. *See Eurosemillas, S.A. v. Uttarwar*, 854 F.
App'x 137, 139 (9th Cir. 2021) ("Under California law, failure to plausibly allege fraud
necessarily equates to failure to allege conspiracy to commit fraud." (citing *Kidron v.
Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581 (Ct. App. 1995))). Moreover,
beyond insufficiently conclusory allegations that the defendants "conspired with" each
other (*see, e.g.*, SAC ¶¶ 2, 9, at 88), the SAC does not adequately allege particularized facts
demonstrating that the defendants reached an understanding or agreement—either explicit
or tacit—to engage in the alleged underlying fraud. *Nasso*, 2016 WL 6922346, at *5.

The SAC accordingly fails to state a claim against the Moving Defendants for conspiracy to commit fraud.[31]

### 7. Aiding and Abetting Fraud Claims

Plaintiff asserts a cause of action for aiding and abetting fraud against the CBIZ Defendants, Mayer Hoffman, the Cooley Defendants, Nall, Kennedy, Gerhardt, Huebner, Aegea, and the Maxim Defendants. Specifically, the SAC repeats the same allegations that are listed in support of the common law fraud claim. (SAC at 90–91.)

Several Moving Defendants contend that, in addition to failing to plead any underlying fraud, Plaintiff fails to allege that the defendants had "actual knowledge" of the alleged fraud or "substantially assisted" in it. (*See* ECF No. 94-1 at 15; ECF No. 95-1 at 33; ECF No. 100-1 at 13; ECF No. 98-1 at 32.) Gerhardt and Huebner contend that the SAC's "conclusory assertion" that they "played a central role" in the alleged wrongdoing "is plainly insufficient under any pleading standard." (ECF No. 95-1 at 33.)

Under California law, a defendant may be held liable for aiding and abetting "the commission of an intentional tort if the person [ ] knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act." *Impac Funding Corp. v. Endresen*, No. SACV 15-588-JLS (JCGx), 2015 WL 13916649, at *2 (C.D. Cal. Dec. 16, 2015) (quoting *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003)). "The substantial assistance standard 'requires that the defendant's actions be a "substantial factor" in causing the plaintiff's injury.'" *Tan v. Quick Box, LLC*, No. 20cv1082-LL-DDL, 2024 WL 1121795, at *6 (S.D. Cal. Mar. 14, 2024)

---

[31] With respect to this claim and others, many Moving Defendants contend in their Reply briefs that Plaintiff fails to address the arguments in their Motions to Dismiss and thus effectively concedes these claims. (*See, e.g.*, ECF No. 125 at 10; ECF No. 124 at 4; ECF No. 119 at 8; ECF No. 135 at 12; ECF No. 149 at 10.) As a general matter, given Plaintiff's pro se status, the Court declines to find that Plaintiff's omissions constitute implicit concessions to the dismissal of any of his claims. *See Prado v. Gastelo*, No. 2:21-cv-05057-JAK (AFM), 2022 WL 20581969, at *5 (C.D. Cal. Mar. 24, 2022) (declining to find that a pro se plaintiff had abandoned his claim despite his "fail[ure] to address the grounds raised in the Motion" in his opposition brief in part because "a document filed pro se is 'to be liberally construed'" (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007))).

(quoting *Facebook, Inc. v. MaxBounty, Inc.*, 274 F.R.D. 279, 285 (N.D. Cal. 2011)). Rule 9(b)'s heightened pleading standard applies to an aiding and abetting fraud claim, meaning "substantial assistance must be pleaded with particularity, while actual knowledge may be averred generally." *Axonic Cap. LLC v. Gateway One Lending & Fin., LLC*, No. CV 18-5127 PSG (SSx), 2018 WL 11355034, at *17 (C.D. Cal. Dec. 18, 2018).

Plaintiff's aiding and abetting fraud claims fail because, as explained above, the SAC does not sufficiently allege the underlying tort of fraud. *See In re McKinsey & Co., Inc. v. Nat'l Prescription Opiate Litig.*, No. 3084 CRB, 2024 WL 2261926, at *15 (N.D. Cal. May 16, 2024) ("Plaintiffs have failed to adequately plead underlying fraud-based claims, so the claim for aiding and abetting fraud is due to be dismissed."). Furthermore, the SAC contains no particularized facts alleging how the defendants gave Biocept "substantial assistance" in carrying out the alleged fraud.[32] The SAC's conclusory allegations that certain defendants "knew or should have known" about the alleged fraud fall short. (*See* SAC ¶¶ 3, 116.)[33]

The SAC accordingly fails to state a claim against the Moving Defendants for aiding and abetting fraud.

