ORIGINAL

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

FILED

MAR 1 1 2025

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____DEPUTY

| | |
|---|---|
| JOHN CESARIO,<br>Plaintiff | )<br>)<br>) |
| V. | ) Case **No. 3:23-cv-01803-WQH-BLM**<br>) |
| BIOCEPT INC., CBIZ, INC.,<br>MICHAEL NALL, CBIZ CPAs,<br>BRUCE E. GERHARDT,<br>COOLEY, LLP,<br>BRUCE A. HUEBNER, JASON<br>MCCARTHY; MARSHA A.<br>CHANDLER, LIPPERT/HEILSHORN<br>& ASSOCIATES INC., JODY CAIN,<br>CHARLES BAIR, TIMOTHY C.<br>KENNEDY, LYLE ARNOLD, MAXIM<br>GROUP, LLC, MIKE BROWN,<br>AEGEA BIOTECHNOLOGIES INC.,,<br>STEPHAN FANUCCI, IVOR ROYSTON,<br>DAVID HALE,<br>Defendants. | )<br>)<br>)<br>) Judge: Hon. William Q. Hayes<br>)<br>) Ctrm.: 14B<br>)<br>)<br>)<br>)<br>) **Jury Trial Requested**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

--------------------------------------------------------------------

# THIRD AMENDED COMPLAINT

# **TABLE OF CONTENTS**

I.      SUMMARY.................................................................................2

II.     JURISDICTION AND VENUE ...........................................................6

III.    PARTIES..............................................................................6-8

        A. Cesario ......................................................................6
        B. Defendants Biocept, MHM. Cooley ....................................6-8


IV.     HISTORY...............  .............................................................8

V.      FACTUAL ALLEGATIONS............................................................  10

        A.      Preliminary Statement.................................................,......10

        B.      April 20, 2020 Proxy.....................................................12

        C.      SEC Letter Regarding Disclosures......................................16

        D.      Agreement To Co-Develop A COVID-19 Test.......................17

        E.      Damages From The Biocept Director Defendants.....................19

        F.      Cooley and Bair Would Not Comply With SEC Rules.............20

        G.      CBIZ CPAs Would Not Comply With SEC and PCAOB Rule...................22

        H.      Aegea Would Aid and Abet the Fraud................................24

        I.      Recap Of Events Up To June 3rd......................................27

        J.      The June 5th Annual Meeting..........................................28

        K.      The July 1st Reconvened Annual Meeting...........................29

        L.      The Director Defendants Supplemental Proxy Filings.............29

        M.      The July 31st Reconvened Annual Meeting..........................32

        N.      Biocept's Second Quarter 10-Q Filed on August 13th, 2020.....................35

        O.      Void August 18th Reconvened Shareholder Meeting................38

        P       CBIZ CPAs, Nall, Kennedy And The Director Defendants Get Rewarded.......40

        Q       The Plaintiff Discovers The Fraudulent Statement In The 10-Q..................42

        R       Biocept's Third Quarter 10-Q Filed November 16th 2020.........................43

        S       Fraud Claims...........................................................45

        T       Asdditional Scienter....................................................48

VI.     LOSS CAUSATION …………………………………...……………………....51

XII     CAUSES OF ACTION…………………………………………………………..54


XII.    RELIEF SOUGHT………………………………………….………...……...58

1

Plaintiff, John Cesario, Defendants Biocept Inc. ("Biocept"), CBIZ Inc ("CBIZ")., CBIZ CPAs, Aegea Biotechnologies ("Aegea"), Michael Nall ('Nall"), David Hale ("Hale"), Bruce Huebner (Huebnar"), Ivor Royston ("Royston"), Wilson ("Wilson"), Bruce Gerhart ("Gerhart"). Timothy Kennedy ("Kennedy"), Michael Brown ("Brown"), Maxim Inc, Jason McCarthy, and Lyle Arnold. The Plaintiff purchased, acquired, otherwise held, or sold the publicly traded securities of Biocept between May 1st 2020, and November 2020. Plaintiff's claims arise under (i) Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, (ii) The Private Securities Litigation Reform Act ("PSLRA"). State violations include certain (iii) common law fraud; (v) constructive fraud; (iv) violations of California Corporations Codes § 25400 and § 25401; (v) Negligence Misrepresentation; (vi) aiding and abetting; (vii) conspiracy; (viii) intentional misrepresentation and fraudulent concealment; (ix) breach of fiduciary duty; and (x) violations and the intentional and reckless abandonment of audits being performed to Public Company Accounting Oversight Board ("PCAOB") rules and standards.

Defendants Nall, Hale, [1]Huebner, Royston, Wilson, and Gerhart were former Biocept board members. They were always active relative to the main allegations in this lawsuit. When discussed as a collective, they will be called the Director Defendants! The Director Defendants were all long-standing members of Biocept's board. Nall was also Biocept's CEO. Former Vice President Kennedy was Biocept's COO and CFO. Brown was Biocept's former in-house counsel.

Plaintiff's allegations concerning this action are based upon the investigation of all: (i) reports and other documents filed publicly by Southern with the U.S. Securities and Exchange Commission ("SEC"), including MHM's audit reports; (ii) transcripts, press releases, news articles, earnings calls, and other public statements issued by or concerning Biocept and Aegea; (iii) email exchanges with MHM's General Council Bill Mann; (iv) email exchanges with Biocept's investor relations; (v) text message exchanges and conversations with Aegea's CEO, Stella Sung and (vi) other publicly available information.

---

[1] Huebnar, a former longstanding member of Biocept's audit committee, resigned shortly after Cesario's first emails to Biocept.

# I.   <u>SUMMARY</u>

1.     The genesis of the complaint arises in what could be the largest penny stock manipulation COVID-19 scam uncovered to date. During the peak of the COVID-19 pandemic, Biocept and the **Director Defendants intentionally withheld material facts and made material misstatements, omissions, and fraud regarding the 2020 Proxy**. Defendants Cooley, Bair, LHA, Cain CBIZ, and CBIZ CPAs offered substantial substance, aided, abetted, and conspired with the Director Defendants to commit the fraud, security law violations, and fiduciary violations. After the fraudulent acts were exposed, the Defendants, collectively and singly, committed dozens of security law violations and fraudulent acts. The Defendants' intentional criminal behavior defrauded the public over 1 BILLION DOLLARS.

2.     Fraud vitiates everything, rendering Biocept's 2020 fraudulent annual shareholder meetings and fraudulent voting void ab initio. Biocept fraudulently obtained shareholder approval for a reverse split. Upon news of the reverse split being approved and the subsequent execution of the reverse split, Biocept's stock price dropped 60% and neve/r recovered, which caused the Plaintiff's losses.

3.     "Fraud vitiates everything" is a legal principle frequently cited by the 9th Circuit Court of Appeals and the U.S. Supreme Court, meaning that anything obtained through fraudulent means is considered void and can be set aside, nullifying the entire transaction due to the deceptive actions involved. The 2020 reverse split vote and the 2020 reverse split are not just voidable; **they are void**. *"There is no question of the general doctrine that fraud vitiates the most solemn contracts, documents, and even judgments" (United States v. Throckmorton, 98 US 61(1878). See Civ. Code, § 1710(3) The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact;*

4.     During the peak of the COVID-19 pandemic, Biocept intentionally withheld material news from proxy voters concerning a material agreement that Biocept executed with Aegea on June 3rd, 2020, to co-develop a new, novel, and revolutionary COVID-19 test. Biocept's executive management team, Biocept's Director Defendants, Biocept's outside SEC attorney,

investment representative, and auditor knew that concealing this announcement violated SEC laws and rules. Biocept's motive for concealing this announcement was financial. Biocept's liquid biopsy business barely did more revenue than a local McDonald's, so it ran massive deficits. Biocept's executive management team received extremely high cash and stock options compensation packages. Because Biocept's massive deficits were funded by selling its stock to the public, for the first time in Biocept's history, it sold almost all the stock it had authorized to sell to the public. The Director Defendants engaged in this fraudulent scheme because without having shares available to sell, they would not get their annual stipends, and the executive management team would not keep their salaries.

5.    At a time when schools were shut down, travel was restricted, businesses were forced to close, and citizens were being denied visitation to say their last goodbyes to dying family members, the Defendants were scheming about the right time to manipulate Biocept's stock price to by announcing the June 3rd, 2020 Agreement ("Development Agreement"). The Director Defendants originally intended to announce the agreement right after the June 5th, 2020, shareholder meeting. Still, when Biocept failed to obtain enough votes to approve a proposed reverse split, they unlawfully withheld disclosing the agreement because the Director Defendants knew if the Development Agreement was announced in June, it would invalidate the stated reasons the Director Defendants gave for supporting the reverse split proposal.

6.    Biocept's longtime auditor, CBIZ CPAs, **whose auditors were employees of CBIZ Inc.**, was a secondary actor with Biocept and the Director Defendants in this violation and many additional SEC disclosure violations and aided and abetted Biocept and the Director Defendants in perpetrating the fraudulent acts detailed herein. Cooley attorney Bair, engaged as Biocept's outside SEC attorney, was a secondary actor with Biocept and the Director Defendants in this violation and many additional SEC disclosure violations, and aided and abetted Biocept and the Director Defendants in perpetrating the fraudulent acts detailed herein. LHA VP Cain was engaged as Biocept's outside investment representative, was a secondary actor with Biocept and the Director Defendants in this violation and many additional SEC disclosure violations, and aided and abetted Biocept and the Director Defendants in perpetrating the fraudulent acts detailed herein.

7.     Aegea offered substantial assistance to Biocept in the fraud. Aegea took direction from Nall as to when they were allowed to announce the June 3rd agreement. Arnold was Biocept's former longstanding VP and chief Science officer and Aegea's founder and controlling person. Aegea has entered an appearance in this lawsuit.

8.     Maxim and Defendant McCarthy participated in the fraudulent scheme by attempting to manipulate Biocept's stock price and vote disinterested shares to approve the unlawful and void reverse split vote. As detailed herein, Maxim, on several occasions, seemed to trade Bikocept's stock for itself and its customers using inside information.

9.     As noted, fraud vitiates everything, including Biocept's June 5th, 2020, annual shareholder meeting and the voting results procured from the meeting. Biocept's three reconvened shareholder meetings on July 1st, July 31st, and August 18th, 2020, and the voting results procured from the meetings are VOID. **Biocept's 2020 reverse split is void, and CBIZ CPAs fraudulently represented themselves as Biocept's auditor.** Biocept's second fraud on the market scheme revolved around the Defendants committing security law violations to get the reverse split proposal approved.

10.     Additionally, since the filing of this lawsuit in September 2023, the Plaintiff has discovered that Biocept, the Director Defendants, Arnold, CBIZ CPAs, and Bair have been engaged in a long-running scheme to artificially inflate Biocept's share price through half-truths, materially misleading statements, and omissions concerning its purported liquid biopsy business. Thirteen days after this lawsuit, Biocept filed for Chapter 7 bankruptcy. At the first bankruptcy hearing, a former Biocept official testified under oath that Biocept did not own the patents Biocept claimed to own and that they were worthless. Biocept represented that it owned the liquid biopsy patent but only referred to it by a trademarked name. Aegea's CEO, Stella Sung, confirmed to the Plaintiff that Aegea co-owned the patent, that Biocept only had the rights to four sample types in oncology, and that Aegea owned all the rest.

11.     Biocept's stock price dropped 60% after the 2020 reverse split vote, but the Plaintiff and all other former Biocept shareholders were defrauded through long-running fraud on the market scheme. Biocept scammed investors through cancer screening and using a COVID-19

test to manipulate the stock. Cooley attorney Bair and the CBIZ CPAs knew about it but were more motivated by fees than fulfilling their legally obligated duties. For example, after the fraudulent scheme was completed, Nall's compensation package increased by 80% to $1.7 million, and CBIZ CPAs' fees swelled by approximately 300% after the fraudulent scheme was completed. Nall's compensation package increased by 80% to $1.7 million.

12.     The Defendants induced the Plaintiff to buy shares in Biocept's stock after Biocept issued a unlawful, delinquent, and misleading press release on August 6th, 2020. Biocept, Biocept's Board of Directors and executives Arnold, Brown, and Kennedy were running multiple fraud on the market schemes involving Aegea. The Plaintiff incurred losses of $197,000 because directly related to the share price drop, and the fraudulent acts and securities law violations perpetrated by the Defendants. The Plaintiff also incurred a minimum of $2 million dollars in lost opportunities, and has incurred legal fees.

13.     The Plaintiff **would not have purchased Biocept stock in August 2020 had known that the Defendants were engaging in fraudulent acts, including artificially suppressing and inflating Biocept's share prices at different times.** Concealing a June 3rd, 2020 Material Agreement to co-develop a novel COVID-19 test was fraud. Issuing an unlawful press release concealing the date of the agreement is fraud. Defendants Bair, Cain, CBIZ CPAs and Fanucchi gave Biocept, the Director Defendants, Arnold, Kennedy and Brown substantial assistance in violating the Exchange Act, and California laws including fraud. In fact, Bair, Cain, Fanucchi, and the CBIZ CPAs audit team violated the SEC rules and laws and /or PCAOB rules in furtherance of Biocepts fraud on the market schemes.

14.     As a result of the conduct described above and more fully below, Biocept, the Biocept Director Defendants, and Kennedy, Brown and Arnold violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5. Defendants Cooley, Bair LHA, Cain, CBIZ CPAs, CBIZ, Aegea, Maxim, and McCarthty provided substantial assistance in furthering the scheme, which violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5. Additionally, the Director Defendants, and Kennedy, Brown, and Arnold committed Common Law and Constructive Fraud and Deceit, violated California Corporation Codes § 25400 and § 25401,

Negligent Misrepresentation; and breached their fiduciary duties. Additionally, Defendants CBIZ CPAs, CBIZ, LHA, Cain, Cooley, Bair, Maxim, and McCarthy conspired with and aided and abetted the Biocept Director Defendants in Common Law and Constructive Fraud and Deceit, violated California Corporation Codes § 25400 and § 25401, Negligent Misrepresentation, and breached their fiduciary duties.

15.     The Plaintiff was induced to buy shares in Biocept's stock after Biocept issued a unlawful, delinquent, and misleading press release on August 6th, 2020. Biocept, Biocept's Board of Directors and executives Arnold, Brown, and Kennedy were running multiple

## II.     **JURISDICTION AND VENUE**

**Jurisdiction** - This Court has jurisdiction over the subject of this action under 28 U.S.C. §1331, §27 of the Exchange Act, and § 22 of the Securities Act. The claims asserted herein arise under §§10(b), 20(a), 20(b), and 20A of the Exchange Act (15 U.S.C. §78j(b), §78t(a) and §78t(b)), and 78t-l, Rule 10b-5(a)-(c) promulgated thereunder (17 C.F.R. §240.10b-5) and California tort violations including CA Civ Code § 3294_ Cal. Civ. Pro. Code § 338(d) common law fraud, aiding and abetting breach of fiduciary responsibility; Cal. Civ. Pro. Code § 343 Cal. Corp. Code § 25506 securities law violations Catchall Provision. As well as all California fraud, conspiracy, aiding and abetting causes of action allowed in California.

**Venue**—This Court has jurisdiction under *28 U.S.C.A.* § 1332, which applies to civil actions with over $75,000 and involving people from different states.

## III.     **PARTIES**

A.)     Plaintiff **John Cesario** ("Cesario") was an investor in Biocept in 2020. Cesario's address is 15 Darrow's Ridge, PO BOX 655, East Lyme, CT 06333

<u>Defendants</u>

B.)     **Biocept Inc**. is a molecular oncology diagnostics corporation incorporated in Delaware. Its headquarters were at 9955 Mesa Rim Road in San Diego, California. Biocept has filed for Chapter 7 bankruptcy.

C.)     **CBIZ Inc.** is a professional services corporation incorporated in Delaware with its principal place of business at 6050 Oak Tree Boulevard South, Suite 500, Cleveland, Ohio 4413. CBIZ employed and set policies for the CBIZ CPAs audit team engaged by Biocept at all times relevant to this action.

D.)     **CBIZ CPAs** (formerly Mayer Hoffman McCann) is a public accounting firm whose auditors were employed by CBIZ and were engaged as Biocept's auditors at all times relevant to this lawsuit. The headquarters is at  700 W. 47th St., Suite 1100, Kansas City, MO 64112.

E.)     **Aegea Biotechnologies Inc.** is a biotechnology corporation incorporated in California, whose business address is 9276 Scranton Rd # 200, San Diego, CA 92121.

F.)     **Michael W. Nall** was Biocept's former Chief Executive Officer (CEO) and was on the Biocept board of directors from 2013 until his forced resignation on February 15, 2022. Nall is a citizen of California.