### 8. Claims for Violations of the California Corporations Code

Plaintiff asserts a cause of action for violations of the California Corporations Code against Nall, Kennedy, Gerhardt, and Huebner. Specifically, without citing to a specific

---

[32] For the same reasons, the SAC's allegations that many of the defendants "stood silent" after Plaintiff notified them of his concerns that Biocept had committed fraud cannot support a fraud claim under either a conspiracy theory or an aiding and abetting theory of liability. (*See, e.g.*, SAC at 15; *id.* ¶¶ 22, 73; *S.V. ex rel. Valencia v. Delano Union Elementary Sch. Dist.*, No. 1:17-cv-00780-LJO-JLT, 2017 WL 3479009, at *4 (E.D. Cal. Aug. 14, 2017) (citing *Michael R. v. Jeffery B.*, 158 Cal. App. 3d 1059, 1069 (1984) for the proposition that "mere knowledge, acquiescence, or approval of an act, without cooperation or agreement to cooperate is insufficient to establish liability," before finding that the complaint was "insufficient" to support a civil conspiracy claim where it "[did] nothing more than allege Defendants had knowledge of wrongful conduct and failed to act upon that knowledge").)

[33] Furthermore, to the extent Plaintiff asserts the defendants aided and abetted the commission of securities fraud—rather than common law fraud—as the Court concluded above, no private right of action exists for such a claim. *See supra* at 48–49.

provision of the California Corporations Code, Plaintiff alleges that the Moving Defendants, among other Biocept defendants, "committed fraud," and then repeats the same allegations that are listed in support of the common law fraud claim. (SAC at 94.)

Gerhardt and Huebner contend[34] that these claims must be dismissed because the only specific citation to the California Corporations Code in the SAC is "Cal. Corp. Code § 25506" (SAC at 9), which does not provide a cause of action, but instead sets out the statute of limitations for certain proceedings related to securities actions under the California Corporations Code. *See* Cal. Corp. Code § 25506.[35]

---

[34] Nall and Kennedy join these arguments. (*See* ECF No. 100.)

[35] Plaintiff's Response in opposition to Gerhardt and Huebner's Motion to Dismiss contains citations to California Corporation Code § 25400 and § 2289. (ECF No. 109 at 5.) However, the Court cannot consider new allegations raised in the Plaintiff's Response when ruling upon a motion to dismiss. *See Schneider*, 151 F.3d at 1197 n.1. Even if these sections of the California Corporations Code had been cited in the SAC, the allegations in the SAC would fail to state a claim. For one matter, § 2289 does not provide a cause of action and instead sets out the "[l]imit on amount of award" under the Victims of Corporate Fraud Compensation Fund. *See* Cal. Corp. Code § 2289(a) ("[T]he liability of the fund shall not exceed fifty thousand dollars ($50,000) for any one claimant per single judgment finding fraud, misrepresentation, or deceit, made with the intent to defraud."). Additionally, although § 25400 provides liability for false statements made "for the purpose of inducing the purchase or sale of the security or raising or depressing the price of the security," the plaintiff must show that the defendant "willfully participate[d]" in the violation. *See Kamen v. Lindy*, 94 Cal. App. 4th 197, 202 (Ct. App. 2001) (noting that § 25500, which creates a private right of action for violations of § 25400, provides for liability for "[a]ny person who *willfully participates* in any act or transaction in violation of Section 25400" (emphasis added) (citing Cal. Corp. Code §§ 25400, 25500)). A cause of action under Section 25400 must also be alleged with particularity in conformity with the heightened pleading standards under Federal Rule of Civil Procedure 9(b). *See Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 401, 404 (9th Cir. 2021) (noting, in a case alleging a claim of securities fraud under California Corporations Code sections 25400(d) and 25500, that "[i]t is established law that Rule 9(b)'s particularity requirement applies to state law causes of action relating to fraud when asserted in federal court").