G.)     **Timothy C. Kennedy** was employed as the Chief Financial Officer (CFO), SVP, and Chief Operating Officer (COO) of Biocept until his forced resignation on February 15th, 2022. Kennedy is a citizen of California.

H.)     **Michael W. Brown** was Biocept's General Counsel and Compliance and Privacy Officer until his resignation or dismissal in February 2022. Brown was a vice president in 2020. Brown is a citizen of California.

I.)     **Lyle Arnold** was Biocept's Chief Science Officer and Senior Vice President. Arnold was fired from Biocept on or about February 16th, 2022.

J.)     **David F. Hale** was a longtime member of Biocept's Board of Directors, who served as chairman. Hale is a citizen of California. Hale has a long history of being involved in microcap stocks and knows all the security law violations and fraud by Biocept.

K.)     **Marsha A. Chandler** was a longtime member of Biocept's Board of Directors. Chandler is a citizen of California.

L.)     **Bruce E. Gerhardt** was a long-standing Biocept's Board of Directors member. Gerhardt is a citizen of California. Gerhardt is a trained CPA and was a member of Biocept's audit Committee for almost ten years

M.)     **Ivor Royston** was a long-standing member of Biocept's Board of Directors. Royston is a citizen of California.

N.)    **Bruce A. Huebner** was a long-time member of Biocept's Board of Directors who resigned in October 2020. Huebner is a California citizen, a trained CPA, and a member of Biocept's audit Committee for almost ten years

O.)    **Charles Bair** is a Cooley attorney operating outside Cooley's San Diego office. Bair handled all the SEC matters on behalf of Biocept.

P.)    **Jody Cain** is Biocept's outside licensed IR representative. Cain is a senior vice president at Lippert/Heilshorn & Associates Inc., aka LHA, a licensed Investor Relations Firm. Cain operates out of LHA's Los Angeles, California, office and is a citizen of California.

Q.)    **Lippert/Heilshorn & Associates, Inc. ('LHA")** is Biocept's outside licensed IR firm headquartered in New York City, NY._ LHA is now a subsidiary of Alliance Advisors.

R.)    **Cooley LLP,** the law firm that represented Biocept in SEC matters through Partner Charles Bair, has its National headquarters in Los Angeles, California.

S.)    **Maxim Group LLC** is a New York company located at 300 Park Ave., 16th Floor, New York, NY 10022. Maxim is an investment banking firm

T.)    **Jason McCarthy** is a senior analyst at Maxim.

U.)    CBIZ MHM LLC is the entity where CBIZ and the CBIZ employees who are MHM Partners conduct accounting business in the United States. CBIZ uses CBIZ MHM LLC as a pass-through entity that forwards most of its billable revenue to CBIZ.

V.)    **Steven Fanucchi** is an employee of CBIZ and is believed to have been part of the CBIZ CPA's San Diego office, which conducted Biocept's audit.

## IV.    <u>HISTORY</u>

16.    In early 2020, Biocept, formerly a public company traded on the NASDAQ exchange, stated its core business was focused on molecular oncology diagnostics. Biocept's filings noted that it claimed to develop and sell lab assays to find rare tumor cells and tumor DNA in blood and cerebrospinal fluid. Biocept's core business was molecular oncology pre-screening, mostly through blood samples.

17.    SEC filings indicate that Biocept's first public stock offering was in 2014. The initial prospectus states that Biocept sold 1,900,000 shares at $10.00 a share, for proceeds of $19

million before fees. CBIZ CPAs was Biocept's public accountant from 2005 through 2023.
SEC disclosures reveal that Nall, Brown, and Arnold's history with Biocept dates back to at
least 2013. Hale, Nall, Chandler, Huebnar, and Gerhardt were appointed to Biocepts Board of
Directors in 2013. According to SEC filings, Bair has been Biocept's external SEC counsel
since 2017, and Cain has been the company's external investment representative since 2018.

18.     Biocept's initial public offering was in 2014, and according to SEC filings and the
prospectus filed by Biocept, they sold 1,900,000 shares at $10.00 a share for proceeds of $19
million before fees. Biocept's heavy operating losses were funded through constant equity
offerings. These offerings ultimately caused the outstanding shares to swell from the original
1.9 million shares sold at $10.00 a share to over a hundred million shares with the share price
dropping into the pennies per share.

19.     Each time Biocept's share price dropped below $1.00 for over 30 consecutive trading
days, NASDAQ issued a deficiency notice. Biocept could extinguish the deficiency notice.
Biocept's stock price closed over $1.00 a share for 10 straight days. NASDAQ grants a
6-month grace period, and a 6-month extension could be applied. If a Company fails to comply
within a year, Biocept's stock would be delisted from NASDAQ. Biocept avoided being
delisted by a NASDAQ $1.00 minimum bid deficiency notice by executing three reverse splits,
which increased its price per share.

20.     Biocept executives were drawing higher-than-normal salaries and constantly issued
large stock option grants despite incurring massive losses year after year. In fact, according to
Aegea's CEO Stella Sung, before 2020, Nall was a part-time CEO who lived hours away from
Biocept's office, mostly staying at home and playing golf.

21.     On January 1st, 2020, Biocept's cash reserves were less than 9 million dollars. The 9
million dollars came from a stock equity raise in December 2019. Biocept was burning through
approximately 2 million dollars per month as 2020 began. By January 2020, COVID-19 started
to dominate the news. By the end of February 2020, worldwide stock markets were collapsing.
The U.S. stock market had its worst week in history, the last week of February, due to fears of
the pandemic. While the general stock market was in a state of collapse, some stocks working

on COVID-related solutions saw significant increases in their stock prices. For example,
Co-Diagnostics, a CLIA lab similar to Biocept, claimed they were developing a COVID-19
test, and their stock price increased from **$1.00 to $18.00 in 5 weeks**. Decision Diagnostics's
price rose 2000 percent based on fraudulent announcements that they were developing a
COVID-19 test. Biocept stock was trading at approximately .70 in the first week of March.

22.     Despite the COVID-19 pandemic, Biocept's dire cash position, stock markets crashing,
and Biocept not having any material news, Biocept's banker, Maxim, completed two raises
totaling 17 million dollars in the first two weeks of March 2020. Between December 2019 and
April 2020, Biocept sold approximately 100 million shares to institutional investors at
discounted prices. Biocept BOD sold shares at roughly a 40% discount to the previous day's
price. Biocept sold those shares at a 40% discount, knowing they were about to have a
significant announcement that they would begin COVID-19 testing. Not only was this
Biocept's highest dollar amount financing, but the equity offerings did not have warrants
attached per the previous financing.  Just weeks before these financings, Biocept was reducing
the strike price of previous offerings to under $.27.

23.     The Plaintiff was introduced to Aegea at the end of April 2020 because Aegea was
seeking investors to fund the development of the Covid-19 test. The Plaintiff set up a call for
Aegea with several high-net-worth individuals, but the Plaintiff ultimately passed on investing
in Aegea. Aegea's Arnold and Sung were on the call, and they claimed that their COVID-19
test was already analytically validated and only needed to be clinically validated through a
CLIA lab to be approved for FDA emergency use authorization. The Plaintiff was investing in
companies doing COVID testing and developing vaccines.

## V.     FACTUAL ALLEGATIONS

### Preliminary Statement

24.     Cooley Partner Bair had legal obligations as an attorney appearing before the Securities
and Exchange Commission to report fraud and violations of security laws.

        CBIZ CPAs and their audit team, including Fanucchi had to comply with SEC laws and
PCAOB rules, and had to report violations of security laws and fraud.

Maxim and Jason McCarthy are governed by the laws set forth by the SEC and rules of Finra.

LHA VP Cain operates under the rules of the SEC.

25.    The Plaintiff is not seeking a private action against Cooley, Bair, LHA, Maxim, and McCarthy for violating the rules of the SEC. The Plaintiff, throughout the complaint, notes that they intentionally and willfully violated the those rules to further Biocept's, the Director Defendants and executive management team multiple violations of the Exchange Act, and to further their fraud, fiduciary and other state torts described herein. The substantial assistance they gave the Biocept, the Director Defendants, and executives made them secondary actors in the Exchange Act violations and raiders, abettors, and conspirators in the State violations alleged herein. Biocept's actual stock price went from a high of $85.600 to $0.43 in less than nine years, and the investing public was defrauded over 1 billion dollars because Cain, Bair, and the CBIZ CPAs audit team were active participants in the fraud on the market schemes alleged herein. All of the acts alleged to the Defendants, or their standing silent despite a duty to act, speak to scienter.

26.    Biocept Directors Nall, Hale, Gerhardt, Huebnar, Royston, Wilson, and Sr. VP's Kennedy, Brown and Arnold were active in all the violations described herein that caused the Plaintiff's losses. Huebnar resigned in October 2020. Nall, Hale, Gerhardt, Huebnar, Royston, Wilson, Kennedy and Brown all were active in Biocept's 2020 proxy, and the proxy supplements and press release dedicated to the proxy. Biocept Directors Nall, Hale, Gerhardt, Huebnar, Royston, Wilson, and Sr. VP's Kennedy, Brown and Arnold were all active in the June 3rd 2020 agreement with Aegea to co-develop a novel highly sensitive COVID-19 test that could also distinguish different strains of COVID. Additionally, they were all active in intentionally withholding the June 3rd material agreement from proxy voters and the investing public. Nall, Hale, Gerhardt, Riccetelli, Royston, Wilson, Kennedy knowingly signed the unclean 2020 annual report, which was unlawfully incorporated into a $25 million stock offering. The allegations against these Defendants all spek to scienter.

27.    As noted, according to SEC filings, Maxim was the lead underwriter for the two March underwritings. Maxim only sold the Biocept shares to *certain institutional investors*. Public

reporting and filings show that Sabby Capital ("Sabby") is an activist investment firm that
predominantly invests in warrants of small-cap healthcare companies - initially held 500,000
shares but increased its position to 9 million shares during the March 2020 offering by Maxim.
As previously noted, with COVID-19 raging and Biocept's cash burn, it was very odd that
Maxim could sell so many shares and that Sabby would buy so many. Within three weeks of
the March financings, Biocept leaked a web page stating that it would do COVID-19 testing;
the web page even had the test price at $100.00 per test. Biocept's stock price surged to almost
$0.80 on heavy late-day trading. Biocept was forced to issue a late-night press release stating
the leaked web page was inadvertent.

### Biocept's 2020 Proxy Misleading Statements Signed By Directors

28.     On April 20th, 2020, Biocept filed a preliminary Proxy with the SEC. Proposal 4
sought approval for Biocept's 3rd reverse split in 4 years. The votes were to be counted at
Biocept's annual June 5th annual shareholder meeting. Proposal 4 became the linchpin for
Biocept's fraudulent acts and SEC disclosure violations. Proposal 4 stated;

> Approval of an amendment to our Certificate of Incorporation to Effect a reverse
> stock split of our common stock at a ratio in the range of 1:5 to 1:30, with such
> ratio to be determined in the discretion of our board of directors (Proposal
> 4):  The approval of an amendment to our Certificate of Incorporation to effect a
> reverse stock split of our common stock at a ratio in the range of 1:5 to 1:30, with
> such ratio to be determined in the discretion of our board of directors.

29.     Biocept's Director Defendants knew that the 2020 proxy contained several material
misstatements and omissions, which were half-truths. See *Macquarie v. Moab Partners*
Biocept's 2020 proxy statement can be found on the SEC's website and is incorporated by
reference into this complaint; See
*https://www.sec.gov/Archives/edgar/data/1044378/000156459020017334/bioc-pre14a_20200605.htm*
**First,** Biocept's 2020 proxy stated the purpose of the reverse split was a half-truth and
intentionally withheld that the primary reason for the reverse split proposal was to reduce the
common shares outstanding because the Director Defendants had previously approved selling
almost all 150 million authorized shares. After Biocept's 2018 reverse split, Biocept had 148
million shares available to sell. By the time the 2020 proxy was issued, Biocept had less than

10 million shares of outstanding stock approved to sell to fund its operational losses, which were over $6 million a quarter the previous four quarters. The proxy also contained the following misleading statement, which was a half-truth;

**Purpose and Material Effects of Proposed Reverse Split**

*"One of the key requirements for continued listing on The Nasdaq Capital Market is that our common stock must maintain a minimum bid price above $1.00 per share. We believe that the reverse split will improve the price level of our common stock so that we are able to maintain compliance with the Nasdaq minimum bid price listing standard. We also believe that the higher share price could help generate interest in us among investors.  Furthermore, we believe that maintaining our Nasdaq listing may provide us with a broader market for our common stock."*

30.    The Directors intentionally withheld disclosing the purpose of the reverse split was that Biocept did not have enough outstanding shares to sell to fund operations. Any boilerplate information as to the effects of what happens, or could happen after a reverse split is executed is not included in the Purpose Section of the proxy.

**Second,** Biocept's 2020 proxy made the following materially misleading statement on page 36,

*"Our board of directors may also elect not to do any reverse split. Our board of directors' decision as to whether and when to effect the reverse stock split will be based on a number of factors, including market conditions, existing and expected trading prices for our common stock, and the continued listing requirements of The Nasdaq Capital Market. Although our stockholders may approve the reverse stock split, we will not effect the reverse stock split if our board of directors does not deem it to be in the best interests of the Company and its stockholders."*

*While our board of directors believes it advisable to authorize and approve the reverse stock split for the reasons set forth above"*

*"While our board of directors believes it advisable to authorize and approve the reverse stock split for the reasons set forth above"*

31.    As noted above, Biocept needed the reverse split to fund operations. Biocept; (i) stock price was under $0.50, (ii) had less than 10 million outstanding shares left to sell to fund operations and (iii) they had over $ 6 million a quarter in operational losses.

Biocept's Director Defendants knew that the 2020 proxy contained several material misstatements and omissions, which were half-truths. First, the proxy stated above the

purpose of the reverse split was a half-truth. The proxy intentionally withheld that the
primary reason for the reverse split proposal was to reduce the common shares
outstanding because the Director Defendants had previously approved selling almost all
150 million authorized shares. After Biocepts 2018 reverse split Biocept had 148
million shares available to sell. By the time the 2020 proxy was issued, Biocept had less
than 7 million shares left to sell to fund its operational losses, which were over $6
million a quarter the previous four quarters.

**Third,** Biocept's 2020 proxy contained the following materially misleading statement and
omission, which was a half-truth;

> *"However, the effect of the reverse split upon the market price for our common stock
> cannot be predicted, and the history of similar reverse stock splits for companies in like
> circumstances is varied."*

As already noted, Biocept has a history of reverse splits. The Director Defendants executed a
1/10 and a 1/30 reverse split in the previous three years, both times followed by its stock price
sinking back into the pennies.

**Fourth,** Biocept's 2020 proxy contained the following materially misleading statement and
omission on page 39, which was a half-truth;

> *"If our stock closes at a bid price equal to or greater than $1.00 for the ten business days prior
> to the Annual Meeting, our board of directors may delay its decision to execute the reverse
> stock split indefinitely. "*

32.   As detailed herein, The Director Defendants proceeded to take every action possible to
make sure Biocept's stock price DID NOT close over $1.00 for ten consecutive days, including
(a) committing fraud, (b) committing proxy violations, (c), holding void shareholder meetings,
(d) withholding a June 3rd material announcement to co develop a novel COVID-19 test,
which if was announced in accordance with security laws would have given Biocept's stock
price a good chance to close over $1.00 for ten consecutive days, a (e) issuing an unlawful and
delinquent press release on August 6th to manipulate Biocept's stock price to flip broker-non
votes to approve the reverse split proposal, allowing only nine trading days for Biocept's stock
price to close over $1.00 a share before the fourth void reconvened shareholder meeting,

thereby foreclosing the opportunity to cure the NASDAQ bid requirement without executing a reverse split.

33.    These material misstatements, omissions and half-truths were done with scienter, as a ninth grader could immediately distinguish that Biocept needed the reverse split to be approved to fund operations. While having your stock trade off of NASDAQ is not ideal, there are thousands of companies trading off NASDAQ. Biocept could not continue its scam if it did not have shares to dump on the public to fund its operations.

34.    The material misstatements, omissions, and half-truths were the first of many violations of Section 14(a) of the Exchange Act and 14a-9 perpetrated by the Director Defendants. The violations could not have been perpetrated without Bair, Fanuscchi, CBIZ CPAs, and Cain offering substantial assistance. In a nutshell, Bair, Fanucchi, the CBIS CPAs, and Cain intentionally violated SEC or PCAOB rules that they were bound by to assist the Biocept Directors. They turned a blind eye to Nall, Kennedy, Arnold, Royston, Hale, Wilson, Brown, Huebnar, and Gerhardt defrauding the investing public, violating SEC laws and PCAOB rules, and committing acts of fraud as long as Biocept kept paying them.