For the same reasons that the SAC fails to state Plaintiff's other causes of action for fraud and securities violations, the SAC similarly fails to allege particularized facts demonstrating that Nall, Kennedy, Gerhardt, and Huebner "willfully participated" in making any false statements. *See Sharp v. Arena Pharms., Inc.*, No. 10cv2111-CAB (BLM), 2013 WL 12094819, at *2 (S.D. Cal. Mar. 29, 2013) (dismissing Plaintiff's § 25400 claim because "Plaintiff fail[ed] to plead any facts showing how, why and what each Defendant knew or should have known when making statements about [the pharmaceutical drug at issue]" and accordingly "fail[ed] to plead facts sufficient to infer that each Defendant willfully misled Plaintiff"). Thus, even if the SAC had cited California Corporations Code § 25400, the SAC nevertheless fails to allege particularized facts that would support such a cause of action.

The SAC does not contain any citations or allegations indicating the particular sections of the California Corporations Code that Plaintiff attempts to assert were violated, rendering the Court unable to evaluate the viability of such claims.

Plaintiff accordingly fails to state a claim for violations of the California Corporations Code against the Moving Defendants.

### 9. Claims for Aiding and Abetting Violations of the California Corporations Code

Plaintiff asserts a cause of action for aiding and abetting violations of the California Corporations Code against the CBIZ Defendants, Mayer Hoffman, the Cooley Defendants, Nall, Kennedy, Aegea, Gerhardt, Huebner, LHAI, and the Maxim Defendants.

The Moving Defendants generally contend that Plaintiff's cause of action fails because he fails to identify any specific section of the California Corporations Code that they allegedly aided and abetted in violating. (*See, e.g.*, ECF No. 93-1 at 18; ECF No. 98-1 at 32; ECF No. 120-1 at 18.)

Because the SAC fails to allege an underlying violation of the California Corporations Code with the requisite particularity, Plaintiff's claims for aiding and abetting such violations are similarly deficient. *See Shepardson v. U.S. Bank Trust Nat'l Ass'n ex rel. Bungalow Series IV Tr.*, No. 23-cv-05497-NC; 2024 WL 3304800, at *8 (N.D. Cal. July 3, 2024) ("Because the Court has concluded all of Plaintiff's other claims, on which the claim for aiding and abetting is based, fail to state [a] claim, Plaintiff's aiding and abetting claim necessarily fails."); *Sec. & Exch. Comm'n v. Miller*, No. CV 17-00897 CBM, 2017 WL 5891050, at *7 (C.D. Cal. Nov. 15, 2017) ("Because the complaint's allegations of the primary violation are deficient, the complaint fails to state a cause of action for aiding and abetting the primary violation.").

Plaintiff accordingly fails to state a claim against the Moving Defendants for aiding and abetting violations of the California Corporations Code.

### 10. Claims for Aiding and Abetting Violations of Fiduciary Duties

Plaintiff asserts a cause of action against the CBIZ Defendants, Mayer Hoffman, the Cooley Defendants, Aegea, and LHAI for aiding and abetting Biocept's officers,

executives, and Board of Directors in violating their fiduciary duties. Specifically, the SAC alleges that these defendants "stood silent while Biocept's officers, executives and Board of Directors committed the security law violations and fraudulent acts." (SAC at 93.)

Several Moving Defendants contend that Plaintiff's claim fails because Plaintiff does not allege the underlying cause of action of breach of fiduciary duty. (*See, e.g.*, ECF No. 92-2 at 25; ECF No. 93-1 at 19.) Gerhardt and Huebner also contend that Plaintiff fails to allege any facts establishing that they substantially assisted in any alleged breach of a fiduciary duty. (*See* ECF No. 95-1 at 32–33.)

"Under California and Delaware law,[36] to state a cause of action against a corporate entity for aiding and abetting a fiduciary's breach of his or her duty of loyalty, a plaintiff must allege (1) knowledge of the fiduciary's breach and (2) substantial participation in the breach." *AngioScore, Inc. v. TriReme Med., LLC*, 70 F. Supp. 3d 951, 957 (N.D. Cal. 2014) (citing *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144 (Ct. App. 2005); *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)) (noting that "there must be an underlying breach of fiduciary duty for those defendants to aid and abet"). Where a breach of fiduciary duty claim is grounded in fraud, the allegations of that claim—as well as any complementary claim for aiding and abetting the breach of fiduciary duty—are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See Bentham v. Bingham L. Grp.*, No. 13cv1424-MMA (WVG), 2013 WL 12186171, at *10 (S.D. Cal. Nov. 15, 2013) (concluding that the heightened pleading standard applied to a claim for aiding and abetting a breach of fiduciary duty because "the underlying claim is [another defendant's] breach of fiduciary duty, which is based on fraud").