35.    The 2020 proxy was approved and signed by all of Biocept's Board members; page 60.

**By Order of the Board of Directors    Michael W. Nall *President and Chief Executive Officer,***

*MSLP, however, filed several Commission filings in the form of Forms 10-K and Forms S-1, as well as amendments thereto, through July 2014, which failed to include complete disclosure of the perquisites identified at the September 2012 board meeting and otherwise known by senior management. Prosser signed these filings as a director. 4. On January 4, 2013, Prosser attended a meeting of*

*As a result of the conduct described above, Prosser caused MSLP's violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, which prohibits solicitations by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing a statement which, at the time and in the light of the circumstances under which it was made, was false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.*

On April 24th, 2020, Biocept filed an S-3 Registration statement with the SEC. The Registration was for a **$100,000,000** Biocept stock offering. As previously noted, Biocept sold all but about 7 million shares. Using a mean average price of $0.50, if Biocept sold its 7 million shares it would

only result in gross proceeds of $3.5 million, which is only 3.5% of $100 million. As already
noted, Biocept desperately needed the reverse split to be approved. The Registration Statement,
prepared by Bair, was signed by Nall, Kennedy, Hale, Chandler, Gerhardt, Huebnar, Royston,
and Wilson. See the registration statement linked on April 24, 2020, incorporated herein by
reference.

*https://www.sec.gov/Archives/edgar/data/1044378/000156459020018551/bioc-s3.htm*

36.     As previously noted, Arnold was the controlling person at Aegea and Biocept's long
standing VP. According to Sung, Arnold was upset that all his previously issued stock options
were worthless because of Biocept's 2016 and 2018 reverse splits and Biocept's stock price
collapsing after the splits were executed. Arnold and Sung had already told the Plaintiff that their
PCR COVID test was analytically validated in April, but they would confirm it within a few
months. In April, Aegea gave equity to a small CBD company called Tauriga in return for funds
to co-develop and clinically validate the test. The Plaintiff believes Tauriga invested about
$400,000. According to Sung, the Biocept Directors prevented Aegea from announcing that
agreement because Biocept wanted to validate the test clinically. While COVID-19 is in the past
today, during that time, many COVID-19 tests were faulty, and the citizens of the country were
traumatized by COVID-19.

37.     The World Health Organization declared COVID-19 a worldwide pandemic. The
following months included a period of mass COVID-19 testing. The news cycle was filled with
reports of medical devices used to test COVID-19 giving faulty readings, including false
positives readings. Delaying clinically validating a novel COVID-19 test did not make sense.

### The SEC Proxy Letter Requiring Full Disclosure

On May 6th, 2020, the SEC sent Former CEO Nall a letter, to which attorney Bair was copied;

> Re: Biocept, Inc. Preliminary Proxy Statement on Schedule 14A Filed April 20, 2020 File
> No. 001-36284
>
> *"Dear Mr. Nall:*
>
> *We have completed our review of your filing. **We remind you that the company and its
> management are responsible for the accuracy and adequacy of their disclosures,**
> notwithstanding any review, comments, action or absence of action by the staff.
> Sincerely, Division of Corporation Finance Office of Life Sciences*

*cc: Charles Bair"*

See the linked May 6th letter filed with the SEC and incorporated by reference:

*https://www.sec.gov/Archives/edgar/data/1044378/000000000020003957/filename1.pdf*

### The June 3rd Agreement To Co-Develop A Novel COVID-19 Test

38.    **Finally, on June 3rd, 2020,** Biocept and Aegea executed an agreement to co-develop a novel new PCR test ("Development Agreement") that purported to be more accurate than other PCR tests and could differentiate different strains of COVID-19. Aegea's CEO, Stella Sung, told the Plaintiff that Nall, Hale, Huebner, Royston, Wilson, Gerhart, and Arnold approved the Development Agreement, and Brown and Kennedy further stated that Defendant Bair drafted the Development Agreement and was aware that it was executed on June 3rd, 2020.

39.    Additionally, Sung told the Plaintiff that Defendant Cain knew the Development Agreement was signed on June 3rd because a draft press release was being prepared and would be released immediately after the June 5th annual shareholder meeting. Sung also told the Plaintiff that the Development Agreement was well before June 3rd. Still, Nall wanted to wait to execute the agreement on June 3rd because Nall and the Director Defendants originally planned to announce the Development after the reverse split was approved at the June 5th, 2020, annual shareholder meeting. Delaying developing signing an agreement to co-develop a novel COVID-19 test during a worldwide pandemic, in order to manipulate Biocept's stock price speaks to scienter, and it will not be the only time the Biocept Director Defendants do this.

40.    The Agreement was material for many reasons, including that Biocept never described its business as a co-developer of COVID-19 tests. Biocept also falsely disclosed the Agreement in quarterly and annual reports filed with the SEC. Furthermore, the U.S Supreme Court has long settled the issue of materiality in securities; *TSC Industries, Inc. v. Northway, Inc., 426 U. S. 438, whereby an omitted fact is material if there is a substantial likelihood that its disclosure would have been considered significant by a reasonable investor*, is expressly adopted for the §10(b) and Rule 10b-5 context. Pp. 485 U. S. 230-232.

General Instructions on rules to file a Form 8-K can be found on the SEC's website;

*https://www.sec.gov/files/form8-k.pdf*

Co-developing a novel COVID-19 test was outside Biocept's normal business scope.

(a) If the registrant has entered into a material definitive agreement not made in the
ordinary course of business of the registrant, or into any amendment of such agreement that is
material to the registrant, disclose the following Information:

> (1) the date on which the agreement was entered into or amended, the identity of the
> parties to the agreement or amendment, and a brief description of any material
> relationship between the registrant or its affiliates and any of the parties, other than in
> respect of the material definitive agreement or amendment; and

> (2) a brief description of the terms and conditions of the agreement or amendment that are
> material to the egistrant. Any material definitive agreement of the registrant not made in
> the ordinary course of the registrant's business must be disclosed under this Item 1.01. An
> agreement is deemed to be not made in the ordinary course of a registrant's business even
> if the agreement is such as ordinarily accompanies the kind of business conducted by the
> registrant if it involves the subject matter identified in Item 601(b)(10)(ii) (A) - (D) of
> Regulation S-K (17 CFR 229.601(b)(10)(ii)(A) - (D)). An agreement involving the
> subject matter identified in Item 601(b) (10)(iii)(A) or (B) need not be disclosed under
> this Item

41.    As previously noted, Biocept's Director Defendants, VP Arnold, VP and CFO & COO
Kennedy, and general counsel Brown were all involved in the Development Agreement. The
Director Defendants made this misleading half-truth statement in the 2020 proxy;

> *"We believe that the reverse split will improve the price level of our common stock so that
> we are able to maintain compliance with the Nasdaq minimum bid price listing standard"*

42.    Sung stated to the Plaintiff that the Director Defendants Nall, Hale, Royston, Wilson,
Gerhardt, Huebnar, Kennedy, Brown, and Arnold were aware of the June 3rd Development
Agreement and there was a Board meeting reflecting the Agreement.

43.    The Director Defendants were all signatories on the 2020 proxy. [2]**The Director
Defendants would not have withheld disclosing the June 3rd Development Agreement to co
develop a novel, more accurate COVID-19 test primary concern regarding the the reverse
split improving the price level of Biocept's stock price to maintain compliance with the
NASDAQ minimum bid listing requirement;** especially because COVID-19 was peaking in
June and the Aegea test claimed to have greater accuracy and differentiate the different strains
and mutations of the COVID-19 virus.  As previously noted, a similar CLIA lab Co-Diagnistics,
stock price increased from $1.00 to $18.00 in just five weeks. As Sung stated to the Plaintiff, the

---

[2] This statement speaks to scienter of the Directors, Kennedy, Arnold and Brown

Director Defendants Nall, Hale, Royston, Wilson, Gerhardt, Huebnar, Kennedy, Brown, and Arnold were aware of the June 3rd Development Agreement.

44.    By failing to disclose the Development Agreement, the Director Defendants were committing common law fraud and constructive fraud and violating their fiduciary duties. Additionally, the Director Defendants and VPs Arnold, Brown, and Kennedy knew that withholding because the disclosure was legally required to comply with the Exchange Act, which included an 8-K with full disclosure of the agreement terms, and a supplemental Proxy was required to be filed, informing the voting stakeholders. The fact that the Director Defendants, Nall, Kennedy, and Brown, would violate so many laws and violate their fiduciary duties speaks loudly to scienter.

### Damages From The Biocept Director Defendants Withholding The June 3rd Agreement

45.    In the first instance, the Director Defendants' decision to intentionally commit fraud and withhold disclosure of the June 3rd Development Agreement on June 3, and Bair, Cain, and CBIZ CPAs aiding, abetting, and conspiring with the Defendants prejudiced the Plaintiff and other stakeholders in Biocept. Had Biocept announced the Development Agreement in June it would have had a more significant impact on Biocept's stock price for several reasons; (1) the possibility of vaccines were further away, (2) Biocept would not have had four void shareholder meetings, (3) Biocept's stock price would have traded much higher as there would have been enough time for Biocepts stock price to trade over $1.00 for ten consecutive days because Biocept would have had to cancel the June 5th meeting and issue a supplemental 14a proxy filing. Over 2 Billion shares were traded before the record date of April 20th and the date of the void shareholder approval of the reverse split on August 18th, 2020. Over 200 million shares traded between the June 3rd Development Agreement and the unlawful August 6th press release. Biocept shareholders that sold part or all of their holdings were prejudiced and suffered fraudulent losses of 140 million dollars or more.

46.    Indeed, if Defendants Nall, Hale, Royston, Wilson, Gerhardt, Huebnar, Kennedy, Arnold not committed fraud by concealing the June 3rd Development Agreement, while violating federal and state security disclosure and proxy laws; the Plaintiff would have acted differently

and NOT purchased shares in August, after Biocept issued an unlawful, misleading and delinquent press release.

## The Biocept Directors and Executives Knew That Cooley and Bair Would Not Comply With SEC Rules

47.    Cooley lawyer Bair and the Biocept Directors, Kennedy and Arnold, had a long history of playing fast and loose while violating SEC laws, especially when it involved Aegea. The Director Defendants, Kennedy, Arnold, Brown, and Bair knew that Biocept maade the material omission failing to disclose that Biocept only had the rights to four samples in oncology for blood testing. The Director Defendants, Kennedy, Arnold, Brown, and Bair also knew that Biocept intentionally concealed that Biocept did not own the patent. They achieved this by referring to the patents as a trademarked name, Target Selector, instead of the patent name Switch Blocker.

48.    Bair even drafted the December 2019 amendment to the cross-licensing agreement. The Director Defendants, Kennedy, Brown, Arnold, and Bair made sure that the legally required 8-K was not filed and that the amended cross-licensing agreement was not added as an exhibit to Biocept's quarterly and annual report, both of which were apparent violations of SEC laws. The cross-licensing was referenced in Biocept's annual report, but just generically. The reference did not disclose that the cross-licensing agreement was Biocept's core business, blood screening testing for cancer. While it is true that Biocept could never achieve sales of over $5 million from this global business, which is the equivalent of a local McDonald's revenue, Biocept duped the investing public and raised hundreds of millions of dollars on these patents, which were worthless to Biocept.

49.    As noted, the Biocept Directors intentionally failed to disclose that the cross license agreement was amended in Decembare of 2019. The Biocept Directors fialied to file the legally required 8-K or add the amended agreement as an Exhibit to the quarterly and annual report as required by law. Per Sung's text message to the Plaintiff on

50.    While the Ninth Circuit does not require examples to establish scheme liability be added to a complaint, out of an abundance of caution the Plaintiff incorporates Biocept's 2019 and 2020 quarterly and annual reports into the complaint. In reality, the material misleading statements and

omissions regarding the ownership and limitations surrounding the patents go back to 2014, but the Plaintiff feels that two years is enough to establish schem liability, Exchange Act violations and fraud.

51.    As further evidence, below are links to three Biocept press releases in 2020 in which they reference Target Selector. For instance, Section 307 of the Sarbanes-Oxley Act of 2002 requires the Commission to prescribe minimum standards of professional conduct for attorneys appearing and practicing before the Commission in any way to represent issuers. While Section 307 does not provide a private right for the Plaintiff to sue Bair or Cooley, Bair's flagrant violations of the rule is evidence and scienter that Bair was a secondary actor in the Exchange Act violation, and the state tort violations including aiding and abetting defrauding the Plaintiff and investing public. As noted above, this was not Bair's first rodeo partnering with Biocept in fraud, and giving substantial assistance to Biocept's Director Defendants, Kennedy, Arnold and Brown in violations of the Exchange Acts security laws. Bair had no conscience in participating in defrauding investors as long as Biocept kept paying him.

52.    As noted, Bair already was violating his his legally obligated duties before and after June 5th, 2020, which speaks to scienter. Bair complicity in Biocept's fraudulent acts and security law violations, went on steroids from 2020 through 2022. It would not be hyperbolic to state that Bair's and Cooley's complicity in assisting the Biocept's Directors in committing fraud has to be record setting, it encompassed everything proxy filings, quarterly reports, annual reports, prospectuses and press releases. Biocept, the Biocept Director Defendants and executives, Bair, CBIZ CPAs, CBIZ, and Cain began defrauding the investing public over 1 billion dollars.

53.    See Securities and Exchange Commission 17 CFR Part 205, which is incorporated herein.
*https://www.sec.gov/rules-regulations/2003/01/implementation-standards-professional-conduct-attorneys*

205.2(e) provides:

(e) Evidence of a material violation means credible evidence, based upon which it would be unreasonable, under the circumstances, for a prudent and competent attorney not to conclude that it is reasonably likely that a material violation has occurred, is ongoing, or is about to occur.

This revised definition of "evidence of a material violation" clarifies aspects of the objective standard that the Commission sought to achieve in the definition originally

proposed.41 The definition of "evidence of a material violation" originally proposed prompted extensive comment because (read together with the rule's other definitions) it defines the trigger for an attorney's obligation under the rule to report up-the-ladder to an issuer's CLO or qualified legal compliance committee ("QLCC") (in section 205.3(b)). Some commenters, including some practicing attorneys, found the proposed reporting trigger too high.42 Many legal scholars endorsed the framework of increasingly higher triggers for reporting proposed by the Commission at successive stages in the reporting process but considered the Commission's attempt at articulating an objective standard unworkable and suggested changes to the language in the proposed rule.43 Nearly all practicing lawyers who commented found the reporting trigger in the rule too low and called instead for a subjective standard, requiring "actual belief" that a material violation has occurred, is ongoing, or is about to occur before the attorney would be obligated to make an initial report within the client issuer.44 The revised definition incorporates suggested changes into an objective standard that is designed to facilitate the effective operation of the rule and to encourage the reporting of evidence of material violations.

Evidence of a material violation must first be cedible evidence.45 An attorney is obligated to report when, based upon that credible evidence, "it would be unreasonable, under the circumstances, for a prudent and competent attorney not to conclude that it is reasonably likely that a material violation has occurred, is ongoing, or is about to occur." This formulation, while intended to adopt an objective standard, also recognizes that there is a range of conduct in which an attorney may engage without being unreasonable.

54.    Cooley Defendant Bair intentionally violated its duties as an attorney appearing before the the SEC, and specifically violated Securities and Exchange Commission 17 CFR Part 205, while aiding, abetting, conspiring with Biocept to commit fraudulent acts defrauding investors. Additionally, they were active secondary actors offering substantial assistance in multiple fraud on the market schemes committed by the Director Defendants and executive management team of Biocept, whereby they violated the Exchange Act.

### The Biocept Directors and Executives Knew That CBIZ Employees At CBIZ CPAs Would Not Comply With SEC and PCAOB Rules

55.    CBIZ CPAs, Fanucchi and the Biocept Directors, Kennedy and Arnold, also had a long history of playing fast and loose while violating SEC laws, especially when it involved Aegea. The Director Defendants, Kennedy, Arnold, Brown, and The CBIZ CPAs audit team and Fanucchi knew that Biocept maade the material omission failing to disclose that Biocept only

had the rights to four samples in oncology for blood testing. The Director Defendants, Kennedy, Arnold, Brown, Fanucci and the CBIZ CPAs audit team also knew that Biocept intentionally concealed that Biocept did not own the patent. They achieved this by referring to the patents as a trademarked name, Target Selector, instead of the patent name Switch Blocker.

56.     Bair even drafted the December 2019 amendment to the cross-licensing agreement. The Director Defendants, Kennedy, Brown, Arnold, and Bair made sure that the legally required 8-K was not filed and that the amended cross-licensing agreement was not added as an exhibit to Biocept's quarterly and annual report, both of which were apparent violations of SEC laws. The cross-licensing was referenced in Biocept's annual report, but just generically. The reference did not disclose that the cross-licensing agreement was Biocept's core business, blood screening testing for cancer. While it is true that Biocept could never achieve sales of over $5 million from this global business, which is the equivalent of a local McDonald's revenue, Biocept duped the investing public and raised hundreds of millions of dollars on these patents, which were worthless to Biocept.