---

[36] Gerhardt and Huebner contend that, "because Biocept is a Delaware corporation, Delaware law applies to Plaintiff's claims for breach of fiduciary duty." (ECF No. 95-1 at 15 n.8 (citing *EpicentRX, Inc. v. Bianco*, No. 21-cv-1950-MMA-DDL, 2024 WL 56995, at *17 (S.D. Cal. Jan. 4, 2024)).) Because Plaintiff's aiding and abetting claim fails under both California and Delaware law, the Court does not decide at this stage of the proceedings which state's law is applicable.

The SAC does not assert a separate claim for breach of fiduciary duty. Nor does it contain any allegations specifying which fiduciary duties the Biocept officers, executives, and Board of Directors are alleged to have breached, much less how these duties were breached.[37] The SAC similarly does not allege how any of the defendants "substantial[ly] participat[ed]" in these violations. *AngioScore, Inc.*, 70 F. Supp. 3d at 957. Without such allegations, Plaintiff's claim for aiding and abetting a breach of fiduciary duty cannot withstand a motion to dismiss. *See EcoHub, LLC v. Recology Inc.*, No. 22-cv-09181-TSH, 2023 WL 3852700, at *9 (N.D. Cal. June 6, 2023) ("The Court agrees … that [the plaintiff's] failure to adequately plead a breach of fiduciary duty … is fatal to the aiding and abetting claim.").

Plaintiff accordingly fails to state a claim against the Moving Defendants for aiding and abetting violations of fiduciary duties.

In sum, the SAC fails to state a claim against any of the Moving Defendants.[38] The Court grants the Moving Defendants' respective Motions to Dismiss (ECF Nos. 91, 92, 93, 94, 95, 98, 100 & 120), as described above.[39]

---

[37] The Court observes that, although Plaintiff's proposed TAC adds a new claim for violations of fiduciary duties against Nall, Kennedy, Brown, Royston, Gerhardt, Huebner, Chandler, and Hale (*see* ECF No. 152-3 at 98–99), the proposed TAC does not specify which specific fiduciary duties were allegedly breached.

[38] The Court need not address the remainder of the Moving Defendants' arguments. In particular, the Court declines to consider the parties' statute of limitations arguments at this stage of the proceedings. *See Mora v. City of Chula Vista*, No. 20cv779-GPC(AGS), 2021 WL 4220633, at *3 n.2 (S.D. Cal. Sept. 16, 2021) ("Because the Court grants dismissal on the merits of the Rule 12(b)(6) claim, it need not address Defendants' argument that the claim is barred by the statute of limitations.").

The Court likewise need not consider the CBIZ Defendants' contention that Plaintiff fails to allege sufficient facts to establish a relationship between the CBIZ Defendants and Mayer Hoffman that renders the CBIZ Defendants liable for Mayer Hoffman's alleged conduct as Biocept's auditor. (*See, e.g.*, ECF No. 92-1 at 10–18.) Given that the SAC fails to state a claim against any of these parties, the Court need not address this contention at this juncture.

[39] The Moving Defendants' remaining requests for judicial notice (ECF Nos. 96 & 98-15) are denied as the Court need not consider these materials in ruling on the present Motions to Dismiss. *See Asvesta v. Petroutsas*, 580 F.3d 1000, 1010 n.12 (9th Cir. 2009) (denying request for judicial notice where judicial notice would be "unnecessary").

### C.    Plaintiff's Motion to Supplement the SAC

In his Motion to Supplement the SAC, Plaintiff contends that he seeks to "clarify for the defendants the allegations against them" "[p]ursuant to Rule 15d." (ECF No. 123 at 2.) Plaintiff contends that his proposed supplement "will leave no doubt as to the allegations the Defendants should answer to." *Id.*

Several Moving Defendants contend that the Motion to Supplement does not meet the requirements of a supplemental pleading under Rule 15(d), as "it does not seek to add new facts or events which have occurred since Plaintiff filed the SAC." (ECF No. 137 at 2; *see also* ECF No. 138 at 2; ECF No. 144 at 3.)