### AS 1000: General Responsibilities of the Auditor in Conducting an Audit

01.     The auditor has a fundamental obligation to protect investors through the preparation and issuance of informative, accurate, and independent auditor's reports. This responsibility transcends an auditor's relationship with management and the audit committee of the company under audit, providing the foundation for an objective and independent audit. A properly conducted audit and the related auditor's report enhance the confidence of investors and other financial statement users1 in the company's financial statements and, if applicable, internal control over financial reporting. Note: The auditor's obligation to protect investors provides important context to the auditor's work when applying the requirements of this and other Public Company Accounting Oversight Board ("PCAOB") standards and rules.

### AS 2810: Evaluating Audit Results

**Performing Analytical Procedures in the Overall Review**

5.     **In the overall review, the auditor should read the financial statements and disclosures and perform analytical procedures** to (a) evaluate the auditor's conclusions formed regarding significant accounts and disclosures and (b) assist in forming an opinion on whether the financial statements as a whole are free of material misstatement.

6.     As part of the overall review, the auditor should evaluate whether: The evidence gathered in response to unusual or unexpected transactions, **events,** amounts, or

relationships previously identified during the audit is sufficient; and Unusual or
unexpected transactions, events, amounts, or **relationships** indicate risks of material
misstatement that were not identified previously, including, in particular, fraud risks.
Note: If the auditor discovers a previously unidentified risk of material misstatement or
concludes that the evidence gathered is not adequate, he or she should modify his or her
audit procedures or perform additional procedures as necessary in accordance with
paragraph 36 of this standard.

20.    *Evaluating Whether Misstatements Might Be Indicative of Fraud.* The auditor
should evaluate whether identified misstatements13/ might be indicative of fraud and, in
turn, how they affect the auditor's evaluation of materiality and the related audit
responses. As indicated in AU sec. 316, *Consideration of Fraud in a Financial Statement
Audit,* fraud is an intentional act that results in material misstatement of the financial
statements.

21.    If the auditor believes that a misstatement is or might be intentional, and if the
effect on the financial statements could be material or cannot be readily determined, the
auditor should perform procedures to obtain additional audit evidence to determine
whether fraud has occurred or is likely to have occurred and, if so, its effect on the
financial statements and the auditor's report thereon.

22.    For misstatements that the auditor believes are or might be intentional, the auditor
should evaluate the implications on the integrity of management or employees and the
possible effect on other aspects of the audit. If the misstatement involves higher-level
management, it might be indicative of a more pervasive problem, such as an issue with
the integrity of management, even if the amount of the misstatement is small. In such
circumstances, the auditor should reevaluate the assessment of fraud risk and the effect of
that assessment on (a) the nature, timing, and extent of the necessary tests of accounts or
disclosures and (b) the assessment of the effectiveness of controls. The auditor also
should evaluate whether the circumstances or conditions indicate possible collusion
involving employees, management, or external parties and, if so, the effect of the
collusion on the reliability of evidence obtained.

23.    **If the auditor becomes aware of information indicating that fraud or another
illegal act has occurred or might have occurred, he or she also must determine his or
her responsibilities under AU secs. 316.79-.82A, AU sec. 317, and Section 10A of the
Securities Exchange Act of 1934, 15 U.S.C. § 78j-1.**

SEC Rules also require auditors to review quarterly reports;

**§ 210.8-03 Interim financial statements.**

Interim financial statements may be unaudited; however, before filing, interim financial
statements in\cluded in quarterly reports on Form 10–Q (§ 249.308(a) of this chapter)
must be reviewed by an independent public accountant using applicable professional
standards and procedures for conducting such reviews, as may be modified or
supplemented by the Commission.

57.     As noted, material agreements are part of the financial notes. Moreover, Fanucci and the
CBIZ CPAs audit team were required to meet with Wilson, Gerhardt and Huebnar to review the
quarterly filings and material events that occurred in the quarter. The fraudulent statement
stating that Biocept disclosed the Development Agreement was intentionally fraudulent in an
attempt to cover up that the Biocept Directors and executives committed fraud, violated their
fiduciary duties and violated the Exchange Act's disclosure and proxy voting laws. As noted, the
August 6th press release did not provide the date of  the Development Agreement or that
Biocep[t was only given a 90 Day Right of First Refusal. The intentional omission of the date
was to hide that Biocept failed to disclose the Development Agreement in accordance with the
law. The omission of the 30 day First Right of Refusal would have minimized the impact of the
press release.

58.     As detailed below, even after that Plaintiff notified the Director Defendants, Cain and
Bair that the quarterly report contained the fraudulent statements, the Director Defendants

59.     The CBIZ CPAs audit team were aware of the June 3rd Development Agreement, and
they were also aware that a Form 8-K needed to be filed with full disclosure of the terms of the
agreement.


## The Biocept Directors and Executives Knew That Aegea Would Aid and Abet the Fraud And Securities Law Violations

Aegea was an active participant in all Biocept's illegal fraud on the market schemes. Aegea
allowed Biocept to always use the trademarked name, Target Selector, in all press releases,
quarterly reports, annual reports, and investor presentations always referred Biocept's blood
testing business patents as Target Selector. For example, Biocept's  2020 second quarter 10-Q
Biocept filed with the SEC references **Target Selector 22 times, and Switch Blocker only
twice**. The two times Switch Blocker was mentioned was irrelevant. The report does not disclose

that the inytellectual property Switch Blocker is jointly owned by Biocept and Aegea, but Biocept only has the rights to four samples in oncology according to Aegea's CEO Sung.

60.    Arnold was a SR. VP and Chief Scientific Officer at Biocept since 2014. Sung told the Plaintiff that Arnold was very upset that in that time all of his stock option grants became worthless, and his only real compensation was his salary. Sung also texted the Plaintiff that Arnold was not happy that his stock options were under water. Prior to COVID-19, Sung acknowledged to the Plaintiff that Biocept and Nall pretended that they owned all the rights to the blood biopsy patents wehen they didn't.

61.    The Plaintiff requests the Court take Judicial Notice of Biocept's 2015, 2016, 2017, 2018 2019 quarterly and annual reports filed with the SEC, as none of those reports reflect that the blood biopsy business patent is co-owned, or that Biocept only had the rights to four samples. Sung's texts indicate that she tried to placate Nall by using the word "certain" instead of four, because Biocept traded on news.

Sung's text regarding the patents, dated October 9th 2020

- Including Switch Blocker in all but the narrow clinical oncology field that is Biocept's. They try to gloss over this.

- Any research only only within oncology is ours. Doesn't matter the sample type. Within CLINICAL oncology. Biocept only has 4 sample types. Any other disease execpt for narrow CLINCAL oncology is ours. Read our joint press releases. I allowed the wording "certain rights within oncology" They wanted to imply ALL oncology rights. I was generous. "Within CLINICAL oncology". They don't even own all of CLINICAL oncology For Switch Blocker.

Sungs text regarding the patents, dated September 30th 2020;

- We share that particular patent, but they ONLY have rights in a narrow field 9we worded it rights within oncology" (I think) I was nice about the wording because they trade on news. We are Private.

62.    As a recap, Sung is the CEO of Aegea. The texts evidence that; (1) Aegea allowed Biocept to use misleading wording, and (2) that misleading wording because Biocept's stock traded on news. Aegea, and Arnold were active participants in the fraud on the market scam involving the patent and the blood testing business. While the Plaintiff did not purchase Biocept

shares because of the blood testing business, he would not have purchased shares if he had
knowledge that Biocept was running a fraud on the market scam.

63.    Aegea also knew and was a substantial participant with Biocept, the Director Defendants,
Arnold, Kennedy and Brown perptrating a fraud on the market scheme regarding the June 3rd
2020 Agreement. Obviously Aegea knew the agreement was signed, Sung acknowledged that the
press release was delinquent, did not date the agreement and concealed that Bioecpt was only
given a 30 day Right of First refusal. Aegea also waited until August 6th to issue a press release.
The Aegea press release also did not disclose the date ofvthe agreement or that Biocept only had
a 30 day First Right of First refusal. The above speaks to scienter for the patent and COVID-19
fraud on the market schemes.

### Recap Of Events Up To June 3rd

64.    Had the Plaintiff known that Biocept, the Director Defendants, and Biocept's executive
management team consisting of Arnold, Kennedy, and Brown were running a fraud on the
market scheme intentionally concealing the co-ownership of the Switch Blocker patent to
artificially manipulate Biocept's stock price to raise capital, the Plaintiff would not have
purchased Biocept's stock under any circumstances.

65.    Had the Plaintiff known that Biocept, the Director Defendants and Biocept's executive
management team consisting of Arnold, Kennedy and Brown were running a fraud on the market
scheme intentionally withholding disclosing the June 3rd Development Agreement to artificially
suppress Biocept's stock price to get the the requisite shareholder votes to approve the reverse
split proposal, the Plaintiff would have sold his shares and not purchased additional shares in
August 2020.

66.    Had the Plaintiff known that Biocept and the Director Defendants made material
misstatements, omissions, and half-truths in 2020, the Plaintiff would not have purchased any
stock.

67.    Had the Plaintiff known that Biocept and the Director Defendants were going to withhold
material news from the stakeholders voting on the 2020 proxy and proceed with a void
shareholder meeting on June 5th, the Plaintiff would have sold his shares and not purchased

additional shares in August 2020. Concealing the June 3rd Development Agreement from voters was fraud. Fraud vitiates everything.

68.     Had the Plaintiff known that gatekeeper CBIZ CPAs, Cooley attorney Bair and Cain were violating SEC and PCAOB rules to offer substantial assistance to the Director Defendants in (1) perpetrating violations of the Exchange Act and (2) aiding, abetting and conspiring with them in acts of fraud and fiduciary violations the Plaintiff would not have purchased Biocept stock.

69.     Defendants Nall, Hale, Royston, Gerhardt, Huebnar, Wilson, Kennedy, Arnold, Cain, Bair, Fanucci, and the CBIZ CPAs audit team all knew that (a) failing to disclose the Development Agreement was fraud; (b)  failing to disclose the Development Agreement was violated Proxy voting laws and (c)  failing to disclose the Development Agreement the Exchage Act; ( failing to disclose the Development Agreement was was a violation of fiduciary duties. All the above named Defendants had legal obligations NOT to participate or report these violations.This speaks to scienter.

## The June 5th Annual Meeting

70.     Not surprisingly, shareholders voted down the reverse spilt proposal on June 5th. But Biocept, the Director Defendants, Kennedy, Brown, Bair, CBIZ CPAs, and Cain began a long fraud on the market scheme. After the execution of the June 3rd Development Agreement Biocept, and the Director Defendants were legally required to (i) file a Form 8-K with the SEC describing the details and date of the agreement, (ii) attach the Development Agreement to the subsequent quarterly filing as an Exhibit, and (iii) disclose the Development Agreement to the shareholders of record voting at the 2020 shareholder meeting. Biocept and the Director Defendants intentionally failed to do any of their legally obligated requirements to scheme further to defraud investors and commit a fraud-on-the-market scheme. Bair, Cain, and the CBIZ CPAs audit team knew that the Development Agreement was executed, and they knew it was material. Bair, Cain, CBIZ CPA's audit engagement team were bound by SEC laws and rules.

71.     The Biocept Directors did not file a Supplemental Proxy notice informing shareholders of the material Development Agreement, as legally required. As already noted, the June 5th annual shareholder meeting and the vote to extend it to July 1st were void. Biocept's 2020 Proxy proposal 7 states;

In this proposal, we are asking our stockholders to authorize the holder of any proxy solicited by our board of directors to vote in favor of granting discretionary authority to the proxy holders, and each of them individually, to adjourn the Annual Meeting to another time and place, if necessary, to solicit additional proxies in the event that there are not sufficient votes to approve Proposal 3 or Proposal 4

72.    The vote to adjourn the June 5th annual meeting to July 1st was void for the reasons already stated. Fraud vitiates everything.

73.    Defendants Nall, Hale, Royston, Gerhardt, Huebnar, Wilson, Kennedy, Arnold, Cain, Bair, Fanucci, and the CBIZ CPAs audit team all knew that (a) the June 5th annual meeting while withholding disclosing the Development Agreement was fraud; (b) the June 5th annual meeting was void due to concealing the Development Agreement (c) continuing the 2020 annual meeting was fraud and void because of the intentional concealment of the Development Agreement. This speaks to scienter.

## The July 1st Reconvened Annual Meeting

74.    Biocept held the void reconvened shareholder meeting on July 1st, and once again, shareholders voted down the reverse split proposal. Since the reverse split proposal was not approved, the meeting was fraudulently adjourned until July 31st. For the same reasons cited above, the meeting and voting were void

## The Director Defendants Supplemental Proxy Filings

75.    Biocept filed two supplemental Proxy filings. On July 13th, 2020, Biocept issued a false and misleading proxy supplement with the SEC  stating that "the Board" encouraged shareholders to vote for the reverse split to maintain the $1.00 minimum bid. On July 16th, Biocept filed another proxy supplement with the SEC, again stating that the Board recommends that shareholders vote for the reverse split proposal;

On May 4, 2020, Biocept, Inc. (the "Company") commenced distributing to its stockholders a Notice of Annual Meeting of Stockholders and Definitive Proxy Statement (the "Notice and Proxy Statement") for its 2020 Annual Meeting of Stockholders (the "Annual Meeting"), which was held on June 5, 2020.  A copy of the Notice and Proxy Statement was filed with the Securities and Exchange Commission (the "SEC") on April 29, 2020.  On May 21, 2020, the Company mailed a letter to certain of its stockholders related to Proposal 3 and Proposal 4 (the "May Letter"), which proposals are described in the Notice and Proxy Statement. A copy of the May Letter was filed with the SEC on May 21, 2020. On June 5, 2020 the Annual Meeting was adjourned prior to voting on Proposal 4 to allow additional time for voting. **On June 10,**

2020, the Company (i) mailed a letter to certain of its stockholders (the "June Letter") and (ii) commenced disseminating an audio recording (the "Recording") to certain of its stockholders by telephone, in each case related to Proposal 4, which proposal is described in the Notice and Proxy Statement. A copy of the June Letter and the script of the Recording were filed with the SEC on June 10, 2020. As announced during the Annual Meeting, the Annual Meeting was reconvened at 1:30 p.m. Pacific Time on July 1, 2020. On July 1, 2020, the Annual Meeting was again adjourned before voting on Proposal 4 to allow additional time for voting. As announced during the reconvened Annual Meeting, the Annual Meeting is to reconvene at 1:30 p.m. Pacific Time on July 31, 2020. On July 9, 2020, the Company mailed a postcard to certain of its stockholders related to Proposal 4 (the "July Postcard"), which proposal is described in the Notice and Proxy Statement. A copy of the July Postcard was filed with the SEC on July 13, 2020. On July 16, 2020, the Company issued a press release related to Proposal 4, which proposal is described in the Notice and Proxy Statement. A copy of the press release is set forth below.

See the links below for the Schedule 14A filings, which are incorporated herein by reference.

*https://www.sec.gov/Archives/edgar/data/1044378/000156459020032493/bioc-defa14a_20200716.htm*

*https://www.sec.gov/Archives/edgar/data/1044378/000156459020032493/bioc-defa14a_20200716.htm*

Biocept filed and issued this press release on July 16th, titled;

> *"Leading Independent Proxy Advisory Firms ISS and Glass Lewis Both Support Biocept Proposal to Authorize the Reverse Split of Common Shares"*

76.    The July 16th, 2020 press release contained this statement, which was a half truth;

> "The reverse stock split proposal is intended to increase the per-share trading price of Biocept's common stock to satisfy the $1.00 minimum closing bid price requirement for continued listing on Nasdaq. Biocept's board believes that maintaining Biocep's Nasdaq listing may provide a broader market for Biocep's common stock than if Biocept's common stock were delisted from Nasdaq and could help in generating interest in Biocept among investors.

77.    As noted, the primary reason for the reverse split proposal was to reduce the outstanding shares so that Biocept could continue selling shares to fund its operational losses. Evidence of this includes, (i) Biocept having less than 7 million shares to sell; (ii) the 100 million dollar S-3 filings; Biocept's Director Defendants intentionally violating Exchange Act and Proxy laws withholding announcing the Development Agreement, knowing that announcing the Development Agreement would have caused Biocept's stock to trade well over $1.00.