Requests to supplement a pleading are governed by Federal Rule of Civil Procedure 15(d), which provides, in relevant part: "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event *that happened after the date of the pleading to be supplemented*." Fed. R. Civ. P. 15(d) (emphasis added). Courts reject efforts to supplement pleadings with allegations that merely "clarif[y] … the allegations contained in [the] original complaint" or "concern[ ] events outlined in the original complaint which occurred before it was filed." *Baker v. Howard*, No. 2:19-CV-2617-KJM-DMC-P, 2021 U.S. Dist. LEXIS 207845, at *4–5 (E.D. Cal. Oct. 26, 2021) (concluding that "Rule 15(d) [was] not the proper vehicle to achieve Plaintiff's goal").

Here, Plaintiff's supplemental allegations must be related to events that transpired after Plaintiff filed the SAC on April 10, 2024. Plaintiff's proposed supplements, however, discuss events that took place "[b]etween April 20, 2020 and September 8, 2020" (ECF No. 123-1 at 1); reference the "June 3rd 2020 agreement," *id.* at 3; provide background information on various statutes, *id.* at 2–3; and "clarify" that the SAC's allegations regarding violations of the California Corporations Code are pursuant to "§ 2281," *id.* at 5. None of Plaintiff's supplemental allegations concern "a transaction, occurrence, or event *that happened after the date of the pleading to be supplemented*." Fed. R. Civ. P. 15(d) (emphasis added).

23-cv-1803-WQH-BLM

1    Accordingly, Plaintiff's Motion to Supplement the SAC (ECF No. 123) is denied.

2    **D.    Plaintiff's Motion to Amend the SAC**

3        In his Motion to Amend, Plaintiff contends that he "seeks to amend the [SAC] for

4    both judicial economy and additional charges against the former Biocept directors and

5    executives." (ECF No. 152 at 2.)

6        Multiple Moving Defendants point out that Plaintiff previously sought and obtained

7    leave from the Court to file the SAC in the face of then-pending motions to dismiss the

8    FAC, thereby mooting those motions. (*See* ECF No. 157 at 2; ECF No. 154 at 2–3.) Aegea

9    contends that Plaintiff fails to explain "why these amendments could not have been

10   incorporated into one of the three earlier versions of the Complaint filed, or why this

11   Motion was filed at this late stage of the proceedings," and not immediately after the

12   Moving Defendants filed their Motions to Dismiss. (ECF No. 156 at 2.) Gerhardt and

13   Huebner contend that "[w]here a plaintiff has repeatedly sought to amend his complaint as

14   rounds of motion to dismiss briefing have come to a close, such ill-timed motions to amend

15   should be denied." (ECF No. 154 at 2 (citing *Franczak v. Suntrust Mortg. Inc.*, No.

16   5:12-cv-01453 EJD, 2013 WL 4764327, at *4 (N.D. Cal. Sept. 5, 2013)).) Gerhardt and

17   Huebner contend that Plaintiff's Motion to Amend "demonstrates bad faith and undue

18   delay," that amendment would be futile, and that they would be prejudiced if Plaintiff's

19   Motion is granted. *Id.* at 4–6. Gerhardt and Huebner contend that the Court should deny

20   Plaintiff's Motion to Amend or, in the alternative, the Court should dismiss the TAC for

21   the reasons stated in their Motion to Dismiss. *Id.* at 11.

22       Plaintiff contends that the defendants would not be prejudiced by a TAC because it

23   "affords the defendants specific claims correlating which to the facts and counts, because

24   the Defendants stated those specific claims were lacking." (ECF No. 162 at 6.)

25       Rule 15 of the Federal Rules of Civil Procedure mandates that leave to amend "be

26   freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). "This policy is to be applied

27   with extreme liberality." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th

28   Cir. 2003) (per curiam) (quoting *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708,

23-cv-1803-WQH-BLM

712 (9th Cir. 2001)). The Supreme Court has identified several factors district courts should consider when deciding whether to grant leave to amend: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Smith v. Pac. Props. Dev. Corp.*, 358 F.3d 1097, 1101 (9th Cir. 2004). "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Cap.*, 316 F.3d at 1052. "The party opposing amendment bears the burden of showing prejudice." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987). "Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence Cap.*, 316 F.3d at 1052.