78.    Additionally, the Director Defendants attempted to leverage ISS and Glass Lewis falsely, arguably the two most prominent proxy advisory services in North America. Plaintiff Cesario questioned Biocept on how ISS and Glass Lewis came to recommend the reverse split proposal, and on September 29th, 2020, Defendant Cain provided the Plaintiff this reply via an email;

- *"Biocept did not engage ISS or Glass Lewis. These are independent advisory firms to institutional investors and are paid by institutional investors for their advice; they are not engaged by companies. Neither Biocept management nor its proxy advisor Alliance Partners had any discussions with ISS or Glass Lewis regarding the reverse stock split or any of the other proposals on the 2020 proxy."*

79.     The Biocept Director Defendants leveraged ISS and Glass Lewis to attempt to persuade shareholders to vote for the reverse split, even though the Director Defendants knew that Biocept was violating proxy laws by intentionally withholding the Development Agreement from stakeholders, and the Directors had not filed the legally obligated 8-K with the SEC. If Biocept didn't hire ISS and Glass Lewis, then who did? Maxim controlled the broker-non-votes, which were institutions that bought the March and April $0.40 and $0.46 stock offerings. Usually, institutions may hire ISS and Glass Lewis, but the evidence doesn't point to that in this case. The institutions abstained from voting on the proposal twice.

80.     Additionally, the institutions knew that Biocept's stock price collapsed after Biocept executed the previous two reverse splits. One of the Defendant Bairs's colleagues in the Cooley San Diego office, Megan Aurthur Shilling, bio states that she *has significant experience advising public companies on the impact of Institutional Shareholder Services (ISS), Glass Lewis, and institutional investor policies and shareholder relations issues.*

81.     As previously noted, Defendant Bair; (i) drafted the Development Agreement, (ii) reviewed, edited and approved every Biocept press releases (including the July 16th release), (iii) was copied on the SEC letter dated May 6th reminded Nall of hist legal obligations to make complete disclosures during the proxy, (iv.) and he did the SEC work on the proxy.

82.     In addition to the Director Defendants issuing the July 16th press release, and the July 13th and 16th supplemental Proxy filings; the Director Defendants also issued press releases on June 5th, June 22nd, June 24th, June 30th, August 3rd, and August 4th, all of which failed to disclose the material Development Agreement. Additionally, on June 5th, Biocept filed a Form 8-K with the SEC, disclosing a material agreement, albeit not the Development Agreement. Biocept's 8-K filing on June 5th disclosed they were moving and entering into an agreement with the landlord.

*https://www.sec.gov/Archives/edgar/data/1044378/000156459020028516/bioc-8k_20200601.htm*

83.    Biocept filed a Form 8-K with the SEC on June 10th and still withholds the disclosure of the material Development Agreement from stakeholders and the investing public. On July 31st, Biocept reconvened the void annual shareholder meeting. Once shareholders voted down the reverse split proposal, Maxim abstained from voting the 46,201,989 broker non-votes it controlled for the third time.

The supplemental proxy filings, while continuing to intentionally withhold disclosing the Development Agreement speaks to Nall, Hale, Gerhardt, Huebnar, Wilson, Brown and Kennedy's scienter

### The July 31st Reconvened Annual Meeting

84.    Biocept held the void reconvened shareholder meeting on July 1st, and once again, shareholders voted down the reverse split proposal. Since the reverse split proposal was not approved, the meeting was fraudulently adjourned until July 31st. For the same reasons cited above, the meeting and voting were void

### August 5th And August 6th Trading Unlawful Press Release

85.    On August 5th, 2020, late-day trading swelled to 50 million shares, 30 times the previous day's trading. Next, at 6 p.m., a maxim analyst issued a price target of $6.00 on Biocept, nearly 800% higher than Biocept's closing price.

86.    On August 6, 2020, Biocept issued a delinquent and unlawful press release titled;

**Biocept Announces Agreement with Aegea Biotechnologies to Develop New, Highly Sensitive PCR-based COVID-19 Assay Utilizing Patented Switch-Blocker PCR Technology**

Biocept's executives and Board of Directors decided to put out an unlawful and misleading press release on August 6th, 2020, to manipulate Biocept's stock price. By issuing the delinquent August 6th press release, Biocept compounded the SEC laws and rules it violated. Biocept now (a) failed to disclose a material announcement; (b) issued legally deficient press release, (c) issued an unlawfully timed press release with material omissions; (d) was committing stock market price manipulation (e) violated proxy disclosure laws; furthermore, Biocept (f) failed to file the legally required Form 8-K; and (g) failed to add the June 3rd Agreement as an exhibit to its 8-K's and 10-K's as was legally required.

87.     Biocept's Director Defendants, Kennedy, Brown, and Arnold, as well as CBIZ CPAs, Cain and Bair, knew that the unlawful August 6th press release would not only pump the stock price higher, but allow the institutions that bought the $0.40 cent stock in March and April to sell their stock at a huge, short term profit which might induce them to change their votes and approve the reverse split proposal. As previously noted, Maxim and its institutional clients bought large amounts of Biocept's shares when stock markets crashed, only to see nearly a doubling of the stock within weeks because Biocept announced it was beginning COVID-19 testing.

88.     Hours before Biocept's most significant announcement in its history, Biocept's share trading volume swelled 30 times the previous days volume. McCarthy issues an unusual after-hours price target on Biocept that is 300% higher than the closing share price. After Biocept issued the unlawful and delinquent press release the August 6th trading volume of Biocept's shares and the price increase were historic.

89.     The August 6th, 2020 press release was delinquent and violated SEC laws and rules. The press release was also misleading as it did not contain the date of the agreement or the terms of the "First Right Of Refusal". The press release is listed on Biocept's website. As a result of Biocept's unlawful August 6th, 2020, press release, Biocept shares traded over 100 times the volume of August 3rd and 4th. Biocept's trading volume on August 3rd and 4th was 1.6 million daily shares. All volumes are recorded as pre-reverse split numbers.

90.     The August 6th, 2020 press release was delinquent and violated SEC laws and rules. The press release was also misleading as it did not contain the date of the agreement or the terms of the "First Right Of Refusal". The press release is linked below and incorporated into this action. The August 6, 2020, press release was delinquent and violated SEC laws and rules. The press release was also misleading as it did not contain the date of the agreement or the terms of the "First Right Of Refusal". The press release is linked below and incorporated into this action. As a result of Biocept's unlawful August 6th, 2020 press release, Biocept shares traded over 100 times the volume of August 3rd and 4th. Biocept's daily trading volume on August 3rd and 4th averaged 1.6 million. On August 6th, trading volume exploded to 192 million shares, a record for Biocept.

        See Biocept's August 6th press release incorporated herein.

*https://www.biospace.com/biocept-announces-agreement-with-aegea-biotechnologies-to-develop-new-highly-sensitive-pcr-based-covid-19-assay-utilizing-patented-switch-blocker-pcr-technology*

91. Biocept traded a record number of shares on August 6th, 2020. All volumes are recorded as pre-reverse split numbers. Moreover, due to Biocept's unlawful August 6th, 2020 press release, Biocept's share price jumped from $0.70 to a high of $1.30. Biocept's closing price on August 6th was $1.10. August 6th, 2020, was the first time Biocept's stock price had closed over $1.00 a share on August 20th, 2019.

92. Biocept intentionally issued the August 6th, 2020 press release for the following reasons;

- to manipulate the stock price and trading volume so that the funds that bought 40 shares a few months earlier could sell at a profit and then vote for the reverse split.

- to prevent Biocept's closing share price from being over $1.00 for ten consecutive days before the August 18, 2020, annual meeting, where a fourth vote was being taken for the proposed reverse split. The proposed reverse split was the only item on the agenda.

93. The Defendants knew that the August 6th press release was unlawful and that they violated the law and committed fraud in failing to announce the June 3rd Development Agreement in a timely manner. The Defendant Directors timed the void reconvened on August 18th, 2020, at the shareholder meeting to guarantee that Biocept could not regain NASDAQ compliance. There were only nine trading days between August 6th and August 18th for Biocept to regain compliance organically. Foreclosing Biocepts stock price from closing over $1.00 for ten consecutive trading days demonstrates the detailed planning the Defendant Directors made leading up to the August 6th press release.

92. Furthermore, Sung told the Plaintiff and others that Biocept had several dates on which she was told the press release would occur, but Nall kept stalling for strategic reasons. Sung would have known because she was anxious to have Aegea announce the codevelopment agreement. Aegea could not issue its press release because it needed Biocept's permission to include its name in Aegea's press release.

See Aegea's August 6th press release incorporated herein.

*https://www.businesswire.com/news/home/20210302005447/en/Aegea-Biotechnologies-Announces-Supply-Agreement-with-Biocept-for-New-COVID-19-Test-with-the-Ability-to-Distinguish-Virus-Strains-and-Quantify-Viral-Load*

**Biocept's Second Quarter 10-Q Filed on August 13th, 2020**

93.      On August 13th, 2020, five days before the void reconvened August 18th shareholder meeting, **Biocept filed its second quarter 10-Q report with the SEC.** The CBIZ CPAs audit team reviewed the report, although Sung told the Plaintiff that Bair, Cain, Fanucci, and the CBIZ CPAs audit team knew that the Development Agreement had been signed on June 3rd, 2020.

94.      Moreover, Bair, Cain, Fanucci, and the CBIZ CPAs audit team knew that Biocept the Director Defendants, Arnold, Kennedy and Brown (a) committed fraud concealing it until August; (b) the August 6th press release was unlawful; (c) Biocept committed proxy law violations and the June 5th annual shareholder meetings should have been cancelled due to the proxy law violation, concealing the June 3rd Agreement.

95.      CBIZ CPAs and Fanucchi were legally obligated by SEC, PCAOB rules and their [3]engagement letter with Biocept interim quarterly reports filed with the SEC. Material agreements are part of the financial notes; See, PCAOB AU Section 722 Interim Financial Information Source: SAS No. 100;

Performing the Review Engagement

- Read and analyze documentation related to the prior-year audit and review engagements.
- Read the most recent annual, and comparable prior interim, financial information.
- Consider the results of any audit procedures performed with respect to the financial statements of the current year.
- **Inquire of management about any changes in business activities of the entity.**
- Inquire of management about any significant changes in internal controls.

**The Accountant's Knowledge of the Entity's Business and Its Internal Control**

---

[3] #Audit Fees consist of fees billed for professional services performed by Mayer Hoffman McCann P.C., including out-of-pocket expenses. The amounts presented relate to the audit of our annual financial statements, the review of financial statements included in our quarterly reports on Form 10-Q, review of our registration statements on Forms S-1, S-3 and S-8, and related services that are normally provided in connection with statutory and regulatory filings or engagements.

#Audit Fees consist of fees billed for professional services performed by Mayer Hoffman McCann P.C., including out-of-pocket expenses. The amounts presented relate to the audit of our annual financial statements, the review of financial statements included in our quarterly reports on Form 10-Q, review of our registration statements on Forms S-1, S-3 and S-8, and related services that are normally provided in connection with statutory and regulatory filings or engagements.

To perform a review of interim financial information, the accountant should have sufficient knowledge of the entity's business and its internal control as they relate to the preparation of both annual and interim financial information to:

.10

- Identify the types of potential material misstatements in the interim financial information and consider the likelihood of their occurrence.

.18

- a. Reading the available minutes of meetings of stockholders, directors, and appropriate committees, and inquiring about matters dealt with at meetings for which minutes are not available, to identify matters that may affect the interim financial information.

- f. Reading other information that accompanies the interim financial information and is contained in reports (1) to holders of securities or beneficial interests or (2) filed with regulatory authorities under the Securities Exchange Act of 1934 (such as Form 10-Q or 10-QSB), to consider whether such information or the manner of its presentation is materially inconsistent with the interim financial information. fn 12 If the accountant concludes that there is a material inconsistency, or becomes aware of information that he or she believes is a material misstatement of fact, the action taken will depend on his or her judgment in the particular circumstances. In determining the appropriate course of action, the accountant should consider the guidance in section 550, *Other Information in Documents Containing Audited Financial Statements*, paragraphs .04 through .06).

96.    Regulation S-X extends the meaning of the term "financial statements" to include all notes to the statements and all related schedules. Regulation S-X is closely related to Regulation S-K, which lays out reporting requirements for various SEC filings and registrations used by public companies.

SEC and PCAOB rules require an auditor to be independent.

97.    For example, the Director Defendants, Kennedy, Brown, Arnold, Bair, CBIZ CPAs engagement team Fanucchi, and Cain knew, and willingly played a part several fraud on the market schemes regarding Aegea. Biocept's Director Defendants, Kennedy, Brown, The August 13th second quarter 10-Q. The fraud on the market scheme in the fraudulent scheme to defraud investors. The second quarter 10-Q attempted to cover up the intentional fraudulent act of Boicept failing to comply with the law by making the following intentional fraudulent statement in anaud by issuing the following false and fraudulent statement in two sections of th report;

> **"On June 3, 2020, the Company announced entering into a development agreement**
> with Aegea focused on the co-development by Biocept and Aegea of a highly sensitive
> PCR-based assay designed by Aegea for detecting the COVID-19 virus."

98.     The reason why a Form 8-K was not filed, and the June 3rd Development Agreement was
not added as an Exhit is because they form a permanent record. Press releases become obsolete
and are not easily found by new investors unless they specifically search the date and title.

99.     Director Defendants, and Biocept's Audit Committee Member Wilson. Gerhardt and
Huebnar were required to review the June 3rd Development Agreement with the CBIZ CPAs
audit team. Material Agreements and other material items are part of a company's financial
Notes. As previously noted, matreial agreements trigger legal obligations, including filing an 8-K
with full disclosure of the date and terms of the agreement. The SEC and PCAOB rules require
material agreements the Biocept Director Defendants, Arnold, Brown and Kennedy were
required to a a timely 8-K be filed with full disclosure is to prevent the fraudulent scam that the
Defendants committed with the Development Agreement. If not for Aegea's CEO Sung
confirming that the Development Agreement was executed on June 3rd the Plaintiff would never
have known for sure. If not for Sung disclosing that Aegea only gave Biocept a 30 day Right of
First Refusal the Plaintiff would not have known those material facts.

100.    The August 6th 2020 unlawful and delinquent press release concealed the date of the
Development Agreement because the Biocept stakeholders would have known that the Director
Defendants were intentionally withholding concealing the agreement to strategically ise the
instrument to manipulate Biocept's stock price and flip the broker non votes to vote for the
reverse split proposal. The Director Defendants intentionally concealed that the Development
Agreement deceive the investing public, by only having a 30 day Right of First Refusal the
co-development pronouncement is significantly minimized.

101.    A pattern of fraud and violations of security laws involving material agreements with
Aegea was developing. In less than six months, the June 3rd, 2020 Development Agreement was
the second material agreement in which the Biocept Directors failed to file the legally required
Form 8-K and attach the Development Agreement as an Exhibit. As noted, the Biocept Directors
intentionally failed to attach the December 2019 amended cross-licensing agreement as an
Exhibit or file the legally required Form 8-K with the SEC.

## Void August 18th Reconvened Shareholder Meeting

102.    On August 18th, 2020, Biocept shareholders of the record date of April 20th, 2020, were allowed to vote to approve the reverse split, even though over 2 billion shares traded from April 20th to August 18th, 2020. According to Biocept's proxy, roughly 150 million shares were publicly owned.

103.    On August 18th, 2020, Biocept shareholders of record on April 20th were allowed to vote on the reverse split proposal for the 4th time, even though over 2 billion shares had traded between the April 12th record date and the August 18th adjourned annual meeting date. After the August 6th pump, the voting for the reverse split was approved by a vote of;

Votes For 65,715,211   Votes Against 27,292,058

104.    As noted above, **the August 18th shareholder meeting and the votes cast were void**, as were the June 5th, July 1st, and July 31st meetings.

105.    Maxim's institutional investors bought over 50 million shares in the months leading up to the June 3rd, 2020 agreement. Because the record date for voting was April 15th, 2020, these institutions controlled a majority of the voting total. If these institutions had retained their holdings in Biocept stock and sold on the August 6th unlawful press release, the institutions would have stood to make profits, tripling their investment, or 120 million dollars. As noted, Maxim controlled 46,201,989 shares of broker-non-votes, but many of those were sold before August 6th, and even more were sold before the 4th adjourned annual meeting on August 18th. Maxim's facilitated buys for its clients on August 5th, before McCarthy issued the after-hours $6.00 price target.

106.    Maxim's institutional clients are known to be short sellers. Maxim facilitated illegal short sales for its clients. As noted above, Sabby increased its stock position in Biocept from 500,000 to 9 million shares when Biocept did not have any catalysts and the worldwide stock markets had a historic crash. After this complaint was filed, the SEC sanctioned Maxim and Sabby for their role in short-selling penny stocks they did business with.