The Court finds that permitting Plaintiff's proposed TAC to replace the SAC as the operative complaint, rendering the present Motions to Dismiss moot, would be inefficient and not in the interests of judicial economy. *See Sanchez v. United States*, No. 18-cv-1550-AJB-AGS, 2020 WL 1157200, at *2 (S.D. Cal. Mar. 10, 2020) (concluding that, where a plaintiff filed a motion for leave to amend the complaint after a motion to dismiss was fully briefed and pending, "with consideration for judicial economy," it was appropriate to address the pending motion to dismiss before considering the motion for leave to amend); *Anderson v. Seaworld Parks & Ent., Inc.*, No. 15-cv-02172-JSW, 2016 WL 4076097, at *2 (N.D. Cal. Aug. 1, 2016) (concluding that, "[b]ecause [the defendant's] motion to dismiss was filed and ripe for decision before Plaintiffs filed their motion for leave to amend … the Court shall consider that motion [to dismiss] in the first instance").

The Court further finds that the proposed TAC fails to rectify many of the deficiencies identified in this Court's Order ruling on the Moving Defendants' Motions to Dismiss. However, "[d]enial of leave to amend on [futility] is rare. Ordinarily, courts will defer consideration of [futility] challenges … until after leave to amend is granted and the amended pleading is filed." *Smith v. Cook*, No. 17-cv-00961-AJB-WVG, 2018 WL

23-cv-1803-WQH-BLM

4105158, at *4 (S.D. Cal. Aug. 29, 2018) (quoting *Netbula, LLC v. Distinct Corp.*, 212 F.R.D. 534, 539 (N.D. Cal. 2003)); *see also Eminence Cap.*, 316 F.3d at 1052 ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear … that the complaint could not be saved by amendment."). This is especially true given that Plaintiff filed the proposed TAC "without the benefit of the court's ruling on the [second] amended complaint." *A.H. v. Sacramento Cnty. Dep't Child, Fam. & Adult Servs.*, No. 2:21-cv-00690-KJM-JDP, 2022 WL 2757665, at *3 (E.D. Cal. July 14, 2022) (noting that although the plaintiffs' proposed amended complaint "[did] not cure the deficiencies identified in this order, the plaintiffs prepared it without the benefit of the court's ruling on the [pending] complaint," so "[t]he court [could not] exclude the possibility that the plaintiffs could state at least one viable claim").

Therefore, because it is not yet clear that further attempts to amend would be futile, the Court grants Plaintiff leave to file an amended complaint that addresses the deficiencies identified in this Order. *See, e.g.*, *Ocampo v. United States*, No. 3:18-cv-01012-JAH-BGS, 2023 WL 6305801, at *16 (S.D. Cal. Sept. 27, 2023) (denying the third-party plaintiff's motion for leave to the extent he sought to "file the proposed second amended third-party complaint that is attached to his motion," but granting him leave to file an amended third-party complaint "that comports with this Order").

Plaintiff's Motion to Amend (ECF No. 152) is denied in part and granted in part. Plaintiff's Motion to Amend is denied to the extent he seeks to file the proposed TAC attached to the Motion. Plaintiff's Motion to Amend is granted to the extent he generally seeks leave to amend the SAC. Accordingly, within twenty-one (21) days of the entry of this Order, Plaintiff may file an amended complaint, entitled "Third Amended Complaint," that address the deficiencies identified in this Order.[40]

/ / /

---

[40] The Court cautions Plaintiff that this may be Plaintiff's final grant of leave to amend if Plaintiff's Third Amended Complaint fails to cure the deficiencies identified in this Order.

### E.    Plaintiff's Rule 11 Motion

In his Rule 11 Motion, Plaintiff requests that the Court impose sanctions against CBIZ Inc.; Mayer Hoffman; CBIZ President and CEO Grisco; Mann; Mayer Hoffman CEO Gragnani; and Attorneys Cemo and Eskenazi pursuant to Federal Rule of Civil Procedure 11(b) for purportedly "attempt[ing] [to] mislead the court with statements that they know are false." (ECF No. 83 at 4.)