See SEC complaints against Sabby and Maxim;

_https://www.sec.gov/enforcement-litigation/administrative-proceedings/34-98605-s_

https://www.sec.gov/enforcement-litigation/administrative-proceedings/34-98605-s

107.    Maxim and Maxim's institutional clients knew Biocept had filed a $100 million S-3

registration in May 2020. The institutional investors knew that Biocept timed the August 6,

2020, unlawful press release so close to the August 18, 2020, adjourned annual meeting that it

was impossible for Biocept to trade over $1.00 a share for ten consecutive days to regain

NASDAQ compliance.

108.    Had Biocept announced the Development Agreement on or about June 3rd, 2020, as

legally required, there would have been more than 10 trading days between June 3rd and the

adjourned July 1st meeting for Biocept to have regained compliance, which would have negated

the reason Biocept gave for the reverse split. As previously noted, Co-Diagnostics' stock price

jumped from $1.00 to $18.00 in five weeks after they announced developing a COVID-19 test.

109.    As soon as the market realized Biocept was proceeding with the reverse split vote,

Biocept's stock price started declining. By the 18th, it was under $1.00 again.

As already noted regarding the 2020 annual shareholder meetings;

1.  The June 5th, July 1st, July 3st and August 18th meetings were all void
2.  The votes were void, including shareholder approval for the reverse split
3.  The publicly stated reason for the reverse split was fraudulent or, at best, a half-truth
    because the Director Defendants took every nefarious action possible to ensure that it
    would not regain NASDAQ compliance before shareholders approved the proposal for a
    reverse split.
4.  On September 3rd, 2020, Biocept's board of Directors approved a fraudulent void 1 for
    10 reverse split.
5.  The shares were bought between $0.40 and $0.46
6.  Biocept's stock price hit a high of $1.30 on August 6th
7.  Liquidating a  46,201,989 million share position of a penny stock requires liquidity
8.  The August 6th unlawful delinquent press release created massive trading volume
    liquidity, and a 300% short term share price increase from the purchase price
9.  Maxim sold Biocept shares to institutions, institutions were aware that historically
    Biocept's share price would go down if they voted for the reverse split proposal
10. Institutions knew that Biocept would begin the dilution cycle by selling shares if the
    reverse split proposal was approved.
11. Short selling companies that reverse split their stock is very profitable

12. Maxim was sanctioned and fined by the SEC for facilitating illegal short sales for its institutional clients.

13. Sabby, who inexplicably bought 8.5 million shares in Biocept while stock markets around the world were collapsing was known to be a notorious short seller in companies that it bought shares in; after they dumped their holdings of course. The SEC action against Sabby and Sabby's owner Mintz is so severe that in addition to sanctions the SEC is seeking to put them out of business.

111.    Moreover, the evidence that Biocept's Director Defendants and executives intentionally committing fraud and violating securities laws is indisputable. That is not a conclusion or a legal theory. The SEC allegations, charges and sanctions sought against Maxim and Sabby involving illegal short selling micro cap stocks is a fact.

112.    As previously noted, prior to Maxim's institutional clients funding Biocept on March 2nd and March 4th, Biocept was reducing warrants to $0.29 to raise slightly $1 million. The preponderance of evidence, especially considering Maxim and the Director Defendants' history of violating security laws, would be that someone at Biocept tipped off Maxim that Biocept would announce they were entering COVID-19 testing.

113.    Moreover, Maxim would have the Court think that McCarthy issuing a rare after hours buy recommendation on Biocept's stock just hours Biocept issued an unlawful and delinquent press release on August 6th, which caused Biocept's stock to trade historic volume and have the largest single day price increase in its history was a coincidence or conclusionary. The timing of McCarthy's buy recommendation was to get eyeballs on Biocept's press release.

114.    Indeed, McCarthy issued another buy recommendation on Biocept's stock on August 17th, one day before the August 18th void vote for the reverse split. The timing can be directly linked to attempting to create buyers and volume on Biocept's stock to facilitate short sales because he knew it would be days before Biocept announced the results of the reverse split vote. Short sellers want to sell at the highest price possible and repurchase the shares at the lowest price possible.

## CBIZ CPAs, Nall, Kennedy And The Director Defendants Get Rewarded.

115.    On September 6th, 2020 the Biocept Director Defendants executed the unlawful reverse split. Shortly after Biocept's stock price collapsed to $0.40. Biocept had announced they were

co-developing a novel new COVID-19 and they were recording COVID-19 testing revenues greater tan they ever had with blood cancer screening and the stock price was trading at levels from the worldwide stock market crash in March of 2020. The share price collapse was a direct result of the unlawful and void reverse split.

116.    The Director Defendants next approved massive option grants to the executive management team at what they assumed to be low stock strike prices.

As previously noted, Biocept major reason for the reverse split was to reduce the outstanding shares to fund operations. Once Biocept was secured the ability to sell its shares, Biocept's unusual and incredibly rich compensation packages were assured. As previously stated, Nall's total 2020 compensation package increased to $1,783,405. Kennedy's compensation package was increased to $1,100,801. According to Sung, Nall only worked part-time and spent most of his time at home playing golf. His home was a few hours away. As previously stated, the Director Defendants earned high cash stipends, Hale as much as $100,000 a year. Chandler as much as $83,000. Arnold and Brown were able to keep their salaries and most likely received bonuses.

117.    CBIZ CPAs audit fees swelled from $297,000 to $632,194.00.

https://www.sec.gov/Archives/edgar/data/1044378/000119312522136763/d231051ddef14a.htm
Bair and Cain were able to continue to collect their high fees. The Directors

### The Plaintiff Discovers The Fraudulent Statement In The 10-Q

118.    On September 30th, 2020, the Plaintiff reviewed Biocept's second quarter 10-Q filing and saw the fraudulent statement. The Plaintiff notified Cain of the fraudulent statement in a lengthy email already entered as an exhibit. Cain never responded,

119.    Nall and Kennedy knowingly signed Biocept's second quarter 10-Q filing with the SEC, which contained fraudulent statements and material omissions. As previously noted, Biocept's Board of Directors, Kennedy, Brown, and Arnold, knew they were legally required to disclose the June 3rd agreement before any proxy vote occurred; they also knew they were legally required to file a Form 8-K with the SEC. Additionally, Biocept was legally required to attach the 8-K as an exhibit to the second quarter 10-Q filing. They purposely did not attach the

Development Agreement to the 10-Q because it would have shown the (a) date of the agreement,
and (b) that Biocept only had First Right of Refusal to commercialize the test.

> Audit Fees consist of fees billed for professional services performed by Mayer Hoffman McCann
> P.C., including out-of-pocket expenses. The amounts presented relate to the audit of our annual
> financial statements, the review of financial statements included in our quarterly reports on Form
> 10-Q, review of our registration statements on Forms S-1, S-3 and S-8, and related services that
> are normally provided in connection with statutory and regulatory filings or engagements.

120.    The Director Defendants, Kennedy, Brown, Arnold, Bair, CBIZ CPAs, and Cain knew
and willingly played a part in the fraudulent scheme to defraud investors. They attempted to
cover up the fraud by issuing the following false and fraudulent statement in two sections of the
report;

> **On June 3, 2020, the Company announced entering into a development agreement**
> with Aegea focused on the co-development by Biocept and Aegea of a highly sensitive
> PCR-based assay designed by Aegea for detecting the COVID-19 virus.

121.    On September 30th, 2020, the Plaintiff reviewed Biocept's second quarter 10-Q and saw
the fraudulent statement in the 10-Q. The Plaintiff notified Cain of the fraudulent statement in a
lengthy email already entered as an exhibit. Cain never responded,

122.    The Director Defendants, Kennedy, Brown, Arnold, Cooley, Bair, LHA, Cain, CBIZ,
CBIZ CPAs, and Aegea either committed fraud or substantially participated in the fraudulent
scheme to intentionally withhold material facts, violate security laws, and commit fraud.

123.    Nall and Kennedy knowingly signed Biocept's second quarter 10-Q filing with the SEC,
which contained fraudulent statements and material omissions. As previously noted, Biocept's
Board of Directors, Kennedy, Brown, and Arnold, knew they were legally required to disclose
the June 3rd agreement before any proxy vote occurred; they also knew they were legally
required to file a Form 8-K with the SEC. Additionally, Biocept was legally required to attach
the 8-K as an exhibit to the second quarter 10-Q filing. They purposely did not attach the
Development Agreement to the 10-Q because it would have shown the (a) date of the agreement,
and (b) that Biocept only had First Right of Refusal to commercialize the test.

124.    On or about September 24th, 2020, Plaintiff John Cesario began emailing Biocept
executives regarding concerns surrounding the vote for the reverse split. On September 29th,

2020, Biocept's investment representative responded to the Plaintiff's emails. Regarding the July 18th, 2020, press release, Defendant Cain wrote an email to the Plaintiff with the following statement;

> *"The stock split was to bring the company into compliance with the Nasdaq listing requirements."*

125. Cain, by virtue of her position and for all practical purposes was a defacto employee of Biocept. On the morning of September 30th 2020, the Plaintiff discovered the fraudulent statement in the COVID -19 section and the related transaction sections of the 10-Q report filed with the SEC that fraudulently stated that; *"On June 3rd, 2020, the Company announced entering into a development agreement with Aegea focused on the co-development by Biocept and Aegea of a highly sensitive PCR-based assay designed by Aegea for detecting the COVID-19 virus."*

126. The fraudulent statement was just one of many concerns the Plaintiff did had, as he did not know if that fraudulent statement was a mistake or actual fraud. The Plaintiffs email was also forwarded to Sung, the Director Defendants, and the executive management team.

127. On September 30th, Sung responded to reading the Plaintiff's September 30th email to Biocept with the following messages;

- **"They NEVER announced June 3rd."**

- **"also fraudulent if they didn't go to all shareholders re reverse""**

- He's (Nall) just not CEO material"

- "They don't care about shareholders. They don't care about PATIENTS. They don't care about innovation."

- "Everything you found is publicly available! Nall doesn't want to believe shareholders are smart and do good research."

128. Nall, Hale, Huebnar, Gerhardt, Royston, Wilson, Kennedy, Arnold, Brown, Cain, Bair, CBIZ CPAs audit team, and Fanucchi knew that Biocept were legally obligated to file a Notice of Non Reliance On Financial Statements and correct the SEC violations. They did not.

129. The Plaintiff continued to email the Director Defendants and Cain during October. On October 7th, he emailed Huebnar. Huebnar abruptly resigned on October 15th and Biocept did

not file his resignation letter. On October 8th, the Plaintiff served Biocept a Notice to Preserve
Evidence. On October 1st, 2nd, and 7th, the Plaintiff sent Cain three more emails without a reply.

130.    The Plaintiff tracked all emails, and there is a record of the time, date, and how many
times the emails were opened. Biocept did not take any steps to correct the SEC violations, even
though they were legally required to do so. On October 15th, 2020, Samuel Riccetelli was
appointed to the Board of Directors and served on Biocept's Audit Committee.

131.    Sung stopped communicating with the Plaintiff at the end of October 2020 after the
Plaintiff informed her that Arnold, a senior vice president at Biocept and the controlling person
at Aegea, was just as guilty of fraud as the Biocept Director Defendants.

### Biocept's Third Quarter 10-Q Filed November 16th 2020

132.    On November 16th, 2020, Biocept filed its third quarter 10-Q with the SEC. The Director
Defendants, Kennedy, Brown, Arnold, Bair, CBIZ CPAs, and Cain knew and willingly played a
part in the fraudulent scheme to defraud investors. By November 2020 Bair, Cain, and Biocept's
Director Defendants and and executives had opened the Plaintiffs emails hundred of time. The
Director Defendants, Nall, Gerhardt, Hale, Wilson,, Royston and Riccitelli (Huebnar had quit the
Board), along with Kennedy, Brown and Arnold were legally obligated to file a Notice of Non
Reliance On Financials with the SEC, and correct the violations of security laws. Bait=r was
legally required to report the fraud and security law violations. Cain was legally obligated to act.
The CBIZ CPAs audit team legal obligations, after discussing the SEC violations and fraudulent
acts with the audit Committee, were legally obligated to act, including resigning as auditor.
Instead of correcting the fraudulent statement in the August 10-Q, they doubled down on
covering up the fraud by once again issuing the following false and fraudulent statement in two
sections of the report;

> **On June 3, 2020, the Company announced entering into a development agreement**
> with Aegea focused on the co-development by Biocept and Aegea of a highly sensitive
> PCR-based assay designed by Aegea for detecting the COVID-19 virus.

133.    On December 20th, 2020, the Plaintiff read Biocept's November 16th 10-Q and realized
that Biocept had not corrected the filing. The Plaintiff sent an [4]email titled "Bair Auditor Fraud"
to Bair (6), Cain (95), Kennedy (6), Arnold (3), Nall (2), Hale (5), and Sung (41).

CBIZ CPAs, Nall, Kennedy and the Director Defendants Get Rewarded.

## **Fraud Claims**

134.    Under Rule 9b and the PSLRA, the Plaintiff has claimed who, what, when, where, and
how the Defendants violated fraud and fraudulent scheme, common law fraud, constructive
fraud, intentional misrepresentation, and violations of California Corporations Code §25400 and
§25401.

135.    To recap the Plaintiff's claims sounding in fraud and fraud on the market schemes;

1.  The Biocept Directors and Defendants Nall, Hale, Royston, Arnold, Wilson Gerharst,
    Huebnar, Kennedy, Brown, conducted a fraud on the market scheme from at least 2016 to
    2023 intentionally misrepresenting the ownership and rights under the Switch Blocker
    patent. The scheme was to artificially inflate Biocept's share price. Defendants CBIZ
    CPAs, Fanucchi, Cooley and Bair knew about this scheme, and rendered substantial
    assistance to the Defendants violating the Exchage Act, and aided, abetted the Defendants
    in the State tort allegations.

2.  The Biocept Directors and Defendants Nall, Hale, Royston, Arnold, Wilson Gerharst,
    Huebnar, Kennedy, Brown, conducted a fraud on the market scheme from at least June
    3rd 2020 until 2023 regarding the co-development of a COVID-19 test. Defendants CBIZ
    CPAs, Fanucchi, Cooley and Bair knew about this scheme, and rendered substantial
    assistance to the Defendants violating the Exchage Act, and aided, abetted the Defendants
    in the State tort allegations. Bair drafted the Development Agreement and was the
    attorney representing Biocept before the Securities and Exchange Commission.
    Defendants Nall, Hale, Royston, Arnold, Wilson Gerharst, Huebnar, Kennedy, Brown
    intentionally withheld disclosing the Development Agreement during a proxy period,
    which is fraud through concealment. Fraud vitiates everything, the June 5th shareholder
    meeting was void, as was all the adjournmants and voting thereof. The initial motive to
    conceal the Development Agreement was because Nall, Hale, Royston, Arnold, Wilson

---

[4] The number in parenthesis indicate how many times the emails were opened.

Gerharst, Huebnar, Kennedy, Brown realized that Biocept did not obtain the requisite
votes to approve a reverse split. The reverse split was needed to reduce the authorized
shares so that Biocept had shares to sell to fund its operational losses, which included
large executive compenstauion packages. Biocept's half-truth stated reason for the
reverse split was to cure a NASDAQ $1.00 minimum bid defeciency. If the Development
Agreement was released on or about June 3rd, Biocept's stock price more likely than not
would have closed over $1.00 a share for 10 consecutive business days, negating the
half-truth reason Biocepts directors gave for making a reverse split a proposal on the
2020 proxy, and for their subsequent urging voters to approve the proposal.

    a.   Defendants CBIZ CPAs, Fanucchi, Cooley and Bair knew that Biocept was
violating proxy voting laws, other Excahnge Act laws and fraud and stood silent
despite having a varying legal obligations to act.

    b.   Maxim and jason McCarthy aided and abetted Biocept in fraud, and aided and
abetted Biocepts Directors and Defendants in violating their fiduciary duties.
Maxim held broker non-votes which abstained from voting for the reverse split
proposal three times. Upon belief that Maxim was induced to vote the broker non
votes in favor of the reverse split, Maxim was tipped off as to the date of August
6th date in which Biocept would issue an unlawful press release. On the 5th
Biocepts share volume swelled and MCCartht issued a late night buy
recommendation on Biocept. On the 6th, it is believed that Maxim sold most if
not all the broker non vote shares it held. On the 18th Maxim voted the broker
non votes were cast in favor of teh reverse split. It is upon belief, that Maxim then
facilitated short sells in Biocept driving the price down Maxim manipulated
Biocept's share price lower.

    c.   As sedsribed above, Aegea was a willing offered substantial assistance in both
fraud on the market schemes.

    d.   The schemes and the illegal VOID reverse split caused Biocept's stock to drop
significantly, almost to alltime lows.