Plaintiff contends that he has "entered into the record irrefutable evidence that the knowing and willful acts by CBIZ, and its employees['] acts were criminal in nature." (ECF No. 83 at 3.) Plaintiff contends that "the Defendants repeatedly, knowingly and willfully attempt [to] mislead the court with statements that they know are false." (ECF No. 83 at 4.) In particular, Plaintiff takes issue with several of Mayer Hoffman's and CBIZ, Inc.'s statements and contentions in various filings, including CBIZ Inc.'s Motion to Dismiss the FAC (ECF No. 9), Mayer Hoffman's Limited Opposition to Plaintiff's Motion to File the SAC (ECF No. 72),[41] Mayer Hoffman's Motion to Dismiss the FAC (ECF No. 8), and Mayer Hoffman's Reply in Support of its Motion to Dismiss the FAC (ECF No. 44).[42] (*See* ECF No. 83 at 5–10 (listing the statements that Plaintiff contends violated Rule 11).) Plaintiff requests that the Court order as sanctions "10 million dollars to be paid by CBIZ, and sanctions of several hundred thousand dollars to one million dollars be paid to the court by the other parties." *Id.* at 11.

Mayer Hoffman and CBIZ, Inc. contend that Plaintiff failed to comply with the "notice requirement" of Federal Rule of Civil Procedure 11(c)(2) because the Rule 11 Motion Plaintiff filed is "materially different" from the "advanced copy of a motion" that he sent to them. (ECF No. 102 at 3.) They attach a copy of the advance motion, contending

---

[41] Although Plaintiff cites ECF No. 8, the Court infers from the phrases Plaintiff quotes that he instead intended to cite ECF No. 72.

[42] Although Plaintiff cites ECF No. 45, the Court infers from the phrases Plaintiff quotes that he instead intended to cite ECF No. 44.

that it "seeks different sanctions, includes additional alleged misconduct, and substantially revises the entire text of the document [Plaintiff] previously sent." *Id.*; *see generally* ECF No. 102-2. Mayer Hoffman and CBIZ, Inc. further contend that Plaintiff's Rule 11 motion largely "rehashes the allegations in the [SAC] and effectively argues that Plaintiff's version of the facts and law are incontrovertible so Defendants and their counsel are necessarily violating Rule 11 by disputing Plaintiff's assertions and mounting a defense." (ECF No. 102 at 2.) They contend that they did not violate Rule 11 because "[e]very pleading in this case, including those referenced in the Motion, was filed in good faith and with a genuine belief in the accuracy and merits of the assertions therein." *Id.* at 4.

Plaintiff contends that his Rule 11 Motion "contains the same Rule 11 allegations" as the advance motion. (ECF No. 122 at 2.) Plaintiff contends that he "adjusted some of the wording after reviewing the Court order." *Id.*

Federal Rule of Civil Procedure 11 provides the duties imposed on filers when "presenting to the court a pleading, written motion, or other paper," Fed. R. Civ. P. 11(b), and the procedure for imposing sanctions when those duties are not met. Fed. R. Civ. P. 11(c). Rule 11 "impose[s] on any party who signs a pleading, motion, or other paper … an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing, and that the applicable standard is one of reasonableness under the circumstances." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991).

Under Rule 11's "safe harbor," "any motion for sanctions must be served on the offending party at least 21 days before the motion is filed with the court." *Walker v. Howmedica Osteonics Corp.*, No. 22-cv-264-MMA (DDL), 2024 WL 3551865, at *6 (S.D. Cal. July 23, 2024) (citing Fed. R. Civ. P. 11(c)(2)). The motion for sanctions may not be filed if the offending party timely "withdraw[s] or appropriately correct[s]" the challenged contention during the safe harbor period. *Id.*

The Ninth Circuit enforces the safe harbor provision "strictly," holding that it "must reverse the award of sanctions when the challenging party [fails] to comply with the safe harbor provisions, even when the underlying filing is frivolous." *Holgate v. Baldwin*, 425

F.3d 671, 678 (9th Cir. 2005); *see also Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 789 (9th Cir. 2001) (finding that plaintiff's informal warnings did not satisfy the "strict requirement that a motion be served on the opposing party twenty-one days prior to filing"); *Barber v. Miller*, 146 F.3d 707, 710 (9th Cir. 1998) ("[I]t would therefore wretch both the language and purpose of the amendment to the Rule to permit an informal warning to substitute for service of a motion."); *Bailey v. Root*, No. 10cv0367 BTM(CAB), 2010 WL 2803950, at *5 (S.D. Cal. July 14, 2010) (denying request for sanctions on the grounds that the movant did not comply with the safe harbor provision).