3. As noted, fraud vitiates everything. The annual meeting was void and the reverse split was void.

136. On or about December 20th, 2020, the Plaintiff began emailing Biocept's auditor, CBIZ CPAs, and Biocept's outside attorney, Defendant Bair. Bair is a Partner at the law firm Cooley. Cesario's emails went to high-ranking CBIZ CPAs Partners, CBIZ CPAs general council Bill Mann, and former CEO Andy Burczyk. The emails contained information on fraud, security law violations, and market manipulation. Plaintiff Cesario's emails to Bair and MHM also included links to the emails sent to Biocept's executives and Board of Directors.

137. How the Defendants acted after the violations were exposed also speak to scienter. CBIZ CPAs General Council Bill Mann, former CEO Adrew Burczyk and current CEO Andrew Gragnani partnered with and aided and abetted the Biocept Directors in covering up the fraud. The CBIZ CPAs Partners listed below became active participants in the cover up. Former General Counsel Michael Gleespen and current CEO Jerome Grisco were contacted, they covered up the fraud and security law violations. It is upon belief that the CBIZ Board of Directors were notified of the security law violations and fraudulent acts committed by the CBIZ CPAs audit team, and they covered up what really appears to be a criminal RICO case. CBIZ Board members include, Rick L. Burdick, Michael H. DeGroote, Richard Marabito, Kathy Raffa, A. Haag, ShermanTodd, J. Slotkin, and Benaree Wiley.

138. The CBIZ Board of Directors first sought to dismiss this action by stating that CBIZ did not have any business being in this lawsuit. The Plaintiff informed the Court that CBIZ has stated in 10 years af audited annual reports filed with the SEC that the CBIZ CPAs (formerly Mayor Hoffman Mccann P.C.) are the employees of CBIZ, and CBIZ sete the policies for the auditors. The CBIZ CPAs have CBIZ domain emails, work out of CBIZ offices and share in CBIZ employee retirement plans. The CBIZ Board of Directors must have known that they then stated that the ten tears of CBIZ annual reports should not be relied upon,

> An SEC disciplinary action found CBIZ to be responsible for the CBIZ CPAs auditing business. https://www.sec.gov/files/litigation/admin/2014/34-73224.pdf

139. The CBIZ Board of Directors do not care about the $1 billion dollars that they were active participants in defrauding the investing public.

140.    The same can be said for Cooley. A Cooley Partner, Charles Bair, was an active
participant in degrading the public over 1 billion dollars. Cooley has not taken any disciplinary
action against Bair. The Plaintiff is not drawing wild legal conclusions, the evidence is in SEC
filings, public press releases, prospectuses and Registarion statements.

## Additional Scienter

141.    Scienter is a frame of mind, or intent. As noted above, the unlawful actions of the
Defendant Directors. Aegea, Arnold, Kennedy, Brown and the failure to correct the errors show
scienter. Cooley, CBIZ, CBIZ CPAs, LHA, and Cain's participation in the unlawful acts are
evidence of scienter. The fact that they violated their legal responsibilities from PCAOB or SEC
laws, even after being notified are evidence of scienter,

142.    After the Plaintiff sold his stock for a loss, the Defendants continued their illegal acts, in
fact, one could say they ratcheted up their illegal acts like they were on steroids.

### Biocept Issues Its 2020 Annual Report

143.    On April 4th, 2021, Biocept issued its annual 10-K. The wording regarding the June 3rd
Agreement contained a material change;

> **From**: "**On** June 3rd, 2020, the Company announced entering into a development
> agreement."

> **To**: "**In** June 2020, we entered into a development agreement with Aegea
> Biotechnologies, Inc.

144.    The change in wording was another intentional attempt to cover up the fraud and
violations of security laws committed by the Biocept Directors, Arnold, Kennedy and Brown.
and CBIZ CPAs' previous fraudulent scheme, hoping that the eight months that had passed would
slip by investors' attention. CBIZ CPAs knew it violated Security laws and PCAOB Rules when
it gave Biocept qualified, "clean" audit reports on Biocept's 2020 financial statements and
internal control over financial reporting, including in its quarterly and annual report SEC filings
that contained false material statements, fraudulent statements, material omissions when The
June 3rd Agreement was signed.

145.    Biocept's 2020 annual report was signed by Nall, Kennedy, Hale, Gerhardt, Royston, Wilson, and Riccitelli. Each of the above knew that the annual report was "unclean". Once again, CBIZ CPAs, CBIZ, Cooley, Fanucchi, Cain, and Bair became "active" participants with the Defendants Nall, Kennedy Gerhardt, Riccitelli, Royston, Hale, Brown, Wilson, and Arnold in; (a) covering up the past frauds and security law violations and (2)  committing new frauds and security law and rule violations. Moreover, CBIZ CPAs continued to intentionally violate PCAOB rules.

To recap, Biocept's 2019 audited annual report;

- Failed to File an 8-K for disclosing the December 2019 disclosing the amended Aegea cross-licensing agreement

- Failed to Attach the amended Aegea cross-licensing agreement to the annual 2019 annual report filed in April 2020.

- Failed to disclose that the blood testing patent was co-wned with Aegea and that Aegea only had the rights to 4 oncology samples.

To recap, Biocept's 2020 audited annual report;

- Failed to file a Form 8-K disclosing the June 3, 2020 Agreement

- Failied to correct the issuance of a deficient, unlawful, and misleading press release on August 6th, 2020

- Failed to add the June 3rd Agreement as an exhibit in the company's 2020 10-Q's and 10-K

- Failed to file a Form 8-K disclosing the Aegea and Biocept amending the cross licenses agreement regarding Switch Blocker

- Failed to add the amended cross-licensing agreement as an exhibit.

- Failed to file an 8-K on the COVID-19 test supply agreement with Aegea

- Failed to add the Aegea supply agreement as an exhibit in the 2020 annual report and future SEC disclosures.

- Failed to identify that the Biocept Director Defendants, Kennedy, Brown and Arnold held a void annual shareholder meeting and vote on June 5th 2020, because they committed common law fraud, constructive fraud and fraud intentionally withholding a material agreement for the voting stakeholders.

- Failed to identify that the Biocept Director Defendants, Kennedy, Brown and Arnold held void shareholder reconvened meetings on Jult 1st, July 31st and August 18th.

- Failed to identify the the August 18th 2020 vote to approve the proposed reverse split proposal, which was the only item on the agenda, was void due to fraud.

- Failed to identify that the shareholder vote approving CBIZ CPAs as Biocept's auditor for 2020 was void.

- Failed to identify that the 2020 reverse split was not just unlawful, but void.

- Failed to disclose that the blood testing patent was co-wned with Aegea and that Aegea only had the rights to 4 oncology samples.

146.    Biocept's 2020 annual report was signed by Nall, Kennedy, Hale, Gerhardt, Royston, Wilson, and Riccitelli. The CBIZ CPAs audit team, CBIZ, Cooley, Bair, LHA, and Cain continued to violate their legal obligations under that law and because of that they allowed Biocept, the Director Defendants, Arnold, Kennedy and Brown to continue defrauding the investing public.

147.    On April 8 th 2022, just 3 days after the unclean audited 2021 annual report was issued Biocept filed a supplemental prospectus seeking to raise $10,219, 945 dollars. The supplemental prospectus. The first paragraph of the supplemental prospectus states; We previously entered into a Controlled Equity Offering SM  Sales Agreement, or Sales Agreement, with Cantor Fitzgerald &amp; Co., or Cantor, relating to shares of our common stock, $0.0001 par value per share, offered by a prospectus supplement dated May 12, 2021 (File No. 333- 237837), or the Prospectus Supplement, and the accompanying prospectus dated May 8, 2020, or the Prospectus. In accordance with the terms of the Sales Agreement, we may offer and sell shares of our common stock having an aggregate offering price of up to $25.0 million from time to time through or to Cantor, acting as sales agent or principal, pursuant to the Prospectus Supplement and the Prospectus.

    https://www.sec.gov/Archives/edgar/data/1044378/000156459021027178/bioc-424b5.htm

See Cooley letter,

    *https://www.sec.gov/Archives/edgar/data/1044378/000119312522100531/d353600dex51.htm*

See Director defendant letter

    *https://www.sec.gov/Archives/edgar/data/1044378/000119312522100531/d353600ds8.htm*

The supplemental prospectus still incorporated Biocept's 2020 8-K and 2020 10-K. The

prospectus also contained fraudulent statements concerning the Covid-19 test;

> In June 2020, we entered into a development agreement with Aegea Biotechnologies, Inc., or Aegea, focused on the co-development by us and Aegea of a highly sensitive PCR-based assay designed by Aegea for detecting the COVID-19 virus. Pursuant to the development agreement, we receive compensation for development services performed based on time and materials expended. In February 2021, we entered into a supply agreement with Aegea for the PCR-based COVID-19 assay kit. Under the supply agreement, Aegea will supply the COVID-19 assay kit to us for validation in our high-complexity molecular clinical laboratory that is certified under the Clinical Laboratory Improvement Amendments of 1988, or CLIA, and licensed by the California Department of Public Health, and accredited by the College of American Pathologists, or CAP, and subsequent commercialization of a laboratory developed test, or LDT.

148.    Biocept failed to disclose that the controlling person at Aegea and Sr. VP at Biocept was fired and that the company had abandoned the COVID-19 test. Biocept once again was fraudulently leveraging COVID-19 using the COVID-19 test to raise capital.

## VI.    LOSS CAUSATION - $197,000

149.    Plaintiff's Exhibit A is a record of the Plaintiff's Biocept's stock purchases. Had the Plaintiff known that Biocept was engaged in multiple fraud on the market shemes he would not have purchased Biocept's stock. The Plaintiff would have allocated the funds used to purchase Biocept shares to purchasing stock options in Biontek and Pfizer, who were developing vaccines. The Plaintiff did take proceeds of the Biocept sales and purchase options in both companies. The Plaintiff's return was 10x to 20x on those options. Had the Plaintiff purchased those options sooner, instead of investing in Biocept shares, the Plaintiffs returns would have been much greater. Plaintiff computes lost opportunity at a minimum of $2,000,000. Plaintiff incurred attorney fees of $187,000 from this matter. The Plaintiff also seeks pre and post judgement interest. As the record shows, the Plaintiff made a small purchase on Augsut 3rd after Biocept announced COVID-19 testing. Most of the Plaintiffs purchases wre after the August 6th unlawful press release. The Plaintiffs final sales were in November.

150.    The Plaintiff first purchased shares of Biocept in April because they announced Covid testing. Those shares were sold for a $319 loss and not included in the damages. As the record shows, the Plaintiff made a small purchase on Augsut 3rd after Biocept announced COVID-19 testing. Most of the Plaintiffs purchases wre after the August 6th unlawful press release. The Plaintiffs final sales were in November.

151.    The price chart below shows the significant drop in price in Biocept's shares that can be conclusively linked to the fraudulent reverse split vote and subsequent unlawful and void execution of the reverse split.

152.    Biocept's share price never recovered, despite COVID-19 testing revenues rising and the announcement that they were developing a novel new COVID-19 vaccine. As chart 2 shows, Cesario would not have purchased shares had he known Biocept's history of SEC violations and fraud. CBIZ MHM & CBIZ MHM LLC was supposed to make sure that Biocept's filings were accurate, but instead they participated in breaking security laws and deceiving Biocept shareholders. Cesario bought more shares after Biocept announced it was co-developing a new novel and revolutionary COVID-19 test with Aegea. Cesario also placed his trust in the proxy, specifically focusing on the section that states Biocept cannot carry out a reverse split. Between COVID-19 testing and Biocept announcing  it was co-developing a novel and revolutionary COVID-19 test, the company would have had ample time to cure the NASDAQ deficiency.

| Date | Closing Price | Pre-Split Closing Price (Historical) |
|------|---------------|--------------------------------------|
| August 6th | $342 | **$1.14** |
| August 7th | $309 | $1.03 |
| August 8th | $333 | $1.11 |
| August 11th | $300 | $ 1.00 |
| August 12th | $306 | $1.02 |
| August 13th | $303 | $1.01 |
| August 14th | $270 | $0.90 |
| August 17th | $252 | $0..84 |
| August 18th | $273 | $0..91 |
| August 24th | $195 | $0.65 |
| REVERSE SPLIT | On  SEPT 8th | |
| September 8th | $118 | $0.39 |
| September 11th | $108 | **$0.36** |

153.    As the chart from stocksplits.com shows, in less than 9 years Biocept's stock price,
adjusted for the reverse splits, had an actual high of $85, 860.00. Biocept's stock price just prior
to this action being filed was $0.43. As previously noted, investors in Biocept were defrauded
over $1 billion from the timeframe the Plaintiff was involved, The Plaintiff did not try to
compute how much the investing public was defrauded prior to his purchasing shares. While
investing in biotechs and microcaps is risky, the narrative that Biocept presented that they solely
owned valuable patents to detect early cancer through blood testing and that they were
developing a novel Covid-19 that was more accurate than other tests on the market.
See; https://www.stocksplithistory.com/?symbol=BIOC





154.    **THIS ACTION IS TIMELY FILED** Plaintiffs fraud based claims are within
California's three year discovery rule. The Exchange Act claims are within two tears of the
Plaintiff discovering all of the elements to bring this action. The Plaintiff did not discover that
the proxy contained false and misleading statements or that the reverse split was void ab initio
until January 2022.

## VII  CLAIMS FOR RELIEF

### First Claim for Relief Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

(Against Biocept, Nall, Kennedy, Hale, Royston, Gerhardt, Huebnar, Arnold, Brown and Wilson)

155.    Paragraphs 1 through 154 are realleged and incorporated by reference.

156.    Defendants directly or indirectly, singly or in concert with others, in connection with the
purchase or sale of any security, with scienter, using the means or instrumentalities interstate
commerce, or of the mails, or of a facility of a national securities exchange: (a) employed
devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and
omitted to state material facts necessary in order to make the statements made, in the light of the
circumstances under which they were made, not misleading; and/or (c) engaged in acts,
practices, and courses of business which operated or would have operated as a fraud or deceit
upon others, including, but not limited to engaging in the fraudulent scheme described herein,
including the knowing or recklessness

(a) Made false and misleading statements in the 2020 proxy as described herein
(b) Withheld material information from proxy stakeholders
(c) Conducted fraudulent void fraudulent shareholder meetings on June 5th, july 1st, July
31st and August 18th 2020
(d) Fraudulently obtained shareholder approval for the 2020 reverse split
(e) Executed a fraudulent void reverse split
(f) Conductor a fraud on the market scheme to obtain a everes split

157.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 9a-c)thereunder

### Second Claim for Relief Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

(Against CBIZ, CBIZ CPAs, Fanucchi, Bair, Cooley, Cain LHA, Aegea)

158.    Paragraphs 1 through 157 are realleged and incorporated by reference.

Defendants directly or indirectly, singly or in concert with others, in connection with the purchase or sale of any security, with scienter, using the means or instrumentalities interstate commerce, or of the mails, or of a facility of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon others, including, but not limited to engaging in the fraudulent scheme described herein, including the knowing or recklessness

(g) Acted as secondary actors in assisting sections (a0 through (f) in paragraph

159.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 9a-c)thereunder

### Third Claim for Relief Fraud California California Civil Code CIV § 1572

(Against Biocept, Nall, Kennedy, Hale, Royston, Gerhardt, Huebnar, Arnold, Brown and Wilson)

160.    Paragraphs 1 through 159 are realleged and incorporated by reference.

Defendants directly harmed the Plaintiff through their fraudulent acts, including

(h) Concealing the material June 3rd 2020 agreement with Aegea

(i) Fraudulently obtaining shareholder approval for a reverse split on Augsut 18th 2020

(j) Fraudulently executing a Reverse split on September 6th 2020

*See; Hardisty v. Moore, 6 F.Supp. 3d 1044, 1052 (S.D. Cal. 2014) (quoting Small v. Fritz Cos., Inc., 30 Cal.4th 167, 173, 132 Cal.Rptr.2d 490, 65 P.3d 1255 (Cal.2003)), as well as constructive fraud, which arises on a breach of a duty by one in a confidential or fiduciary*

*relationship to another and which induces justifiable reliance by the latter to his prejudice. See Tyler v. Children&#39;s Home Soc&#39;y, 29 Cal.App.4th 511, 548, 35 Cal.Rptr.2d 291 (Cal.Ct.App.1994); In re Harmon, 250 F.3d 1240, 1249 (9th Cir.2001)*

By reason of the foregoing, Defendants committed fraud

### Fourth Claim for Relief Deceit California California Civil Code CIV § § 1709

(Against Biocept, Nall, Kennedy, Hale, Royston, Gerhardt, Huebnar, Arnold, Brown and Wilson)

162.  Paragraphs 1 through 161 are realleged and incorporated by reference.

   (k) Concealing the material June 3rd 2020 agreement with Aegea

   (l) Fraudulently obtaining shareholder approval for a reverse split on Augsut 18th 2020