Although "the issue of whether the safe harbor provision requires the motion served and the motion filed to be identical is one that has yet to be explicitly addressed by the Ninth Circuit," district courts within the Ninth Circuit have found that the safe harbor provision is not satisfied where a party files a motion for sanctions that differs from the motion he previously served on the opposing party. *San Diego Comic Convention v. Dan Farr Prods.*, No. 14-cv-1865-AJB-JMA, 2018 WL 9539481, at *2–4 (S.D. Cal. Apr. 13, 2018) (finding that "the plain language of Rule 11's safe harbor provision requires [a party] to serve [the opposing party] with a copy of the full motion that will be filed with the Court"); *see also U.S. ex rel. Jacobs v. Advanced Dermatology & Skin Cancer Specialists, P.C.*, No. 20-1373 JGB (SHKx), 2023 WL 6370921, at *4 (C.D. Cal. Aug. 24, 2023) (observing that "[c]ourts within the Ninth Circuit have routinely … held that the motion filed on opposing counsel must be in the same form as the motion later filed with the court") (collecting cases).

In the present case, while the advance motion contains many of the same statements and references that Plaintiff raises in his filed Rule 11 Motion, a comparison of the two motions reveals some obvious differences, including differences in the length of the motions, various assertions in the motions, and the monetary sanctions requested in the motions. (*Compare, e.g.*, ECF No. 102-2 at 5 (asserting in the advance motion that "Plaintiff will seek $7.5 million dollars to be paid by CBIZ Inc"), *with* ECF No. 83 at 11

(asserting in Plaintiff's filed Rule 11 Motion that "Plaintiff will seek 10 million dollars to be paid by CBIZ").)

The Court concludes that Plaintiff did not serve the opposing parties with a "copy of the full motion that [was] filed with the Court." *San Diego Comic Convention*, 2018 WL 9539481, at *2. Given the Ninth Circuit's "strict[ ]" enforcement of the safe harbor provision, *Holgate*, 425 F.3d at 678, the Court finds that Plaintiff failed to properly comply with Federal Rule of Civil Procedure 11(c)(2).

Plaintiff's Rule 11 Motion (ECF No. 83) is accordingly denied.

## IV. CONCLUSION

IT IS HEREBY ORDERED that the Moving Defendants' respective Motions to Dismiss (ECF Nos. 91, 92, 93, 94, 95, 98, 100 & 120) are granted as discussed above. The SAC is dismissed without prejudice as to the Moving Defendants.

IT IS FURTHER ORDERED that the Motion to Amend (ECF No. 152) is denied in part and granted in part. The Motion to Amend is denied to the extent Plaintiff seeks to file the proposed TAC attached to the Motion. The Motion to Amend is granted to the extent Plaintiff generally seeks leave to amend the SAC. Accordingly, Plaintiff may file an amended complaint, entitled "Third Amended Complaint," within twenty-one (21) days of the entry of this Order. The amended complaint must be complete in itself without reference to any prior complaints. *See* S.D. Cal. Civ. L.R. 15.1(a).

IT IS FURTHER ORDERED that the Motion to Strike Plaintiff's Supplemental Opposition (ECF No. 150) is granted. The Court did not consider Plaintiff's Supplemental Opposition (ECF No. 139) in ruling on the Motions to Dismiss.

IT IS FURTHER ORDERED that the Objection to Aegea's Motion to Dismiss (ECF No. 133) is overruled. The Court considered and granted Aegea's Motion to Dismiss (ECF No. 120) because it was timely filed.

/ / /

/ / /

/ / /

23-cv-1803-WQH-BLM

IT IS FURTHER ORDERED that the Motion to Supplement the Second Amended Complaint (ECF No. 123) is denied.

IT IS FURTHER ORDERED that the Rule 11 Motion (ECF No. 83) is denied.

Dated:  February 18, 2025

Hon. William Q. Hayes
United States District Court

23-cv-1803-WQH-BLM