   (m) Fraudulently executing a Reverse split on September 6th 2020

**§ 1710 defines Deceit as** *A deceit, within the meaning of the last section, is either: 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,4. A promise, made without any intention of performing it.*

By reason of the foregoing, Defendants committed deciet

### Fifth Claim for Relief for Constructive Fraud California California Civil Code CIV § 1573

(Against Biocept, Nall, Kennedy, Hale, Royston, Gerhardt, Huebnar, Arnold, Brown and Wilson)

163.  Paragraphs 1 through 162 are realleged and incorporated by reference.

164.  Defendants directly harmed the Plaintiff through their fraudulent acts, including

   (n) Concealing the material June 3rd 2020 agreement with Aegea

   (o) Fraudulently obtaining shareholder approval for a reverse split on Augsut 18th 2020

   (p) Fraudulently executing a Reverse split on September 6th 2020

*"In its generic sense, constructive fraud comprises all acts, omissions and concealments involving a breach of legal or equitable duty, trust, or confidence, and resulting in damages to another. [Citations.] Constructive fraud exists in cases in which conduct, although not actually fraudulent, ought to be so treated - that is, in which such conduct is a constructive or quasi*

*fraud, having all the actual consequences and all the legal effects of actual fraud."(Prakashpalan, supra, 223 Cal.App.4th at p. 1131.)*

By reason of the foregoing, Defendants committed constructive fraud

### Sixth  Claim for Relief Concealment. Civil Code Section 1710

(Against Biocept, Nall, Kennedy, Hale, Royston, Gerhardt, Huebnar, Arnold, Brown and Wilson)

155.    Paragraphs 1 through 164 are realleged and incorporated by reference.

(q) Concealing the material June 3rd 2020 agreement with Aegea

(r) Fraudulently obtaining shareholder approval for a reverse split on Augsut 18th 2020

(s) Fraudulently executing a Reverse split on September 6th 2020

*[F]alse representations made recklessly and without regard for their truth to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered.' " (Engalla, supra, 15 Cal.4th at p. 974, quoting Yellow Creek Logging Corp. v. Dare (1963) 216 Cal.App.2d 50, 55 [30Cal.Rptr. 629].*

### Seventh Claim for Relief Violations of California Corporation Code § 25400

(Against Nall, Kennedy, Hale, Royston, Gerhardt, Huebnar, Arnold, Brown and Wilson)

156    Paragraphs 1 through 155are realleged and incorporated by reference.

(t) Concealing the material June 3rd 2020 agreement with Aegea

(u) Fraudulently obtaining shareholder approval for a reverse split on Augsut 18th 2020

(v) Fraudulently executing a Reverse split on September 6th 2020

### Eigth  Claim for Relief Violations of California Corporation Code § 25401

(Against Biocept, Nall, Kennedy, Hale, Royston, Gerhardt, Huebnar, Arnold, Brown and Wilson)

(w) Concealing the material June 3rd 2020 agreement with Aegea

(x) Fraudulently obtaining shareholder approval for a reverse split on Augsut 18th 2020

(y) Fraudulently executing a Reverse split on September 6th 2020

### Ninth Claim for Relief Section Aiding and Abetting

(Against CBIZ, CBIZ CPAs, Fanucchi, Bair, Cooley, Cain LHA, Aegea)

157. Paragraphs 1 through 156 are realleged and incorporated by reference.

158.    Defendants directly harmed the Plaintiff through their fraudulent acts, including;

The Defendants aided and abetted Biocept and Biocept Directors in Committing

(z)    Concealing the material June 3rd 2020 agreement with Aegea

(aa)    Fraudulently obtaining shareholder approval for a reverse split on Augsut 18th 2020

(bb)    Fraudulently executing a Reverse split on September 6th 2020

(cc)    Aidede and Abetted Biocepts Executives and Directors in Violating their fiduciary duties

### Tenth Claim for Relief Violations Violations Of Fiduciary Duties

(Nall, Kennedy, Hale, Royston, Gerhardt, Huebnar, Arnold, Brown and Wilson)

Paragraphs 1 through 158 are realleged and incorporated by reference.

The Defendantstheir fiduciary duties by

(dd)    Concealing the material June 3rd 2020 agreement with Aegea

(ee)    Fraudulently obtaining shareholder approval for a reverse split on Augsut 18th 2020

(ff)    Fraudulently executing a Reverse split on September 6th 2020

### VIII. Plaintiff requests a Jury Trial

### XiV.    Relief Sought

WHEREFORE, Cesario prays that the Court enter judgment on his behalf based on the allegations herein, adjudging and decreeing that the Defendants are liable for the Counts claimed herein:

A.    Cesario recovers damages plus interest;

B.    Cesario recovers all costs of this suit, including reasonable attorneys fees, past and future, as provided by law;

C.    Cesario should receive punitive damages of $250 million or an amount determined by the jury in accordance with the law;

D.    Cesario shall be allowed to amend this Complaint, if necessary;

E.      The Court issues an order requiring Biocept to restate past disclosures with the Securities and Exchange Commission that contain false statements and/or half-truth disclosures, as it is in the best interest of the public and required by security laws;

Cesario receives such other and further relief as may be just and proper.

Respectfully submitted, this 9th of March  2025.

_____ 3/9/2025

John Cesario

PO BX 655

East Lyme, CT 06333

860-333-4300

johncesario9@gmail.com

EXHIBIT A

## Biocept Buys & Sells

| Quantity | Sold Acquired | Disposed | Proceeds | Cost Bassis | Profit / Loss |
|---|---|---|---|---|---|
| 2,000,000 | 8/3/2020 | 8/19/2020 | 1665.92 | 1527.2 | 138.72 |
| 500,000 | 8/3/2020 | 8/19/2020 | 416.48 | 385 | 31.48 |
| 850,000 | 8/3/2020 | 9/14/2020 | 3,229.83 | 7,140.08 | -3910.25 |
| 850,000 | 8/3/2020 | 9/14/2020 | 3412.57 | 7,276.25 | -3863.68 |
| 850,000 | 8/3/2020 | 9/14/2020 | 6,544.99 | 3,357.58 | -3,357.58 |
| 546,000 | 8/3/2020 | 9/18/2020 | 2,414.89 | 4,966.10 | -2,551.21 |
| 304,000 | 8/3/2020 | 9/18/2020 | 1,344.56 | 2,765.03 | -1,420.47 |
| 2,709 | 8/3/2020 | 11/17/2020 | 11,998.95 | 20,938.05 | -8,939.00 |
| 1,037 | 8/3/2020 | 11/17/2020 | 4,863.30 | 8,207.73 | -3,344.43 |
| 291 | 8/3/2020 | 11/17/2020 | 1,291.96 | 2,249.41 | -957.43 |
| 0 | 8/3/2020 | 11/17/2020 | 1.39 | 2.32 | -93.00 |
| 1,408 | 8/3/2020 | 11/17/2020 | 6,545.49 | 11,141.77 | -4,596.28 |
| 2,555 | 8/3/2020 | 11/17/2020 | 12,007.93 | 20,222.50 | -8,214.57 |
| 400 | 8/17/2020 | 9/14/2020 | 1,519.92 | 3,485.24 | -1,965.32 |
| 110 | 8/17/2020 | 9/14/2020 | 412.49 | 899.91 | -487.42 |
| 321 | 8/17/2020 | 9/14/2020 | 1,288.75 | 2,972.58 | -1,683.83 |
| 400 | 8/17/2020 | 9/14/2020 | 1,605.92 | 3,549.32 | -1,943.00 |
| 400 | 8/17/2020 | 9/14/2020 | 1,499.96 | 3,205.20 | -1,705.24 |
| 110 | 8/17/2020 | 9/14/2020 | 441.63 | 994.54 | -552.91 |
| 112 | 8/17/2020 | 9/14/2020 | 449.66 | 999.74 | -550.08 |
| 112 | 8/17/2020 | 9/14/2020 | 425.58 | 981.80 | -556.22 |
| 890 | 8/17/2020 | 9/14/2020 | 3,337.41 | 7,288.21 | -3,950.80 |
| 1,000.00 | 8/17/2020 | 9/14/2020 | 3,749.89 | 8,400.00 | -4,650.11 |
| 890 | 8/17/2020 | 9/14/2020 | 3,381.82 | 7,911.30 | -4,529.48 |
| 112 | 8/17/2020 | 9/14/2020 | 419.99 | 903.39 | -483.40 |
| 321 | 8/17/2020 | 9/14/2020 | 1,219.72 | 2,921 | -1,701.42 |
| 388 | 8/17/2020 | 9/14/2020 | 1,557.74 | 3,469 | -1,911.10 |
| 890 | 8/17/2020 | 9/14/2020 | 3,573.16 | 8,053.88 | -4,480.72 |
| 112 | 8/17/2020 | 9/14/2021 | 419.98 | 976.00 | -558.94 |
| 388 | 8/17/2020 | 9/14/2020 | 1,557.74 | 3,468.84 | -1,911 |
| 890 | 8/17/2020 | 44,088.00 | 3,573.16 | 8,053.88 | -4,480.72 |
| 110 | 8/17/2020 | 9/18/2020 | 417.98 | 976.92 | 558.94 |
| 388 | 8/17/2020 | 9/18/2020 | 1,454.96 | 3,135.04 | -1,680.08 |
| 388 | 8/17/2020 | 9/18/2020 | 1,474.32 | 3,406.00 | -1,932.00 |
| 890 | 8/17/2020 | 9/18/2020 | 3,936.36 | 8,530.22 | -4,594.00 |
| 110 | 8/17/2020 | 9/18/2020 | 486.52 | 1,053.41 | -566.89 |
| 112 | 8/17/2020 | 9/18/2020 | 496.00 | 1,059.68 | -564.00 |
| 679 | 8/17/2020 | 11/17/2020 | 3,003.14 | 6,246.87 | 3,243.73 |
| 388 | 8/17/2020 | 11/17/2020 | 1,716.15 | 3,676.50 | -1,960.00 |
| 321 | 8/17/2020 | 11/18/2020 | 1,419.74 | 3,144.38 | 1,724.64 |
| 400 | 8/17/2020 | | 1,769.00 | 3,763.00 | 1,994.25 |

| | | | | | |
|---|---|---|---|---|---|
| 118 | 8/17/2020 | | | | |
| 1,882.30 | 8/17/2020 | 11/18/2020 | | | -466.58 |
| 360 | 8/17/2020 | 11/18/2020 | 522.73 | 989.00 | -7,433.00 |
| 797 | 8/17/2020 | 11/18/2020 | 8,338.18 | 15,781.20 | 1,352.00 |
| 843 | 8/17/2020 | 11/18/2020 | 1,598.79 | 2,951.00 | -2,953.79 |
| 500 | 8/18/2020 | 11/18/2020 | 3,587.68 | 6,541.47 | -3,114.68 |
| 100 | 8/18/2020 | 11/18/2020 | 3,801.74 | 6,916.42 | -1,941.00 |
| 900 | 8/18/2020 | 11/18/2020 | 2,248.54 | 4,189 | -368.97 |
| 138 | 8/18/2020 | 11/18/2020 | 451.00 | 820 | -3,397.10 |
| 250 | 8/18/2020 | 9/14/2020 | 3,986.98 | 7,384.08 | -655.51 |
| 105 | 8/18/2020 | 11/18/2020 | 517.49 | 1,173.00 | 1,019.28 |
| 207 | 8/18/2020 | 11/18/2020 | 1,105.00 | 22,125.00 | -404.00 |
| 138 | 8/18/2020 | 11/19/2020 | 488.22 | 892.50 | -881.86 |
| 1,086 | 8/18/2020 | 11/19/2020 | 877.64 | 1,759.51 | -698 |
| 414 | 8/14/2020 | 11/19/2020 | 585.09 | 1,283.41 | -5,396.57 |
| 80 | 8/18/2020 | 11/19/2020 | 4,810.74 | 10,207 | -2,052.54 |
| 419 | 8/20/2020 | 11/19/2020 | 1,841.47 | 3,894.00 | -399.93 |
| 1,000 | 8/20/2020 | 9/24/2020 | 351.99 | 751.92 | 2,098.17 |
| 1,000 | 8/20/2020 | 11/19/2020 | 1,846.59 | 3,894.01 | 3,726.98 |
| 700 | 8/20/2020 | 11/19/2020 | 4,399.78 | 8,126.76 | -3943 |
| 1,500 | 8/21/2020 | 11/19/2020 | 4,399.78 | 8,343 | -2,455 |
| 350 | 8/24/2020 | 11/19/2020 | 3,078.85 | 5,535.34 | -5,502 |
| 300.3 | 8/24/2020 | 9/24/2020 | 6,599.68 | 12,101.70 | -786.88 |
| 1,399 | 8/24/2020 | 11/25/2020 | 1,483.92 | 2,270.80 | -756 |
| 500 | 8/24/2020 | 11/25/2020 | 1,328.93 | 2,077.78 | -3526.14 |
| 300 | 8/24/2020 | 11/25/2020 | 6,158.38 | 9,684.52 | -1,282.36 |
| 3,000 | 8/25/2020 | 11/25/2020 | 2,199.89 | 3,482.25 | -746.53 |
| 2180 | 8/31/2020 | 11/25/2020 | 1,328.93 | 2,075.70 | -10,041.05 |
| 1052 | 8/31/2020 | 11/25/2020 | 13,199.35 | 23,240.40 | -5,541.92 |
| 100 | 8/31/2022 | 11/25/2020 | 9,592.85 | 15,134.77 | -2652.96 |
| 1468 | 8/31/2020 | 11/25/2020 | 4,649.60 | 7,302.56 | -253.17 |
| 200 | 8/31/2020 | 12/1/2020 | 440.99 | 694.16 | -3,716.71 |
| 750 | 9/3/2020 | 9/24/2020 | 6,473.56 | 10,190.27 | -467.66 |
| 2000 | 9/3/2020 | 7/7/1902 | 3,179.84 | 1,386.24 | -1,185.15 |
| 555 | 9/4/2020 | 9/24/2020 | 8,479.57 | 4,364.99 | -3,920.43 |
| 110 | 9/4/2020 | 9/24/2020 | 2,353.08 | 12,400 | -211 |
| 125 | 9/4/2020 | 9/24/2020 | 470.78 | 2,564 | -40.72 |
| 9.7 | 9/4/2020 | 9/24/2020 | 536 | 511.5 | -42.63 |
| 1000 | 9/4/2020 | 9/24/2020 | 41.51 | 578 | -4.08 |
| 4,800 | 9/4/2020 | 9/24/2020 | 4,239.79 | 45.59 | -673 |
| 7,293 | 9/4/2020 | 12/1/2020 | 22,080.31 | 4,913 | -4037.87 |
| 103 | 9/4/2020 | 12/1/2020 | 33,400.33 | 26,118.18 | -6280.51 |
| 716 | 9/8/2020 | 9/14/2020 | 391.38 | 39,680.84 | -75.23 |
| 1084 | 9/8/2020 | 9/14/2020 | 2,874 | 466.61 | -727 |
| 800 | 9/8/2020 | 9/14/2020 | 4,118.98 | 3,408.46 | -887.65 |
| | 9/8/2020 | 9/14/2020 | 3,039.84 | 4,986 | -592 |
| | | | | 3,632.09 | |

| | | | | | |
|---|---|---|---|---|---|
| 3,925 | 9/8/2020 | 9/14/2020 | 14,914.20 | 17,820.31 | -2906 |
| 3925 | 9/8/2020 | 9/14/2020 | 16,798 | 19,391 | -2592 |
| 716 | 9/8/2020 | 9/14/2020 | 3,064 | 3,791.67 | -727 |
| 103 | 9/9/2020 | 9/14/2020 | 440.82 | 543.88 | -103 |
| 93 | 9/8/2020 | 24-Sep | 398.00 | 492.00 | -98.98 |
| 368 | 9/8/2020 | 9/24/2020 | 1,574.98 | 1,840.00 | -265 |
| 707 | 9/8/2020 | 9/24/2020 | 3,025.81 | 3,492.80 | -466.99 |
| 200 | 9/9/2020 | 9/10/2020 | 803.96 | 792.00 | 11.96 |
| 1084 | 9/9/2020 | 9/14/2020 | 4,129.81 | 4,293 | -163 |
| 800 | 9/9/2020 | 9/14/2020 | 3,095.91 | 3,168 | -72 |
| 103 | 9/9/2020 | 9/14/2020 | 399.62 | 408.00 | -8.26 |
| 101 | 9/9/2020 | 9/14/2020 | 405.49 | 399.96 | 5.53 |
| 3,925 | 9/9/2020 | 9/14/2020 | 15,188 | 15,543 | -354 |
| 1213 | 9/15/2020 | 9/16/2020 | 5,676.57 | 5,519 | 157 |

($197,213)